

# Collective Bargaining

# Agreement

# For

# Painters District Council

# No. 30

# May 1, 2004

# Through

# April 30, 2008



Collective Bargaining

Agreement

For

Painters District Council

No. 30

May 1, 2004

Through

April 30, 2008

## INDEX

## ARTICLES OF AGREEMENT

This Agreement is effective this first day of May, 2004 by and between Painters' District Council No. 30, International Union of Painters and Allied Trades, AFL-CIO, (hereinafter referred to as the "Union") and the present and future members of the FCA of Illinois (hereinafter referred to as the "Association"), its successors and assigns, each employer which has assigned to the Association the authority to represent it for collective bargaining purposes, and such other employers who become signatory to this Agreement (hereinafter collectively referred to as the "Employers").

## ARTICLE 1.
## PURPOSE AND INTENT

The parties' express purpose and intent is to promote and improve the relationship between Employers, the Union and the employees subject to this Agreement, to facilitate peaceful and orderly adjustments of grievances and disputes, to enter into contractual relations with respect to wages, hours of work and other conditions of employment to be faithfully observed by all parties.

1

The parties recognize their respective responsibility for and mutual interest in continuity of employment, gained through efficient service to the customer and sincere fulfillment of their obligations to the public in promoting the best interest of the painting, decorating and drywall industry.

## ARTICLE 2
## THE PARTIES

Section 2.1    The Union is acting on behalf of all of its present and future affiliated Local Unions and as the sole and exclusive bargaining agent of all employees in the Bargaining Unit. The Union's geographical jurisdiction is the counties of: Boone, Bureau, DeKalb, DuPage, Ford, Fulton, Hancock, Iroquois, JoDaviess, Kane, Kankakee, Kendall, LaSalle, Lee, Livingston, Marshall, Mason, McDonough, McHenry, McLean, Ogle, Peoria, Putnam, Schuyler, Stark, Stephenson, Tazewell, Winnebago, and Woodford and any other geographical jurisdiction that the International Union of Painters and Allied Trades may grant to the Union.

Section 2.2    The Association, and its successors and assigns, represents that it has the legal authority under its governing documents to act as the sole and exclusive bargaining agent

2

for all of its present and future members, and their successors and assigns, as well as for those employers which have assigned to the Association the authority to represent the employer for collective bargaining purposes, and their successors and assigns (hereinafter collectively referred to as "Employer"). The Union recognizes the Association as the sole and exclusive bargaining agent for all such Employers. Every Employer shall remain bound to the Agreement as amended thereafter in future negotiations with the Association unless timely written notice is given to the Union and the Funds of its withdrawal from membership in the Association.

Section 2.3    A non-member of the Association which has not previously assigned to the Association the authority to bargain on its behalf may become bound by this Agreement and all references to the Association or Employer shall be considered as referring to and including that non-member.

Section 2.4    Notwithstanding any other term or provision set forth in this Agreement or a written assignment of bargaining authority, every Employer bound to this Agreement agrees that if a majority of the members of the FCA of Illinois, in accordance with the Association's by-laws, vote to transfer or assign the Association's authority to represent

3

its members, and those Employers which have assigned to the Association the authority to represent the Employer for collective bargaining purposes, to any other association, then all references to the FCA of Illinois set forth in this Agreement or any related document shall automatically be changed to read the name of the association.

## ARTICLE 3
## RECOGNITION

Section 3.1    The Association and its members/Employers agree that all work generally recognized as coming within the jurisdiction of the painting, decorating and drywall finishing industry shall be assigned to employees working under this Agreement. The Bargaining Unit work to be performed by journeymen, apprentice painters, decorators, applicators, paperhangers, drywall tapers, drywall apprentices, and apprentice applicants shall include, but not be limited to, the application of all painting and decorating finishes and the operation of all equipment used in the performance of such work, including sandblasting equipment; the erection, moving and dismantling of all scaffolding, as has been customary; the operation of compressors, lifts or any other equipment related to Bargaining Unit

4

work; and all preparatory work incidental to the above work. The term "painting and decorating finishes", as used herein, includes painting, decorating, paperhanging, and the application and removal of any and all types of wall covering including all soft roll wall coverings goods; the finishing of wood, metal or other surfaces; the application of insulating and acoustical materials; the application of wet film waterproofing coatings and all other coatings for decorative and protective purposes; the taping, surfacing and finishing of drywall surfaces; and any work that is necessary to remove any paint due to the application of material by any method, any sandblasting by-products due to any sandblasting method, or any removal of paint or sandblasting residue.

Section 3.2    The Employer agrees to recognize and deal with the Union's elected or appointed representatives, at a reasonable time, at every location at which the Employer performs any work. The Employer agrees to permit the Union's representatives to visit its shops (upon reasonable notice) and job sites during working hours for the purpose of inspecting lists of employees, payroll records, insurance certificates, and time cards in order to determine if the Employer is complying with this Agreement and with federal law.

5

Section 3.3    The Secretary-Treasurer of the Union, or his designee, may appoint shop or job stewards. Stewards shall be selected at the sole discretion of the Secretary-Treasurer. If a steward is appointed from outside the Employer's workforce, the Employer shall place the steward on the job. The steward must be a qualified mechanic in work performed by the Employer and shall be a working steward. If there is a work slowdown, the steward shall be the last employee employed. If an Employer's work load does not require employees, the Secretary-Treasurer shall remove the steward until the Employer hires any employee to perform Bargaining Unit work. In no event shall any steward be considered an agent of the Union. If an Employer is not satisfied with the work performance of any steward, the Employer may request a replacement by notifying the Union's Secretary-Treasurer in writing.

### ARTICLE 4
### UNION SECURITY

Section 4.1    (a) All employees in the Bargaining Unit must during the term hereof, as a condition of employment, maintain their membership in the Union.

(b) Current employees shall be required as a condition of continued

employment to become members of the Union on the eighth (8) day following the effective date of this Agreement. Employees hired after the effective date of this Agreement and covered by this Agreement shall be required, as a condition of continued employment, to become members of the Union on the eighth (8) day following the beginning of their employment.

Section 4.2    The Employer agrees to check off from each employee's wages special administrative dues in the amount of two (2%) percent of gross wages in each payroll period plus twenty cents ($.20) per hour paid assessment for the Union's organizing and defense fund and will remit such sums to the Union in accordance with Article 9, provided the employees in question have signed a valid authorization card authorizing such deduction.

The Employer further agrees that at the time it employs any Bargaining Unit employee the Employer will submit to each such employee, for his voluntary signature, a dues deduction authorization card in triplicate, one copy of which shall be returned to the Union. The form will be supplied to the Employer by the Union.

The Employer further agrees that each month it will submit a list of all employees covered by the Agreement who have failed to sign a dues deduction authorization card,

6

7

together with the numbers of hours each such employee was paid.

Section 4.3   The Union agrees to indemnify and hold the Employer harmless against any and all claims, demands, suits or other forms of liability, exclusive of attorneys' fees and costs, which may arise out of or by reason of any actions taken or not taken by the Employer for purpose of complying with a specific direction of, or notice from, the Union regarding any provision of this Article.

## ARTICLE 5
## THE UNION'S GEOGRAPHICAL JURISDICTION - WORK OUTSIDE AREA

Section 5.1   The Employer's principal place of business and employment shall be considered within the jurisdiction of the Union. An Employer may undertake Bargaining Unit work in other counties and areas, on which occasions the Employer employs additional employees who are members of affiliated Local Unions outside the Union's jurisdiction. In recognition of these facts, it is agreed that:

(a) This Agreement shall embrace, and the Union shall be the exclusive bargaining representative for and on behalf of, all the employees employed by such Employer, wherever and whenever employed during the term of this Agreement.

(b) The Employer, when engaged in work outside the Union's geographical jurisdiction, shall employ not less than fifty percent (50%) of the workers employed on such work from among the residents of the area where the work is performed, or from among persons who are employed the greater percentage of their time in such area; any others shall be employed only from the Employer's home area.

(c) The Employer shall, when engaged in work outside the Union's geographical jurisdiction, comply with all of the lawful clauses of the collective bargaining agreement in effect in said other geographical jurisdiction and executed by the employers in the industry and the affiliated Local Unions in that jurisdiction, including, but not limited to, the wages, hours, working conditions, fringe benefits, and procedure for settlement of grievances set forth therein; provided, however, that as to employees employed by such Employer from the Local Unions within the Union's geographical jurisdiction and who are brought into an outside jurisdiction, such employees shall be entitled to receive the wages and conditions effective in either the Union's or the outside jurisdiction, whichever are more

8

9

favorable to such employees, and fringe benefit contributions on behalf of such employees shall be made solely to the Funds in accordance with the Funds' governing documents. This provision is enforceable by the Local Union or District Council in whose jurisdiction the work is being performed, both through the procedure for settlement of grievances set forth in its applicable collective bargaining agreement and through the courts, and is also enforceable by the Union, both through the procedure for settlement of grievances set forth in this Agreement and through the courts.

Section 5.2    An Employer shall not attempt to engage in any work covered by this Agreement in any area outside the geographical jurisdiction of the Union through the use or device of a joint venture with another employer or contractor in the outside area, unless such use or device is not for the purpose of taking advantage of lower wages or conditions that are in effect in the home area of the other employer.

Section 5.3    There shall be no priority given for employment opportunities to any person because of membership in the Union nor shall there be any discrimination on the basis of race, color, sex, age, handicap, or national origin.

10

# ARTICLE 6
## HOURS OF WORK - HOLIDAYS

Section 6.1    (a) The normal work week shall be Monday through Friday.

(b) The normal work day shall be eight (8) hours, excluding one-half (fi) hour for lunch, between the hours of 7:00 a.m. and 3:30 p.m.

(c) For residential repainting only, a work day shall be eight (8) hours, excluding one-half (fi) hour for lunch, and may have a starting time of either 7:00 a.m. or 8:00 a.m.

Section 6.2    The Legal Holidays are: New Year's Day, Memorial Day (as designated by the federal government), Independence Day, Labor Day, Thanksgiving Day, and Christmas Day. When any Legal Holiday falls on Sunday, the Monday following shall be observed. When any Legal Holiday falls on Saturday, the Friday preceding shall be observed. No work shall be performed on any Legal Holiday, except in extreme emergencies, such emergencies to be determined solely by the Union.

Section 6.3    A permit must be secured for overtime or work on Saturday, Sunday or a Holiday. The request must be submitted to the Union's Secretary-Treasurer twenty-four (24) hours in advance, or within four (4) hours of a request to the Employer, whichever is later.

11

Section 6.4    An Employer may, with the employee's agreement, schedule that employee for a make-up day on a Saturday, at regular pay, only if that employee missed a full day of work (Monday through Friday) as a result of weather or the employee's voluntary absence from work but not because of a Holiday. The scheduling of a make-up day shall not be for the Employer's scheduling convenience. This provision shall not affect the employee's right to Holiday pay or premium pay for "off-hours" work or for hours worked in excess of eight (8) in a day or forty (40) in a week.

Section 6.5    There shall be an allowance of five (5) minutes for wash-up time in each one-half (1/2) day's work. There shall be a thirty minute unpaid lunch break at the half way point of the day.

Section 6.6    (a) Any employee required to report to a job site or shop (including supply houses) who is subsequently directed to a different site, different supply house, or to the shop shall be paid from the time the employee first reported to a job site, supply house or to the shop.

(b) Employees shall not report to the shop, supply house or job more than fifteen (15) minutes before the seven (7:00) or eight (8:00) starting time, as the case may be.

12

Section 6.7    When an employee works a fractional part of a day, he shall be paid for no less than one-half (fi) of a day's work, except in cases when an employee quits voluntarily or when weather conditions prevent a continuation of his employment.

Section 6.8    An employee who reports for work at the regular starting time shall be paid regular Journeymen's wages for two (2) hours when no work is provided for him. However, this provision shall not apply if work is not available because of weather conditions.

Section 6.9    The Employer shall report, in writing to Painters District Council NO. 30, all job sites where Collective Bargaining Unit work is to be performed, including the name of the job site and the location of the job site, prior to the commencement of work. Failure to adhere to this Article will be subject to Article 13 of this Agreement.

## ARTICLE 7
## WORKING TOOLS AND CONDITIONS

Section 7.1    (a) No Employer shall require or permit an employee to use in oil paint a brush which exceeds four and one-half (4fi) inches in width.

(b) Water emulsion paints such as rubber base, acrylic resins or paints of that type

13

shall not be applied with a brush which exceeds six (6) inches in width.

Section 7.2    The use of the dip type roller applicator is permitted on all work. However, (1) the roller surface shall not exceed nine (9) inches from one end of the roller to the other, except for applying coatings on floors in which case a 19" roller is permissible; (2) the diameter of the roller, including the nap or cover, shall not exceed three (3) inches unwrapped, except when the roller applicator is used in painting wire fences or wire window guards, in which cases the diameter of the roller, including nap and cover, shall not exceed four and one-half (4fi) inches unwrapped; and (3) the paint container into which the roller applicator is dipped shall not contain more than three and one-half (3fi) gallons of paint.

Section 7.3    (a) Spray work shall be permitted for any number of coats required on all doors and frames. Spraying of finish coats of any kind shall be permitted provided that the first coat on all surfaces is back rolled unless that surface is impractical to brush or roll.

(b) An Apprentice may operate a spray gun only during the last eighteen (18) months of the apprenticeship.

(c) State of Illinois health and safety laws must be complied with and shall be strictly enforced. Employees may not be discharged for refusing to operate a spray machine or equipment due to lack of skills or knowledge. If an employee refuses to operate a spray machine or equipment due to lack of skills or knowledge, the employee shall submit to the next available journeyman upgrading class for skill enhancements for spray painting. An employee shall not be discharged for refusing to operate a spray machine or equipment due to any physical impairment.

(d) For all applications of materials above the permissible exposure limit, the Employer at its own expense shall furnish to all employees working above the permissible exposure limit an appropriate respirator.

(e) When using spray equipment with flammable material, the spray equipment shall be grounded to prevent ignition from a spark from static electricity.

(f) Employees using spray equipment shall be instructed in the safety aspects of the proper use and care of the required safety equipment.

Section 7.4    (a) When solvents, including organic solvents, caustics, corrosives, acids, detergents and toxins are used, disposable protective clothing, protective gloves, eye and face protection, and protective skin creams shall also be furnished.

(b) Appropriate signs warning others of the fire and respiratory dangers present shall be

14

15

posted in all areas where the above materials are used.

Section 7.5   The Employer shall at all times provide proper lighting for employees.

Section 7.6   (a) The Employer shall provide proper ventilation on all painting and drywall finishing jobs and supply the employees with appropriate personal protective spray equipment such as, but not limited to, masks, hoods, shields, air filters, respirators and cartridges.

(b) The Employer will replace all personal respirators and related equipment when said equipment is found to be worn beyond repair or unsafe for continued use.

(c) If the personal respirator is lost, the employee is liable to replace such respirator. If the employee does not replace the respirator, the Employer may purchase the identical respirator and deduct such cost from the employee's next pay check.

(d) No Employer may deduct any money from an employee's pay for a personal respirator not returned if the employee has filed a police report indicating such respirator was stolen.

Section 7.7   The Employer hereby agrees:

(a) that drop cloths and rags shall be furnished to workmen in a sanitary condition;

(b) that employees may use gloves at work when the employee considers it necessary;

(c) that employees, while at work, shall be permitted sufficient time for inspection of ladders, scaffolding and for sanitary conditions of employment;

(d) The lead man may order any necessary material which may be required on the job for that days work at the Employer's expense.

Section 7.8   (a) Painter employees shall furnish the following tools: grip, assorted scrapers up to six (6) inches in width, five gallon bucket opener, wire brush, spinner, assorted screwdrivers, duster, hammer, nail set, wrench, vice-grips, razor blade holder, pencils and pliers. Paperhangers shall furnish ruler, smoother, seam roller, and level. An employee shall not be required to furnish any tool not specifically listed herein.

(b) The Employer shall furnish all tools not set forth in (a) above and all materials, sandpaper, dust masks, floor scrapers, and scaffolding.

Section 7.9   (a) The Employer shall provide all employees who perform drywall finishing with machine tools with a register number of each tool. The Employer shall list, in writing, each register number and tool description. The list shall be given to each employee to review at the time such machine

16

17

tool(s) are issued. The machine tool(s) shall be in good working order. Each employee shall examine the tool list and, if accurate, each employee shall acknowledge receipt of the tool(s) by signing on the tool list. No employee shall refuse to acknowledge an accurate and complete list. Each employee shall be responsible for all stolen, lost or mislaid machine tools for which the employee has signed.

(b) If, upon the Employer's request, an employee does not return any machine tool(s) for which employee has acknowledged receipt thereof, the Employer may deduct the reasonable cost of such machine tool(s) from the employee's next regular paycheck.

(c) Upon termination of employment, each employee shall return all machine tools. If an employee fails within five (5) days of termination to return any such tool(s) for which employee has acknowledged receipt thereof, the Employer may deduct the reasonable cost of such machine tool(s) from the employee's final paycheck.

(d) No Employer may deduct any money from an employee's paycheck for tools not returned if the employee has filed a police report indicating such tool(s) were stolen.

Section 7.10    (a) The Employer agrees that no employee shall be required to use any poisonous material or material injurious to the employee's health, such as wood alcohol, varnish remover, oxalic acid, or to perform the sanding of lead or other dangerous materials, unless they are protected by respirators and gloves furnished to them by the Employer. Prepared liquid paint and varnish removers shall be of the non-flammable type. This shall not apply to the use of other liquids or solvents or other methods.

(b) Where lead is used, the Employer shall furnish hot water, soap, and towels to employees.

Section 7.11    (a) In accordance with the requirements of the Occupational Safety and Health Act of 1970, as amended, it shall be the Employer's responsibility to ensure the safety of its employees and compliance by employees with any safety rules, standards and regulations contained in federal or state law or established by the Employer. Nothing in this Agreement shall make the Union liable to any employee or to any other person in the event that work-related disease, sickness, death, injury or accident occurs.

(b) The Employer shall not file or assert a claim against or engage in any litigation against the Union on a subrogation theory, contribution theory, or otherwise, in connection with any work-related disease, sickness, death, injury, or accident.

18

19

Section 7.12   Employees are prohibited from carrying any material, scaffold or tools exceeding one hundred (100) pounds to or from jobs.

Section 7.13   Any building in which work is performed between November 1 and April 1 shall be heated.

Section 7.14   The Employer agrees that it shall comply with all applicable federal and state laws concerning worker's compensation, including all applicable standards, rules, and regulations issued pursuant thereto.

Section 7.15   The Employer shall at all times provide safe tools, materials, equipment, and working conditions.

Section 7.16   (a) If an employee covered by this Agreement sustains an accidental injury in the course of his employment which requires immediate medical care off the premises, during work hours, such employee shall be permitted to obtain medical care at once. The employee shall be paid his regular wages for that day, not to exceed eight hours, for the time necessarily spent in going to and from a physician's office, medical center, or hospital, as well as the time required to obtain the appropriate medical care. Except in unusual circumstances, this provision shall be effective only on the date of the injury, unless subsequent visits, during working hours, are required by the Employer's physician for independent medical examination.

(b) If an injured employee needs to be taken to a medical care facility following an injury, he shall be taken to the nearest appropriate medical facility from the job site at the Employer's expense.

(c) The job steward or lead man shall be immediately notified of all injuries. If the steward or lead man determines that someone should accompany the injured employee to the hospital, medical center, physician's office or, later, to the employee's home, the Employer shall select such person, who shall be compensated at his regular rate for such services. If the Employer fails to select such person promptly, the steward or lead man shall select such person.

(d) If an employee is injured in the course of his employment, he shall not be dismissed from such employment because of his injury, nor shall he be dismissed during the period of medical care required by the injury, unless there is no work available with his Employer, or unless his dismissal is due to a condition beyond the control of the Employer. This paragraph shall not obligate Employer to pay an employee while the employee is disabled.

(e) The Union shall be notified by the Employer within seventy-two (72) hours

20

21

following any reportable injury falling within the scope of this Article.

Section 7.17    All Journeymen and Apprentices including tapers and painters shall be required to wear either white overalls or white pants and whenever possible present a neat and clean appearance.

Section 7.18    Notwithstanding any other provision, every Employer shall be obligated to abide by and comply with any applicable OSHA regulation or standard.

# ARTICLE 8
## WAGE RATES

Section 8.1    (a) The Union and the Association shall establish various "Wage Zones" within the Union's jurisdiction, as set forth in Appendix G, as a basis for determining the wages that will prevail in each Zone. When any Bargaining Unit Employee works in any Zone, the Employee shall receive the higher of (1) the hourly wage rate for the Zone in which the employee's Local Union is chartered (the "Employee's Home Zone") (see Appendix B through F) or (2) the hourly wage rate for the Zone where the work is being performed.

Section 8.2    (a) Effective May 1, 2004, the regular minimum wage for Journeymen Painters and Tapers working in the

Union's jurisdiction shall be $32.23 per hour in Zone A; $28.10 per hour in Zone B and $25.30 per hour in Zone C.

(b) Effective May 1, 2005, the total regular minimum wage rate and fringe benefit contributions for Journeymen Painters and Tapers working in the Union's jurisdiction shall be increased by $2.20 per hour for work in Zone A and $1.95 per hour for work in Zones B and C. This amount shall be allocated by the Union between wages and fringe benefits.

(c) Effective May 1, 2006, the total regular minimum wage rate and fringe benefit contributions for Journeymen Painters and Tapers working in the Union's jurisdiction shall be increased by $2.40 per hour for work in Zone A and $2.05 per hour for work in Zones B and C. This amount shall be allocated by the Union between wages and fringe benefits.

(d) Effective May 1, 2007, the total regular minimum wage rate and fringe benefit contributions for Journeymen Painters and Tapers working in the Union's jurisdiction shall be increased by $2.60 per hour for work in Zone A and $2.15 per hour for work in Zones B and C. This increase shall be allocated by the Union between wages and fringe benefits.

(e) During the life of this Agreement, all Apprentices and Apprentice Applicants shall

22                                             23

receive their proper percentage of Journeymen wages based on the applicable wage rate.

Section 8.3    (a) The regular rate of wages for all Foremen shall be the Journeymens' rate plus one dollar ($1.00) per hour.

(b) the regular rate of wages for all General Foremen shall be the Journeymens' rate plus two dollars ($2.00) per hour.

(c) a regular Foreman shall be appointed after eight (8) or more Journeymen or Apprentice employees have been employed on one particular job site.

(d) A General Foreman shall be appointed after sixteen (16) or more Journeymen or Apprentice employees have been employed on one particular job site.

Section 8.4    All work performed outside the normal work day or the adjusted work day , in accordance with Article 6.1 (b), shall be considered as overtime and shall be paid at one and one-half (1fi) times the employee's regular rate.

Section 8.5    All work performed in industrial and commercial buildings only after 3:30 p.m. or before 7:00 a.m. Monday to Friday inclusive until 7:00 a.m. Saturday, shall be paid at the rate of nine (9) hours of pay for eight (8) hours worked. If less than eight hours of work is performed during this period, each employee shall be paid at the premium rate one (1) extra

24

hour of pay above the number of hours actually worked. The Employer shall report all such work to the Union at least twenty-four (24) hours before the work begins or be subject to the procedures of the Joint Trade Board. If such notice is not given, all work performed shall be paid at time and one-half (1fi) the employee's regular rate.

Section 8.6    If an employee works more than eight (8) hours in a day, premium pay of time and one-half (1fi) shall be paid for each hour worked after eight (8) hours. All work on Saturday, Sunday, and Holidays, if permitted pursuant to Article 6.3, shall also be at time and one-half (1fi) the employee's regular rate (subject to Article 6.4, for Saturday makeup).

Section 8.7    (a) The Employer shall establish and maintain a weekly payday which shall be Friday, not later than the ending time of the normal work day. Payment of wages is to be made on the job site or, if prior arrangements have been made and agreed to by the Union, the employees and the Employer, such payments may be made at the Employer's principal place of business, by electronic transfer or mailed to the employee. All employees shall be paid by negotiable check for all work performed up through and including the Wednesday night preceding said payday.

25

(b) Each employee shall be furnished with a detachable check stub showing the Employer's business name, the employee's name or social security number, total straight time hours, overtime hours, the ending date of the pay period, the total amount due, and all itemized deductions. The Employer shall (as shown on the pay stub) conform with federal law pertaining to the payment of Social Security. It shall be a violation of this Agreement for an Employer to issue any check other than a payroll check for compensation earned under this Agreement.

(c) Employees shall be required to fill out time sheets. The time sheet will contain the employee's name, all regular straight time hours worked, all overtime hours worked, the day and month in which the work was preformed, and the location of the job site. The time sheet must by completed by the employee and signed by the employee. If the employee is not capable of completing a time sheet it may be completed by another Bargaining Unit Member. The employee must sign or apply his/her mark to the time sheet. All time sheets must be kept by the Employer for six (6) years. The time sheet must be turned into the Superintendent, General Foreman or Foreman on the job site by the end of the working day for which the pay period ends. If there is no Superintendent, General Foreman or Foreman on the job site, the

26

Employer must make arrangements for the time sheets to be picked up on the job site or allow the time to be called into the shop no later than 10:00 a.m. the day following the end of the pay period. If no time sheet is turned in the Employer is not obligated to pay the employee until the following payroll period. The employee will stand no loss of time for complying with this provision.

(d) An Employer, who requests or insists on having daily time sheets mailed in, shall furnish employees with sufficient stamped envelopes or funds to cover the expense incurred. The time on all time sheets and records shall be expressed in terms of the actual number of hours worked. Hours for which time and a half are to be paid shall be shown separately from the number of hours actually worked. Each employee shall make out and sign the time sheets or, if someone else makes out the time sheets for him, the employee shall sign his time sheets.

(e) Any Employer hiring Journeymen, Apprentices, or Apprentice Applicants to work between 3:30 p.m. Friday and 7:00 a.m. Monday (if Article 6.1(b) is in effect, between either 3:30 p.m. or 4:30 p.m. Friday and 7:00 a.m. or 8:00 a.m. Monday) for work only on that particular job, shall pay such employees on

27

or before 3:30 p.m., or the ending hour on the normal work day, of the following Friday.

Section 8.8    If an employee, the Union, or an employee benefit fund provided for under this Agreement is paid by a check which is returned for insufficient funds or because the account is closed or if an Employee does not receive full and proper wages for all hours worked, the Union shall withhold all employees from jobs until all wages, dues, and fringe benefit contributions due are paid by cashiers check or by certified check unless suitable payment terms have been established. Every such employee withheld shall be paid for all time withheld up to eight (8) hours per day until all wages, dues, and fringe benefit contributions due are paid by cashiers check or by certified check. If a check for wages, dues, or fringe benefit contributions is returned for insufficient funds or because the account was closed or if an Employer is delinquent to the Funds, then, at the sole discretion of the Union, the Employer shall be obligated to pay weekly, by cashiers check or by certified check, all wages, dues, and fringe benefit contributions due. The Employer shall be obligated to pay all attorneys' fees and costs incurred in collecting such sums that are due.

Section 8.9    A discharged employee shall be paid his full wages through and

28

including the hour of discharge. Payment must be made to the employee within twenty-four (24) hours after discharge, except when the discharge occurs on a Friday, Saturday, or Sunday, in which case the employee shall be paid by 3:00 p.m. on the following Monday. If the employee is not paid in accordance with this Section, the Employer shall pay the employee the regular hourly wage rate for each hour following termination of employment until payment is actually made.

Section 8.10    All reasonable costs for transportation, food and lodging shall be paid by the Employer when it is not practical for the employee to return to his usual place of residence each evening.

Section 8.11    When an employee files a workers' compensation claim and he is assigned by the Employer to light duty, the employee shall remain a member of the Bargaining Unit. The Employer shall pay to the employee the appropriate hourly wage rate and make contributions to all Benefit Funds set forth in Article 9 for all hours actually worked by the employee.

29

## ARTICLE 9
## BENEFIT FUNDS

Section 9.1 Each Employer bound by this Agreement, and its affiliates, agree to make contributions to the Painters' District Council No. 30 Health and Welfare Fund ("Health and Welfare Fund"), the Painters' District Council No. 30 Pension Fund ("Pension Fund"), the Painters' and Allied Trades District Council No. 30 Joint Apprenticeship and Training Fund ("Apprenticeship and Training Fund"), the International Union of Painters and Allied Trades Joint Apprenticeship and Training Fund ("International Apprenticeship Fund"), and the International Union of Painters and Allied Trades Union and Industry Pension Fund ("International Pension Fund"), (collectively the "Funds") in accordance with the terms of this Agreement and with the Agreements and Declarations of Trust ("Trust Agreements") under which each Fund is operated.

Section 9.2 (a) Effective May 1, 2004 the fringe benefit contribution due for each hour or portion thereof worked by an individual covered by this Agreement shall be in accordance with Appendixes A through F.

(b) Effective May 1, 2005 and each May 1 thereafter, the Union may in its sole discretion allocate a portion of the negotiated

increase to the above Funds. The Employers shall be notified of the allocation prior to May 1 of each year.

Section 9.3 (a) At all times, contributions and the completed monthly remittance report form (provided by the Funds) as required by this Article 9 shall be paid and remitted to the Painters' District Council No. 30 Funds' Office. If the Funds' monthly remittance report is not completed in its entirety, the report shall be considered delinquent. If appropriate, contributions shall then be directed by the Funds' Office on behalf of each employee to the employee benefit fund for the Employee's Home Zone. Notwithstanding the above, all contributions, if any, due to the International Pension Fund shall be remitted directly to the International Pension Fund.

(b) All contributions to the Funds shall be submitted with the Funds' remittance report forms with full, complete and accurate representations of the hours worked and the sums due for each employee.

(c) The contributions and remittance reports to the Funds shall be due as of the 15th day of the month after the month in which the work was performed, or on such other date as this Agreement may require. As of the due date, the contributions shall be considered the assets of each Fund.

**Section 9.4**   Each Employer adopts and agrees to be bound by each Fund's Trust Agreement, and as the Trust Agreement(s) may be amended hereafter, as fully as if the Employer was an original party thereto. The Employer hereby designates the Association Trustees named in the respective Trust Agreement, together with their successors, as its representatives on the Board of Trustees of each Fund. The Employer agrees to be bound by all actions taken by each Board of Trustees pursuant to the powers granted them by federal law or the respective Trust Agreements. The Employer recognizes that each Board of Trustees has the sole power to construe the provisions of the respective Trust Agreements, the respective employee benefit plans, and each Fund's rules and regulations, if any, and that all constructions, interpretations, and determinations made by the respective Trustees for their respective Funds shall be final and binding on all parties.

**Section 9.5**   The Employer shall contribute for each hour worked by any individual who performs any management, supervisory, or estimation services and any Bargaining Unit work. The amount of contributions due shall be presumed to be at least 140 times the then current hourly contribution rates for each month during which any such services were performed unless the

32

Employer provides with his monthly remittance report specific, credible evidence to the Trustees' satisfaction that the individual worked less than 140 hours. Receipt of any benefits provided for by the Funds shall not excuse the Employer's obligation to make contributions for hours worked in any capacity.

**Section 9.6**   If an Employer is delinquent in its contributions to any of the Funds for a period of seventy-two (72) hours, the Union shall be entitled to remove all Bargaining Unit employees from the shop or job in addition to seeking any other legal remedy it may have.

**Section 9.7**   Contributions not received by the due date shall be considered delinquent and shall be assessed the liquidated damages, interest, reasonable attorneys' fees and costs established by the Funds' Trustees. The Employer acknowledges that the liquidated damages are provided for by federal law and shall be used to defer administrative costs arising from the delinquency.

**Section 9.8**   (a) Each Employer shall furnish the Trustees with information such as the names of all subcontractors, affiliates, employees (by classification, craft and social security number), wages earned and hours worked by employees, the Employer's federal/state employer identification number, the Employer's business address (which shall not be

33

a P.O. Box), the principal corporate officer's or business owner's driver's license number, proof of the Employer's corporate status, proof of insurance or surety bonds as required by this Agreement, and such other information as may be required by the Trustees. Such information available at the time this Agreement is executed shall be provided within seven (7) days of execution; all other information shall be provided within seven (7) days of the Trustees' written request.

    (b) In addition, the Union and/or the Funds' Trustees shall have the authority to audit the Employer's books and records, including the books and records of affiliated employers, in accordance with the terms of the Funds' Trust Agreements. The Employer shall be responsible, in accordance with the terms of the Funds' Trust Agreements, for the costs of audit and for all attorneys' fees incurred if discrepancies are discovered.

    Section 9.9  (a) If an Employer employs a person or entity in violation of Article 16, the number of hours for which such Employer owes contributions to the Funds shall be computed by dividing the total dollar amount paid to such employees by the actual hourly wage rate paid, as determined by the Trustees.

    (b) If an Employer violates this Agreement by contributing on the basis of

34

piecework rather than contributing on the basis of hours worked, the compensation actually received by the employee will be divided by twenty-five percent (25%) of the applicable hourly wage rate in order to estimate the number of hours worked for which contributions are due.

    Section 9.10  In the event the Trustees of the Health and Welfare Fund, concurring with the recommendation of their consultant, determine additional contributions are needed for the Health and Welfare Fund, the Union shall give notice to contributing Employers that a certain portion of the wage rate negotiated in the Agreement shall be paid to the Health and Welfare Fund, and said portion contributed to the Fund shall lower the wage rate accordingly.

## ARTICLE 10
## APPRENTICESHIP AND TRAINING PROGRAM

    Section 10.1  (a) An Employer will be allowed to have one (1) Apprentice if at least one (1) Journeyman is employed. After the Employer employs four (4) Journeymen, the Employer will be allowed one (1) additional Apprentice; with eight (8) Journeymen, the Employer will be allowed an additional Apprentice; with each

35

additional four (4) Journeymen, an additional Apprentice will be allowed.

(b) Notwithstanding above, the ratio of Apprentice tapers to Journeymen tapers shall not exceed a one to one ratio.

Section 10.2　(a) Any Apprentice who works in the geographical jurisdiction of the Union shall be immediately enrolled in the Painters' and Allied Trades District Council No. 30 Joint Apprenticeship and Training Program ("Training Program") which is incorporated and made part of this Agreement. The Apprentice shall be required to attend the Training Program's next scheduled apprentice training class.

(b) Any Apprentice or Apprentice Applicant shall be enrolled in the Training Program effective with the applicant's date of hire.

(c) If an Employer has a contractual obligation to another apprentice program and fails to abide by the terms of this Section, the Employer shall nevertheless be obligated to the Funds set forth in Article 9 for all of the contributions required by this Agreement for each hour or fraction thereof that an Apprentice is paid by the Employer or attends the other apprentice program.

(d) An Employer shall provide, within seven (7) days of hiring, the Training Fund with the names and social security number of every

36

Apprentice and Apprentice applicant employed by the Employer.

Section 10.3　Except in the final year of his apprenticeship, no Apprentice shall be permitted to take charge of any job or to work on any job unless there is at least one Journeyman employed on the same job.

Section 10.4　From the Employer contributions set forth in Article 9, the Trustees of the Training Fund shall hold in trust the sum of five ($.05) cents per hour for each hour or portion thereof for which an employee received pay, and remit said sum to the International Apprenticeship Fund at such regular periods of time and in the manner and form as shall be determined by the Trustees of the International Apprenticeship Fund.

Section 10.5　(a) Before any Apprentice applicant can work in the Union's geographical jurisdiction, the Employer must obtain a permit from the Union for that Apprentice. If the permit is not obtained, the Apprentice applicant shall be considered a Journeyman for the purposes of wages and fringe benefits. Upon application to the Training Program, an Apprentice applicant shall be granted a thirty (30) day probationary period from date of employment during which time contributions to the Health and Welfare Fund, Industry Fund, Apprenticeship Fund, Pension Fund, Painters

37

District Council No. 30 dues check-off and Painters' District Council No. 30 Organizing and Defense Fund will not be required.

(b) Apprentice applicants shall be paid at the rate of forty (40) percent of Journeymen's wage rate for the first thirty (30) days of employment.

Section 10.6    The regular wage rate for Apprentices shall be the following respective percentages of the then current regular rate for Journeymen:

| | |
|---|---|
| 1st six months | 40% of Journeymen's wage rate |
| 2nd six months | 45% of Journeymen's wage rate |
| 3rd six months | 50% of Journeymen's wage rate |
| 4th six months | 55% of Journeymen's wage rate |
| 5th six months | 70% of Journeymen's wage rate |
| 6th six months | 85% of Journeymen's wage rate |
| Thereafter | 100% of Journeymen's wage rate |

## ARTICLE 11
## EMPLOYERS' INDUSTRY FUND

Section 11.1    Each Employer shall contribute the sum of one and one half percent (1.5%) of the gross wages of all employees in each payroll period and shall remit such sums to the Northern Illinois Painting and Drywall Institute ("Employers' Industry Fund") by the due date set forth in Article 9.

38

Section 11.2    The Trustees of the Employers' Industry Fund, and their successors, shall be appointed by the Association.

Section 11.3    Such contributions shall be applied for the purpose of promoting the painting, decorating and drywall industry in the area covered by this Agreement and shall not be used, directly or indirectly, to the detriment of the parties to this Agreement.

Section 11.4    The Employers' Industry Fund hereby established shall be administered by its Board of Trustees and said Trustees shall establish and maintain a Trust Fund, the terms of which are hereby accepted by the Employers signatory to this Agreement.

Section 11.5    The Employer agrees that a representative of its company will attend one (1) meeting of either the FCA of Illinois or the Northern Illinois Painting and Drywall Institute within twelve (12) months of executing this Agreement.

## ARTICLE 12
## INSURANCE AND SURETY BONDS

Section 12.1    Each Employer agrees to be bound by the provisions of the Illinois Workers' Compensation Act and the Illinois Workers' Occupational Disease Act and shall submit to the Union certificates of insurance

39

under the Acts or proof of self-insurance before commencing any work covered by this Agreement.

Section 12.2   Before commencing any work covered by this Agreement, the Employer shall provide a performance or surety bond, in the amount and under the terms set forth below, to insure the prompt and full payment of all contributions, dues/assessments, and wages due in accordance with Articles 4, 8, 9, and 11:

$10,000.  -  6 or fewer covered employees
$25,000.  -  7 but fewer than 13 covered employees
$50,000.  -  13 but fewer than 25 covered employees
$75,000.  -  25 or more covered employees

Section 12.3   The bond shall be in a form acceptable to the Union and the Association and shall:

(a) be written by an insurance carrier authorized, licensed, or permitted to do business in the State of Illinois; or

(b) be secured by a cash deposit of the full amount of such bond in an account maintained jointly by the Trustees of the Funds; or

40

(c) be secured by other assets or personal sureties acceptable to the Trustees which equal or exceed in value the full amount of the bond; or

(d) be secured by any combination of (a), (b), and/or (c) above.

Section 12.4   The Employer must maintain the bond (or other security arrangement acceptable to the Union) for the term of this Agreement and for a period of six months following the Agreement's termination. Any bond (or other security arrangement) must provide that it shall be payable on written demand by the Union.

Section 12.5   (a) If an Employer fails for any reason to satisfy the bonding requirement of this Article, the Employer or the Employer's corporate officials who are authorized to execute agreements or sign checks, or to designate the persons authorized to do so, shall be personally liable for the wages, dues/assessments, and fringe benefit contributions due under this Agreement or the Funds' Trust Agreements. This Section shall not relieve or excuse in any way any Employer of the obligation to provide the bond required by Article 12.2 nor shall this Section limit the personal liability of any Employer or corporate official based on state or federal law. An Employer shall be required to submit for an

41

audit any document required by this Agreement and shall provide such records as the Union considers necessary to enforce the provisions of this Agreement.

(b) notwithstanding any other provision in this Article, if the performance or surety bond is obtained and maintained in accordance with this Article and provided the Employer has completely and accurately reported and paid on a timely basis for all covered employees and hours worked under this Agreement, the Employer or the Employer's appropriate corporate officials shall not be personally liable for a delinquency as set forth in Article 12.5 (a).

(c) Article 12.5 (b) shall also apply to the extent that an Employer can establish that a subcontractor(s) has complied with the bonding and reporting obligations pursuant to Article 12.5 (b).

12.6. An Employer covered by the Illinois Unemployment Compensation Act ("IUCA") shall provide the Union with the Employer's IUCA identification number. An Employer not covered by the IUCA agrees to elect to be bound by the IUCA and shall be personally liable for the payment of IUCA benefits.

42

# ARTICLE 13
## JOINT TRADE BOARD

Section 13.1  The Union and the Association agree to establish and maintain a Joint Trade Board consisting of twelve (12) members with six (6) members and an alternate appointed by each party. All disputes and grievances shall be referred to the Joint Trade Board, unless as otherwise expressly provided for under this Agreement.

Section 13.2  The Joint Trade Board shall have the right to establish reasonable rules and regulations for its operation and such rules and regulations shall be binding upon all the parties.

Section 13.3  Three (3) members of the Joint Trade Board shall constitute a quorum, provided that at least one (1) member is representing each party to this Agreement. In the absence of any party's representatives or if there is a vacancy, that party shall be entitled to cast pro rata through the members present the votes of an absent member or vacant position so that at all times the votes of each party shall be equal. Any decision of the Joint Trade Board shall be final and binding upon every party and any signatory to this Agreement.

Section 13.4  (a) The officers of the Joint Trade Board shall be a Chairman and a

43

Secretary-Treasurer. One officer shall be a representative of the Union and the other officer shall be a representative of the Association.

(b) The Joint Trade Board shall meet once every quarter and at such other times during the year as the Chairman determines.

Section 13.5    If the Joint Trade Board finds that an Employer violated this Agreement, the Joint Trade Board is authorized to fashion, in its sole discretion, all appropriate remedies, including but not limited to, awarding actual damages to the aggrieved individual or entity, plus fines not to exceed one thousand dollars ($1,000.00) per violation, and assessing liquidated damages, interest, costs, reasonable attorneys' fees, administrative expenses, and auditing fees incurred by the Joint Trade Board. Such remedies and assessments shall also be imposed on the Employer if the Joint Trade Board, any party to this Agreement, or any entity enforcing its rights under this Agreement obtains judicial enforcement of the Joint Trade Board Award.

Section 13.6    If the Joint Trade Board deadlocks, all matters in dispute shall be referred to arbitration by either party. The complaining party may submit the matter to binding arbitration before the American Arbitration Association ("AAA") (Labor Dispute Rules) in Chicago. The decision of the arbitrator shall be final and binding. Each party

44

shall bear its own costs but shall share the costs of the arbitrator and of the AAA.

Section 13.7    If the Joint Trade Board finds that a member in good standing of Painters' District Council No. 30 violated this Agreement, Painters' District Council No. 30 shall have the duty to prefer charges against such member.

Section 13.8    If an Employer violates the provisions of Article 8 or Article 16, the Employer shall be required to provide a thirty thousand dollar ($30,000) bond for the life of the Agreement, in addition to any other bond which may be required. The Joint Trade Board shall meet within five (5) days of giving notice to an Employer charged with violating the above Articles.

Section 13.9    Each and every Employer and member of the Union pledges upon his honor not to break the rules and regulations embodied herein, which have been promulgated for the improvement and betterment of the entire organized painting, decorating and drywall industry in the jurisdiction of Painters' District Council No. 30, and, furthermore, each shall recognize it to be their duty to report immediately to the Trade Board, in writing, any facts, and facts only, pertaining to any violation of the Agreement.

45

## ARTICLE 14
## MISCELLANEOUS

Section 14.1   The Employer shall give notice to the Union in writing not later than ten (10) days after the occurrence of any of the following events relating to the Employer, occurring after the date hereof:

(a)   formation of partnerships;

(b)   termination of business;

(c)   change of name commonly used in business operation;

(d)   change of form of business organization;

(e)   incorporation of business;

(f)   dissolution of corporation;

(g)   name and business organization of successor;

(h)   admission to or withdrawal from any association operating as a multi-employer bargaining agent;

(I)   formation of a L.L.C.

A copy of this notification shall be sent to the Association Secretary.

Section 14.2   The Employer shall maintain an office and telephone where it can be contacted during the usual working hours.

46

Section 14.3   The Association and the Union shall share equally in the cost of printing copies of this Agreement, which shall bear the union label.

Section 14.4   Employees covered by this Agreement shall, during the life hereof, have the right to respect any legal picket line validly established by any bonafide labor organization. In addition, the Union has the right to withdraw employees covered by the Agreement whenever the Employer is involved in a legitimate primary labor dispute with any bonafide labor organization. These rights shall not be subject to the jurisdiction of the Joint Trade Board.

Section 14.5   Should any part of, or any provision of this Agreement be rendered or declared invalid by reason of any existing or subsequent enacted legislation, or by any decree of a court of competent jurisdiction, such invalidation of such part or portion of this Agreement shall not invalidate the remaining portions thereof.

Section 14.6   Every employee hired shall be required to provide the Employer and the Union with a driver's license number or state identification number. Every employee must have a valid photo identification card issued by the Union. It shall be the Employer's responsibility to ensure that all employees are in possession of the

47

Union issued photo identification card while employed by the Employer.

Section 14.7   The Employer shall employ at least one (1) Journeyman.

Section 14.8   The Union shall provide ongoing Journeyman education classes for safety and skills training and will notify the Employers of all scheduled classes.

## ARTICLE 15
## THE PAINTERS AND ALLIED TRADE LABOR-MANAGEMENT COOPERATION INITIATIVE

Section 15.1   (a) Commencing with the 1st day of May, 2004, and for the duration of this Agreement, and any renewals or extension thereof, the Employer agrees to make payments to The Painters and Allied Trades Labor-Management Cooperation Initiative ("LMCI") for each employee covered by this Agreement, as follows:

(b) For each hour or portion thereof, for which an employee receives pay, the Employer shall make a contribution of $.05 to the LMCI.

(c) For the purpose of this Article, each hour paid for, including hours attributable to show up time, and other hours for which pay is received by the employee in accordance with

48

the Agreement, shall be counted as hours for which contributions are payable.

(d) Contributions shall be paid on behalf of any employee starting with the employee's first day of employment in a job classification covered by this Agreement. This includes, but is not limited to, apprentices and apprentice applicants.

Section 15.2   (a) The Employer and Union agree to be bound by and to the Agreement and Declaration of Trust, as amended from time to time, establishing the LMCI.

(b)  The Employer hereby irrevocably designates as its representatives on the Board of Trustees such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors.

Section 15.3   All contributions shall be made at such time and in such manner as this Agreement provides in Article 9. The LMCI Trustees may at any time conduct an audit in accordance with the Agreement and Declaration of Trust. If an Employer fails to make contributions to the LMCI within twenty (20) days after the date required by the Trustees, the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provision hereof to the contrary notwithstanding, and the Employer shall be liable for all costs of collection of the

49

payments due together with attorneys' fees and such penalties as may be assessed by the Trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no-strike" clause which may be provided or set forth elsewhere in this Agreement.

## ARTICLE 16
## SUBCONTRACTING

Section 16.1  If an Employer contracts or subcontracts any work covered by this Agreement to be done at the job site of the construction, alteration, painting or repair of a building or structure or other work to any person or proprietor who is not signatory to this Agreement, the Employer shall:

(a) require such subcontractor to be bound by all the provisions of this Agreement. Such signatory Employer shall maintain daily records of the subcontractor and the subcontractor's employees' job site hours and shall be liable for payment of wages, dues check-off, as well as payments to the Funds identified in Articles 9, 11, and 15 of this Agreement for each of such hours worked. The Union may require an Employer to deposit into an escrow the subcontractor's estimated contributions to the Funds.

50

(b) obtain from any subcontractor a list of all of the subcontractor's employees, with address and social security number, a list of the subcontractor's employees performing the subcontracted work, the address and legal description of the property, a brief description of the type of property and a counting of the surfaces subcontracted out, and the subcontractor's price. This information must be submitted on the Union's form before the job starts. If any Employer violates this Article, the Employer shall be subject to fine and any remedy awarded by the Joint Trade Board.

(c) the Employer which subcontracts must file with the Funds' Office a copy of the subcontractor's contribution report forms as an attachment to the Employer's own remittance reports. A subcontractor is not excused from the obligation to file its own remittance reports.

Section 16.2  Any Employer which sublets or subcontracts any work covered by this Agreement shall be directly responsible and obligated for the wages, dues/assessments, benefits, and employee benefit fund contributions owed to employees or to the Funds for work performed for the subcontractor. The terms of this Article shall apply to all Bargaining Unit work performed directly or indirectly by the Employer or any affiliate or member of a controlled group, as defined in the Internal Revenue Code.

51

Section 16.3    To protect and preserve, for the employees covered by this Agreement, all work they have performed and all work covered by this Agreement, and to prevent any device or subterfuge to avoid the protection and preservation of such work, it is agreed that if the Employer performs on-site construction work of the type covered by this Agreement, under its own name or the name of another, as a corporation, company, partnership, or other business entity, including a joint venture, wherein the Employer, through its officers, directors, partners, owners, or stockholders, exercises directly or indirectly (through family members or otherwise), management, control, or majority ownership, the terms and conditions of this Agreement shall be applicable to all such work.

## ARTICLE 17
## SUBSTANCE ABUSE AND RECOVERY PROGRAM

Section 17.1    The Employer and the Union agree to the Substance Abuse and Recovery Program (Program) as described in this Article 17 and further agree that the Employer may only implement a policy regarding drug and alcohol abuse to the extent that it complies with Program.

52

Section 17.2    It is further agreed that there will be established a Joint Committee on Substance Abuse and Recovery which will be made up of three (3) persons selected by Union and three (3) persons selected by the Association. This Committee shall meet on the request of any two members at reasonable times and places, no less often than quarterly. The Committee shall be empowered, upon the affirmative vote of five members of the Committee, to establish or modify this drug and alcohol testing policy which shall become binding upon the parties to this Agreement provided sixty (60) days written notice has been served on the Union and the Association.

Section 17.3    The parties recognize the problems created by drug and alcohol abuse and the need to develop prevention and treatment programs. The Employer and the Union have a commitment to protect people and property, and to provide a safe working environment. The purpose of the Program is to establish and maintain a drug-free, alcohol-free, safe, healthy work environment for all of the employees covered by this Agreement.

Section 17.4    For the purpose of this Article, the term "Prohibited Substances" shall mean and include any illegal drugs, controlled substances (other than prescribed medications), look alike drugs, designer drugs and alcoholic beverages.

53

For the purpose of this Article the, term "Job Site" shall include that portion of the site on which construction or construction related activities is taking place as well as the portion of the site or project which is used for parking and shall also include automobiles, trucks and other vehicles owned or leased by the Employer.

Section 17.5    It is recognized that there are certain medications which may impair the performance of job duties and mental and/or motor functions. In such cases, with the permission of an employee and after consultation with such employee's physician or other physician, the Employer shall make every effort to accommodate an employee by reassignment to a job compatible with the administration of such medications.

Section 17.6    An employee who is involved in the sale, purchase, dispensation, distribution, possession, consumption or use of a Prohibited Substance on the Job Site shall be subject to termination in accordance with the terms of this Agreement.

Section 17.7    No pre-employment screening shall be permitted and no random testing shall be permitted except as provided in Sections 17.17(c).

54

Section 17.8    An employee involved or injured in a work place accident may, at the discretion of the Employer, be required to submit to a drug test. It is agreed that under certain circumstances, an employee whose work performance and/or behavioral conduct indicates that he or she is not in a physical condition that would permit the employee to perform a job safely and efficiently will be subject to submitting to a urine, blood or Breathalyzer test to determine the presence of alcohol or drugs in the body, provided:

(a)    The Employer has reasonable grounds to believe that the employee is under the influence of or impaired by the use of Prohibited Substances. Reasonable grounds include abnormal coordination, appearance, behavior, speech, odor or any detectable amount of a Prohibited Substance. It can also include work performance, safety and attendance problems.

(b) The supervisor's reasonable grounds must be confirmed by another management representative in conjunction with a representative of the Union, which may be steward or Business Representative if available in a reasonable period of time. Both management representatives must describe such grounds in writing prior to any testing being directed.

(c) The employee will be provided with an opportunity to explain his or her

55

conduct at a meeting with the Representatives, including the Union Representative referred to in Article 17.8(b), provided that such a Union Representative is reasonably available and provided further that all reasonable efforts have been made to attempt to have such Union Representative present.

Section 17.9    An employee who refuses to submit to a test requested pursuant to Article 17.8 shall be offered the option of enrolling in an Alcohol/Drug Assistance Program. In the event the employee refuses to do either, he shall be subject to termination.

Section 17.10    Drug testing shall take place at a recognized medical facility or certified independent laboratory at the expense of the Employer.

Section 17.11    When a test is required, the specimen will be identified by a code number, not by name to insure confidentiality of the donor. Each specimen contained will be properly labeled and made tamper proof.

Section 17.12    The handling and transportation of each specimen will be properly documented through the strict chain of custody procedures.

Section 17.13    Any sample taken for testing must be tested as follows:

56

(a) for screening; and

(b) in the event the screening test is positive, for confirmation testing by gas chromatography/mass spectrophotometer (GC/MS)

Section 17.14    Drug testing shall only be conducted by a CAP or NIDA certified independent laboratory.

Section 17.15    The Employer, all of its medical personnel and the personnel of the laboratory/testing facility shall adhere to the American Occupational Medical Association's Code of Ethical Conduct for Physicians Providing Occupational Medical Services and to AOMA Drug Screening in the Work Place Ethical Guidelines.

Section 17.16    (a) An employee undergoing testing shall be placed on an unpaid leave of absence pending results of the screening test.

(b) In the event that the results of the screening test are positive, there shall be confirmation testing by a laboratory selected by the Union. In the event the results of the confirmation testing are negative, the employee shall be reinstated with back pay. Unless an initial positive result is confirmed as positive, it shall be deemed negative and reported by the laboratory as such.

57

(c) In the event that results of the confirmation testing are positive, the employee will be given the opportunity to enroll in a recognized Alcohol/Drug Assistance Program. In the event such employee declines to participate in the ADAP, he shall be subject to termination.

Section 17.17   An employee who fails to cooperate, abandons, does not complete the treatment program prescribed by the ADAP counselor or who fails to live up to the terms and conditions of this Agreement will be subject to termination.

(b) If treatment necessitates time away from work, the Employer shall provide for the employee an unpaid leave of absence for purposes of participation in an agreed upon treatment program. An employee who successfully completes a rehabilitation program shall be reinstated to his or her former employment status, if work for which he or she is qualified exists.

(c) Employees returning to work after successfully completing the rehabilitation program will be subject to drug test without prior notice for a period of one (1) year. A positive test result will result in termination.

(d) In order to ensure confidentiality in the ADAP program, Employer shall designate a management Representative as the Employee Assistance Representative for the Employer.

This individual shall be the sole representative of the Employer who may be in possession of the employee's ADAP information.

(e) Whenever Owner or Awarding Agency specifications require the Employer to provide a drug-free work place, such additional requirements may be incorporated herein upon mutual agreement of the Union and the Employer.

Section 17.18   All aspects of this policy and Program shall be subject to the Joint Trade Board.

Section 17.19   Nothing in this Article shall be construed to limit the Employer's right to suspend or terminate an employee so long as such suspension or termination is otherwise permitted without regard to the provisions of this Article.

## ARTICLE 18
## TERM AND RENEWAL

Section 18.1   This Agreement shall be in effect until April 30, 2008, and shall continue in effect from year to year thereafter and, unless the parties otherwise agree, the parties hereto hereby specifically adopt the Agreement between the Union and the Association for the contract period subsequent to April 30, 2008, and each such subsequent Agreement thereafter unless written notice of such termination of

58

59

Agreement is given from the Employer or the Union at least one hundred twenty (120) days prior to the expiration of the then current Agreement adopted by reference.

Section 18.2   At least one hundred and twenty (120) days prior to the original termination of this Agreement or prior to the expiration date of any renewal of this Agreement, representatives of Painters' District Council No. 30 and the Association shall convene and meet for the purpose of reviewing the various terms and provisions of this Agreement.

This Agreement shall remain in full force and effect from May 1, 2004 through April 30, 2008.

FCA of Illinois

Date: 4/27/04

Painters District Council 30

Date: 4-26-04

60

## APPENDIX A

INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES UNION AND INDUSTRY PENSION FUND

The Employer and the Union agree as follows:

1. (a) Commencing with the 1st day of May, 2004, and for the duration of the Agreement, and any renewals or extension thereof, the Employer agrees to make payments to the IUPAT Union and Industry Pension Fund for each employee covered by this Agreement, as follows:

(b) For each hour or portion thereof for which an employee receives pay, the Employer shall make a contribution in accordance with Appendices C through F to the above named Pension Fund;

(c) For the purpose of this Article, each hour paid for, including hours attributable to show-up time, and other hours for which pay is received by the employee in accordance with the Agreement, shall be counted as hours for which contributions are payable;

(d) Contributions shall be paid on behalf of any employee starting with the employee's first day of employment in a job classification covered by this Agreement. This

61

includes, but is not limited to, apprentices, helpers, and probationary employees.

(e) The payments to the Pension Fund shall be made to the IUPAT Union and Industry Pension Fund, which was established under an Agreement and Declaration of Trust, dated April 1, 1967. The Employer hereby agrees to be bound by and to the said Agreement and Declaration of Trust, as amended from time to time, as though he had actually signed the same.

2. The Employer hereby irrevocably designates as its representatives on the Board of Trustees such Trustees as are now serving, or who will in the future serve, as employer Trustees, together with their successors. The Employer further agrees to be bound by all actions taken by the Trustees pursuant to the said Agreement and Declaration of Trust, as amended from time to time.

3. All contributions shall be made at such time and in such manner as the Trustees require; and the Trustees may at any time conduct an audit in accordance with said Agreement and Declaration of Trust.

4. If an Employer fails to make contributions to the Pension Fund within twenty (20) days after the date required by the Trustees, the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provisions hereof to the

62

contrary notwithstanding, and the Employer shall be liable for all costs of collection of the payments due together with attorneys' fees and such penalties as may be assessed by the Trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no-strike" clause which may be provided or set forth elsewhere in this Agreement.

5. The Pension Plan adopted by the Trustees shall at all times conform with the requirements of the Internal Revenue Code so as to enable the Employer at all times to treat contributions to the IUPAT Union and Industry Pension Fund as a deduction for income tax purposes.

63

## APPENDIX B

### WAGE and CONTRIBUTION RATES
### EFFECTIVE MAY 1, 2004
### THROUGH APRIL 30, 2005
### FOR MEMBERS OF PAINTERS
### LOCAL UNIONS 97, 154, 448 and 1285

| | |
|---|---|
| Hourly wage | $32.23 per hour |
| Health and Welfare Fund | $ 4.85 per hour |
| Painters D.C. 30 Pension Fund | $ 4.20 per hour |
| Apprenticeship Fund | $ .30 per hour |
| I.U.P.A.T. Labor Management Fund | $ .05 per hour |
| Northern Illinois Painting and Drywall Institute | 1.5% of gross wages |

Note: Painters District Council 30 Pension Fund
contributions are not required on Apprentices
whose membership is in the above mentioned
Local Unions.

64

## APPENDIX C

### WAGE and CONTRIBUTION RATES
### EFFECTIVE MAY 1, 2004 THROUGH
### APRIL 30, 2005 FOR MEMBERS OF
### PAINTERS LOCAL UNION 209

| | |
|---|---|
| Hourly wage | $25.30 per hour |
| Health and Welfare Fund | $ 4.85 per hour |
| Painters D.C. 30 Pension Fund | $ 2.70 per hour |
| I.U.P.A.T. Pension Fund | $ 1.50 per hour |
| Apprenticeship Fund | $ .30 per hour |
| I.U.P.A.T. Labor Management Fund | $ .05 per hour |
| Northern Illinois Painting and Drywall Institute | 1.5% of gross wages |

65

## APPENDIX D

### WAGE and CONTRIBUTION RATES EFFECTIVE MAY 1, 2004 THROUGH APRIL 30, 2005 FOR MEMBERS OF PAINTERS LOCAL UNIONS 465 and 467

| | |
|---|---|
| Hourly wage | $25.30 per hour |
| Health and Welfare Fund | $ 4.85 per hour |
| Painters D.C. 30 Pension Fund | $ 1.90 per hour |
| I.U.P.AT. Pension Fund | $ 2.30 per hour |
| Apprenticeship Fund | $ .30 per hour |
| I.U.P.A.T. Labor Management Fund | $ .05 per hour |
| Northern Illinois Painting and Drywall Institute | 1.5% of gross wages |

66

## APPENDIX E

### WAGE and CONTRIBUTION RATES EFFECTIVE MAY 1, 2004 THROUGH APRIL 30, 2005 FOR MEMBERS OF PAINTERS LOCAL UNION 157

| | |
|---|---|
| Hourly wage | $25.30 per hour |
| Health and Welfare Fund | $ 4.85 per hour |
| Painters D.C. 30 Pension Fund | $ 1.60 per hour |
| I.U.P.AT. Pension Fund | $ 2.60 per hour |
| Apprenticeship Fund | $ .30 per hour |
| I.U.P.A.T. Labor Management Fund | $ .05 per hour |
| Northern Illinois Painting and Drywall Institute | 1.5% of gross wages |

67

## APPENDIX F

### WAGE and CONTRIBUTION RATES
### EFFECTIVE MAY 1, 2004 THROUGH
### APRIL 30, 2005 FOR MEMBERS OF
### PAINTERS LOCAL UNION 607

| | |
|---|---|
| Hourly wage | $28.10 per hour |
| Health and Welfare Fund | $4.85 per hour |
| Painters D.C. 30 Pension Fund | $ .75 per hour |
| I.U.P.A.T. Pension Fund | $ 3.45 per hour |
| Apprenticeship Fund | $ .30 per hour |
| I.U.P.A.T. Labor Management Fund | $ .05 per hour |
| Northern Illinois Painting and Drywall Institute | 1.5% of gross wages |

68

## APPENDIX G

### Effective May 1, 2004
### through the term of this Agreement

Zone A will include DeKalb, DuPage, Kane, Kendall and McHenry Counties in the State of Illinois.

Zone B will include Boone, JoDaviess, Lee, Ogle, Stephenson and Winnebago Counties in the State of Illinois.

Zone C will include Bureau, Ford, Fulton, Hancock, Iroquois, Kankakee, LaSalle, Livingston, Marshall, Mason, McDonough, McLean, Peoria, Putnam, Schuyler, Stark, Tazewell and Woodford Counties in the State of Illinois.

69

## SIGNATURE PAGE

The May 1, 2004 through April 30, 2008
Agreement between Painters' District Council
No. 30 and the FCA of Illinois and various
individual Painting, Decorating and Drywall
Finishing Contractors .

Company Name _____

Address _____

_____

Signature_____

Title_____

Print name_____

Drivers License #_____

Phone number_____

70

71

Date signed _____

Federal Identification # _____

State Unemployment # _____

State Tax # _____

72

## SIGNATURE PAGE

The May 1, 2004 through April 30, 2008
Agreement between Painters' District Council
No. 30 and the FCA of Illinois and various
individual Painting, Decorating and Drywall
Finishing Contractors

Company Name _____

Address _____

_____

Signature _____

Title _____

Print name _____

Drivers License # _____

Phone number _____

73

Date signed _____

Federal Identification # _____

State Unemployment # _____

State Tax # _____

74