## PAINTERS DISTRICT COUNCIL 30 JOINT TRADE BOARD
## JANUARY 17, 2008

The meeting of Painters District Council 30's Joint Trade Board was called to order at 9:00 a.m. by Chairman Pro-Tem Michael LeGood. In attendance representing Painters District Council No. 30 were Charles E. Anderson, Aaron Anderson, Brian Muscat, Mark Guethle and Todd Dotson, representing the FCA of Illinois were Joe Maring, Michael LeGood and Rick Vandegraft.

Minutes of the previous meeting had been distributed by e-mail. A motion was made, seconded and passed to accept the minutes as presented.

Secretary-Treasurer Anderson advised the Board that Bryer Construction had not complied with the ruling issued by the Joint Trade Board. He stated Bryer Construction had been referred to the Council's attorneys for collection.

The case of K. R. Drywall was presented to the Board by Secretary-Treasurer Anderson. Greg Thompson and Ken Teske, representing K. R. Drywall, were in attendance. After hearing the facts as they related to the case, the Board suspended the hearing until further investigation is completed. The case of VINCO Painting was presented to the Board by Secretary-Treasurer Anderson. James Stelmasek, Director of Membership Servicing and Member Loren Deland were in attendance. Vince Angelilli of VINCO Painting was absent. In accordance with the rules of the Joint Trade Board the hearing was held in his absence. The facts and testimony as they related to the charges were presented to the Board. After hearing the testimony the Board found VINCO guilty as charged and set forth the following decisions: VINCO is to pay Loren Deland $38,591.82 ($500.00 per day for 73 days for non-payment of overtime plus actual overtime 11-5-07 through 1-17-08), pay William Medina $40,092.95 ($500.00 per day for 79 days for non-payment of overtime plus actual overtime 10-30-07 through 1-17-08), pay Jesus Mota $32,048.70 ($500.00 per day for 63 days for non-payment of overtime plus actual overtime 11-15-07 through 1-17-08), pay Jeremy Weise $47,216.39 ($500.00 per day for 94 days for non-payment of overtime plus actual overtime 10-15-07 through 1-17-08). In addition, VINCO is to pay Painters District Council 30 a total of $148,000.00 for violations of the Collective Bargaining Agreement ($500.00 per day for 94 days of no overtime permit, 101 days of not registering job locations and 101 days for not providing check stubs to the employees). Mr. Angelilli will be informed that all payments are to be sent to the District Council before January 31, 2008. The case of TRICOR Carpentry was presented to the Board by Secretary-Treasurer Anderson. James Stelmasek, Director of Membership Servicing and Member Jorge Vargas were in attendance. James Weber of TRICOR Carpentry was absent. In accordance with the rules of the Joint Trade Board the hearing was held in his absence. The facts and testimony as they related to the charges were presented to the Board. After hearing the testimony the Board found TRICOR Carpentry guilty as charged and set forth the following decisions: TRICOR is to pay Jorge Vargas a total of $246,413.56 ($500.00 per day for 349 days for non-payment of overtime and actual overtime and $500.00 per day for 142 days of not providing taping tools to Jorge Vargas



DEF EXHIBIT
3
5-19-08

and requiring him to use his own tools).  In addition, TRICOR Carpentry is to pay Painters District $349,000.00 for violations of the Collective Bargaining Agreement ($500.00 per day for 349 days of no overtime permit and 349 days of not registering job locations).  Mr. Weber will be informed that all payments are to be sent to the District Council before January 31, 2008.

**The next meeting of the Joint Trade Board was scheduled for March 13, 2008 at 9:00 a.m.**

No further business was brought before the Board the meeting was adjourned.

Respectfully submitted
Charles E. Anderson
Secretary-Treasurer

# PAINTERS DISTRICT CO...

**Joint Trade Board**

AYEY
*Chairman*

CHARLES ANDERSON
*Secretary*

U.S. Postal Service
CERTIFIED MAIL RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)
For delivery information visit our website at www.usps.com

OFFICIAL USE

Postage $

Certified Fee

Return Receipt Fee
(Endorsement Required)

Restricted Delivery Fee
(Endorsement Required)

Postmark
Here

7006 2150 0002 0963 9743

Vince Angelilli
Vinco Painting, Inc.
6649 Ogallah
Chicago, IL 60631

See Reverse for Instructions

January 22, 2008

Vince Angelilli
Vinco Painting, Inc.
6649 Ogallah
Chicago, Illinois    60631

Certified Return Receipt Mail
1st Class Mail

Dear Mr. Angelilli:

The following is the excerpt from the minutes of Painters District Council 30's Joint Trade Board hearing involving your company.  I am sure that you will find it self explanatory.

    The case of VINCO Painting was presented to the Board by Secretary-Treasurer Anderson.    James Stelmasek, Director of Membership Servicing and Member Loren Deland were in attendance. Vince Angelilli of VINCO Painting was absent.   In accordance with the rules of the Joint Trade Board the hearing was held in his absence.   The facts and testimony as they related to the charges were presented to the Board.   After hearing the testimony the Board found VINCO guilty as charged and set forth the following decisions:   VINCO is to pay Loren Deland $38,591.82 ($500.00 per day for 73 days for non-payment of overtime plus actual overtime 11-5-07 through 1-17-08), pay William Medina $40,092.95 ($500.00 per day for 79 days for non-payment of overtime plus actual overtime 10-30-07 through 1-17-08), pay Jesus Mota $32,048.70 ($500.00 per day for 63 days for non-payment of overtime plus actual overtime 11-15-07 through 1-17-08), pay Jeremy Weise $47,216.39 ($500.00 per day for 94 days for non-payment of overtime plus actual overtime 10-15-07 through 1-17-08).   In addition, VINCO is to pay Painters District Council 30 a total of $148,000.00 for violations of the Collective Bargaining Agreement ($500.00 per day for 94 days of no overtime permit, 101 days of not registering job locations and 101 days for not providing check stubs to the employees).   Mr. Angelilli will be informed that all payments are to be sent to the District Council before January 31, 2008.

As a reminder, the decision of Painters District Council 30's Trade Board is final and



DEP EXHIBIT
4
5-19-08

1905 Sequoia Drive, Suite 201, Aurora, Illinois 60506  •  630.377.2120
www.PaintersDC30.com

binding on all parties.   If this matter is referred to Civil Court for adjudication, all attorney's fees and court costs will be added to the fine issued by the Board.

If you have any questions regarding this matter, please call my office.

Sincerely,

Charles E. Anderson
Secretary-Treasurer

1/24/200

**Employer Number**    2607

**Employer Name**    Vinco Painting, Inc.

**Address**    4637 N. Forestview Ave.

**City**    Chicago                    IL        60650

**Phone**    773-544-7401        **Fax**

**E-Mail**

**Contact**    Vince Angelilli   – DENISE

**Status Code**    Inactive Member

**Notes**    Signed Cba 8/07  Vince's Cell Phone 773.507.7400
Old Add&Ph:6649 Ogallah,Chgo 60631 773-507-7400 1/24/08

FAX 589-1413

1/24   LM /w Denise to call me tomorrow
1/25   FAXED OVER CHANGES

305
1/5

DEP. EXHIBIT
tabbies®    5
5-19-08

## SIGNATURE PAGE

The May 1, 2004 through April 30, 2008 Agreement between Painters' District Council No. 30 and the FCA of Illinois and various individual Painting, Decorating and Drywall Finishing Contractors

Company Name _MINCO PAINTING INC._

Address _6649 OKALLAH_

_CHICAGO, IL 60631_

Signature _[signature]_

Title _PRESIDENT_

Print name _VINCE ANGELUCCI_

Drivers License # _A524870713S1_

Phone number _773 507 7460_

Date signed _8-3-07_

Federal Identification # _38-3739026_

State Unemployment # _0521015336_

State Tax # _____

71

72



EXHIBIT
6



Collective Bargaining

Agreement

For

Painters District Council

No. 30

May 1, 2004

Through

April 30, 2008



Dep. Ex 7.

Collective Bargaining

Agreement

For

Painters District Council

No. 30

May 1, 2004

Through

April 30, 2008

## INDEX

                                    **PAGE**

ARTICLE 1 - PURPOSE AND INTENT ........1

ARTICLE 2 - THE PARTIES .................2

ARTICLE 3 - RECOGNITION ...............4

ARTICLE 4 - UNION SECURITY ...........6

ARTICLE 5 - UNION'S GEOGRAPHICAL .......8

ARTICLE 6 - HOURS OF WORK - HOLIDAYS .11

ARTICLE 7 - WORKING TOOLS AND
                    CONDITIONS ..................13

ARTICLE 8 - WAGE RATES .................22

ARTICLE 9 - BENEFIT FUNDS ............. 30

ARTICLE 10 - APPRENTICESHIP AND
                     TRAINING PROGRAM ........ 35

ARTICLE 11 - EMPLOYERS' INDUSTRY
                     FUND .....................38

ARTICLE 12 - INSURANCE AND SURETY
                     BONDS ...................39

ARTICLE 13 - JOINT TRADE BOARD ........43

ARTICLE 14 - MISCELLANEOUS ...........46

ARTICLE 15 - THE PAINTERS AND ALLIED
                     TRADE LABOR-MANAGEMENT
                     COOPERATION FUND ........48

ARTICLE 16 - SUBCONTRACTING .........50

ARTICLE 17 - SUBSTANCE ABUSE &
                     RECOVERY PROGRAM ........52

ARTICLE 18 - TERM AND RENEWAL ........59

## ARTICLES OF AGREEMENT

This Agreement is effective this first day of May, 2004 by and between Painters' District Council No. 30, International Union of Painters and Allied Trades, AFL-CIO, (hereinafter referred to as the "Union") and the present and future members of the FCA of Illinois (hereinafter referred to as the "Association"), its successors and assigns, each employer which has assigned to the Association the authority to represent it for collective bargaining purposes, and such other employers who become signatory to this Agreement (hereinafter collectively referred to as the "Employers").

## ARTICLE 1.
## PURPOSE AND INTENT

The parties' express purpose and intent is to promote and improve the relationship between Employers, the Union and the employees subject to this Agreement, to facilitate peaceful and orderly adjustments of grievances and disputes, to enter into contractual relations with respect to wages, hours of work, and other conditions of employment to be faithfully observed by all parties.

1

The parties recognize their respective responsibility for and mutual interest in continuity of employment, gained through efficient service to the customer and sincere fulfillment of their obligations to the public in promoting the best interest of the painting, decorating and drywall industry.

## ARTICLE 2
## THE PARTIES

Section 2.1   The Union is acting on behalf of all of its present and future affiliated Local Unions and as the sole and exclusive bargaining agent of all employees in the Bargaining Unit. The Union's geographical jurisdiction is the counties of: Boone, Bureau, DeKalb, DuPage, Ford, Fulton, Hancock, Iroquois, JoDaviess, Kane, Kankakee, Kendall, LaSalle, Lee, Livingston, Marshall, Mason, McDonough, McHenry, McLean, Ogle, Peoria, Putnam, Schuyler, Stark, Stephenson, Tazewell, Winnebago, and Woodford and any other geographical jurisdiction that the International Union of Painters and Allied Trades may grant to the Union.

Section 2.2   The Association, and its successors and assigns, represents that it has the legal authority under its governing documents to act as the sole and exclusive bargaining agent

for all of its present and future members, and their successors and assigns, as well as for those employers which have assigned to the Association the authority to represent the employer for collective bargaining purposes, and their successors and assigns (hereinafter collectively referred to as "Employer"). The Union recognizes the Association as the sole and exclusive bargaining agent for all such Employers. Every Employer shall remain bound to the Agreement as amended thereafter in future negotiations with the Association unless timely written notice is given to the Union and the Funds of its withdrawal from membership in the Association.

Section 2.3   A non-member of the Association which has not previously assigned to the Association the authority to bargain on its behalf may become bound by this Agreement and all references to the Association or Employer shall be considered as referring to and including that non-member.

Section 2.4   Notwithstanding any other term or provision set forth in this Agreement or a written assignment of bargaining authority, every Employer bound to this Agreement agrees that if a majority of the members of the FCA of Illinois, in accordance with the Association's by-laws, vote to transfer or assign the Association's authority to represent

2

3

its members, and those Employers which have assigned to the Association the authority to represent the Employer for collective bargaining purposes, to any other association, then all references to the FCA of Illinois set forth in this Agreement or any related document shall automatically be changed to read the name of the association.

## ARTICLE 3
## RECOGNITION

Section 3.1    The Association and its members/Employers agree that all work generally recognized as coming within the jurisdiction of the painting, decorating and drywall finishing industry shall be assigned to employees working under this Agreement. The Bargaining Unit work to be performed by journeymen, apprentice painters, decorators, applicators, paperhangers, drywall tapers, drywall apprentices, and apprentice applicants shall include, but not be limited to, the application of all painting and decorating finishes and the operation of all equipment used in the performance of such work, including sandblasting equipment; the erection, moving and dismantling of all scaffolding, as has been customary; the operation of compressors, lifts or any other equipment related to Bargaining Unit

4

work; and all preparatory work incidental to the above work. The term "painting and decorating finishes", as used herein, includes painting, decorating, paperhanging, and the application and removal of any and all types of wall covering including all soft roll wall coverings goods; the finishing of wood, metal or other surfaces; the application of insulating and acoustical materials; the application of wet film waterproofing coatings and all other coatings for decorative and protective purposes; the taping, surfacing and finishing of drywall surfaces; and any work that is necessary to remove any paint due to the application of material by any method, any sandblasting by-products due to any sandblasting method, or any removal of paint or sandblasting residue.

Section 3.2    The Employer agrees to recognize and deal with the Union's elected or appointed representatives, at a reasonable time, at every location at which the Employer performs any work. The Employer agrees to permit the Union's representatives to visit its shops (upon reasonable notice) and job sites during working hours for the purpose of inspecting lists of employees, payroll records, insurance certificates, and time cards in order to determine if the Employer is complying with this Agreement and with federal law.

5

Section 3.3   The Secretary-Treasurer of the Union, or his designee, may appoint shop or job stewards. Stewards shall be selected at the sole discretion of the Secretary-Treasurer. If a steward is appointed from outside the Employer's workforce, the Employer shall place the steward on the job. The steward must be a qualified mechanic in work performed by the Employer and shall be a working steward. If there is a work slowdown, the steward shall be the last employee employed. If an Employer's work load does not require employees, the Secretary-Treasurer shall remove the steward until the Employer hires any employee to perform Bargaining Unit work. In no event shall any steward be considered an agent of the Union. If an Employer is not satisfied with the work performance of any steward, the Employer may request a replacement by notifying the Union's Secretary-Treasurer in writing.

## ARTICLE 4
## UNION SECURITY

Section 4.1   (a) All employees in the Bargaining Unit must during the term hereof, as a condition of employment, maintain their membership in the Union.

(b) Current employees shall be required as a condition of continued

6

employment to become members of the Union on the eighth (8) day following the effective date of this Agreement. Employees hired after the effective date of this Agreement and covered by this Agreement shall be required, as a condition of continued employment, to become members of the Union on the eighth (8) day following the beginning of their employment.

Section 4.2   The Employer agrees to check off from each employee's wages special administrative dues in the amount of two (2%) percent of gross wages in each payroll period plus twenty cents ($.20) per hour paid assessment for the Union's organizing and defense fund and will remit such sums to the Union in accordance with Article 9, provided the employees in question have signed a valid authorization card authorizing such deduction.

The Employer further agrees that at the time it employs any Bargaining Unit employee the Employer will submit to each such employee, for his voluntary signature, a dues deduction authorization card in triplicate, one copy of which shall be returned to the Union. The form will be supplied to the Employer by the Union.

The Employer further agrees that each month it will submit a list of all employees covered by the Agreement who have failed to sign a dues deduction authorization card,

7

together with the numbers of hours each such employee was paid.

Section 4.3   The Union agrees to indemnify and hold the Employer harmless against any and all claims, demands, suits or other forms of liability, exclusive of attorneys' fees and costs, which may arise out of or by reason of any actions taken or not taken by the Employer for purpose of complying with a specific direction of, or notice from, the Union regarding any provision of this Article.

## ARTICLE 5
## THE UNION'S GEOGRAPHICAL
## JURISDICTION - WORK OUTSIDE AREA

Section 5.1   The Employer's principal place of business and employment shall be considered within the jurisdiction of the Union. An Employer may undertake Bargaining Unit work in other counties and areas, on which occasions the Employer employs additional employees who are members of affiliated Local Unions outside the Union's jurisdiction. In recognition of these facts, it is agreed that:

(a) This Agreement shall embrace, and the Union shall be the exclusive bargaining representative for and on behalf of, all the employees employed by such Employer,

8

wherever and whenever employed during the term of this Agreement.

(b) The Employer, when engaged in work outside the Union's geographical jurisdiction, shall employ not less than fifty percent (50%) of the workers employed on such work from among the residents of the area where the work is performed, or from among persons who are employed the greater percentage of their time in such area; any others shall be employed only from the Employer's home area.

(c) The Employer shall, when engaged in work outside the Union's geographical jurisdiction, comply with all of the lawful clauses of the collective bargaining agreement in effect in said other geographical jurisdiction and executed by the employers in the industry and the affiliated Local Unions in that jurisdiction, including, but not limited to, the wages, hours, working conditions, fringe benefits, and procedure for settlement of grievances set forth therein; provided, however, that as to employees employed by such Employer from the Local Unions within the Union's geographical jurisdiction and who are brought into an outside jurisdiction, such employees shall be entitled to receive the wages and conditions effective in either the Union's or the outside jurisdiction, whichever are more

9

favorable to such employees, and fringe benefit contributions on behalf of such employees shall be made solely to the Funds in accordance with the Funds' governing documents. This provision is enforceable by the Local Union or District Council in whose jurisdiction the work is being performed, both through the procedure for settlement of grievances set forth in its applicable collective bargaining agreement and through the courts, and is also enforceable by the Union, both through the procedure for settlement of grievances set forth in this Agreement and through the courts.

Section 5.2    An Employer shall not attempt to engage in any work covered by this Agreement in any area outside the geographical jurisdiction of the Union through the use or device of a joint venture with another employer or contractor in the outside area, unless such use or device is not for the purpose of taking advantage of lower wages or conditions that are in effect in the home area of the other employer.

Section 5.3    There shall be no priority given for employment opportunities to any person because of membership in the Union nor shall there be any discrimination on the basis of race, color, sex, age, handicap, or national origin.

10

## ARTICLE 6
## HOURS OF WORK - HOLIDAYS

Section 6.1    (a) The normal work week shall be Monday through Friday.

(b) The normal work day shall be eight (8) hours, excluding one-half (fi) hour for lunch, between the hours of 7:00 a.m. and 3:30 p.m.

(c) For residential repainting only, a work day shall be eight (8) hours, excluding one-half (fi) hour for lunch, and may have a starting time of either 7:00 a.m. or 8:00 a.m.

Section 6.2    The Legal Holidays are: New Year's Day, Memorial Day (as designated by the federal government), Independence Day, Labor Day, Thanksgiving Day, and Christmas Day. When any Legal Holiday falls on Sunday, the Monday following shall be observed. When any Legal Holiday falls on Saturday, the Friday preceding shall be observed. No work shall be performed on any Legal Holiday, except in extreme emergencies, such emergencies to be determined solely by the Union.

Section 6.3    A permit must be secured for overtime or work on Saturday, Sunday or a Holiday. The request must be submitted to the Union's Secretary-Treasurer twenty-four (24) hours in advance, or within four (4) hours of a request to the Employer, whichever is later.

11

Section 6.4   An Employer may, with the employee's agreement, schedule that employee for a make-up day on a Saturday, at regular pay, only if that employee missed a full day of work (Monday through Friday) as a result of weather or the employee's voluntary absence from work but not because of a Holiday. The scheduling of a make-up day shall not be for the Employer's scheduling convenience. This provision shall not affect the employee's right to Holiday pay or premium pay for "off-hours" work or for hours worked in excess of eight (8) in a day or forty (40) in a week.

Section 6.5   There shall be an allowance of five (5) minutes for wash-up time in each one-half (1/2) day's work. There shall be a thirty minute unpaid lunch break at the half way point of the day.

Section 6.6   (a) Any employee required to report to a job site or shop (including supply houses) who is subsequently directed to a different site, different supply house, or to the shop shall be paid from the time the employee first reported to a job site, supply house or to the shop.

(b) Employees shall not report to the shop, supply house or job more than fifteen (15) minutes before the seven (7:00) or eight (8:00) starting time, as the case may be.

12

Section 6.7   When an employee works a fractional part of a day, he shall be paid for no less than one-half (fi) of a day's work, except in cases when an employee quits voluntarily or when weather conditions prevent a continuation of his employment.

Section 6.8   An employee who reports for work at the regular starting time shall be paid regular Journeymen's wages for two (2) hours when no work is provided for him. However, this provision shall not apply if work is not available because of weather conditions.

Section 6.9   The Employer shall report, in writing to Painters District Council NO. 30, all job sites where Collective Bargaining Unit work is to be performed, including the name of the job site and the location of the job site, prior to the commencement of work. Failure to adhere to this Article will be subject to Article 13 of this Agreement.

## ARTICLE 7
## WORKING TOOLS AND CONDITIONS

Section 7.1   (a) No Employer shall require or permit an employee to use in oil paint a brush which exceeds four and one-half (4fi) inches in width.

(b) Water emulsion paints such as rubber base, acrylic resins or paints of that type

13

shall not be applied with a brush which exceeds six (6) inches in width.

Section 7.2    The use of the dip type roller applicator is permitted on all work. However, (1) the roller surface shall not exceed nine (9) inches from one end of the roller to the other, except for applying coatings on floors in which case a 19" roller is permissible; (2) the diameter of the roller, including the nap or cover, shall not exceed three (3) inches unwrapped, except when the roller applicator is used in painting wire fences or wire window guards, in which cases the diameter of the roller, including nap and cover, shall not exceed four and one-half (4½) inches unwrapped; and (3) the paint container into which the roller applicator is dipped shall not contain more than three and one-half (3½) gallons of paint.

Section 7.3    (a) Spray work shall be permitted for any number of coats required on all doors and frames. Spraying of finish coats of any kind shall be permitted provided that the first coat on all surfaces is back rolled unless that surface is impractical to brush or roll.

(b) An Apprentice may operate a spray gun only during the last eighteen (18) months of the apprenticeship.

(c) State of Illinois health and safety laws must be complied with and shall be strictly enforced. Employees may not be discharged for refusing to operate a spray machine or equipment due to lack of skills or knowledge. If an employee refuses to operate a spray machine or equipment due to lack of skills or knowledge, the employee shall submit to the next available journeyman upgrading class for skill enhancements for spray painting. An employee shall not be discharged for refusing to operate a spray machine or equipment due to any physical impairment.

(d) For all applications of materials above the permissible exposure limit, the Employer at its own expense shall furnish to all employees working above the permissible exposure limit an appropriate respirator.

(e) When using spray equipment with flammable material, the spray equipment shall be grounded to prevent ignition from a spark from static electricity.

(f) Employees using spray equipment shall be instructed in the safety aspects of the proper use and care of the required safety equipment.

Section 7.4    (a) When solvents, including organic solvents, caustics, corrosives, acids, detergents and toxins are used, disposable protective clothing, protective gloves, eye and face protection, and protective skin creams shall also be furnished.

(b) Appropriate signs warning others of the fire and respiratory dangers present shall be

14

15

posted in all areas where the above materials are used.

Section 7.5    The Employer shall at all times provide proper lighting for employees.

Section 7.6    (a) The Employer shall provide proper ventilation on all painting and drywall finishing jobs and supply the employees with appropriate personal protective spray equipment such as, but not limited to, masks, hoods, shields, air filters, respirators and cartridges.

(b) The Employer will replace all personal respirators and related equipment when said equipment is found to be worn beyond repair or unsafe for continued use.

(c) If the personal respirator is lost, the employee is liable to replace such respirator. If the employee does not replace the respirator, the Employer may purchase the identical respirator and deduct such cost from the employee's next pay check.

(d) No Employer may deduct any money from an employee's pay for a personal respirator not returned if the employee has filed a police report indicating such respirator was stolen.

Section 7.7    The Employer hereby agrees:

(a) that drop cloths and rags shall be furnished to workmen in a sanitary condition;

16

(b) that employees may use gloves at work when the employee considers it necessary;

(c) that employees, while at work, shall be permitted sufficient time for inspection of ladders, scaffolding and for sanitary conditions of employment;

(d) The lead man may order any necessary material which may be required on the job for that days work at the Employer's expense.

Section 7.8    (a) Painter employees shall furnish the following tools: grip, assorted scrapers up to six (6) inches in width, five gallon bucket opener, wire brush, spinner, assorted screwdrivers, duster, hammer, nail set, wrench, vice-grips, razor blade holder, pencils and pliers. Paperhangers shall furnish ruler, smoother, seam roller, and level. An employee shall not be required to furnish any tool not specifically listed herein.

(b) The Employer shall furnish all tools not set forth in (a) above and all materials, sandpaper, dust masks, floor scrapers, and scaffolding.

Section 7.9    (a) The Employer shall provide all employees who perform drywall finishing with machine tools with a register number of each tool. The Employer shall list, in writing, each register number and tool description. The list shall be given to each employee to review at the time such machine

17

tool(s) are issued. The machine tool(s) shall be in good working order. Each employee shall examine the tool list and, if accurate, each employee shall acknowledge receipt of the tool(s) by signing on the tool list. No employee shall refuse to acknowledge an accurate and complete list. Each employee shall be responsible for all stolen, lost or mislaid machine tools for which the employee has signed.

(b) If, upon the Employer's request, an employee does not return any machine tool(s) for which employee has acknowledged receipt thereof, the Employer may deduct the reasonable cost of such machine tool(s) from the employee's next regular paycheck.

(c) Upon termination of employment, each employee shall return all machine tools. If an employee fails within five (5) days of termination to return any such tool(s) for which employee has acknowledged receipt thereof, the Employer may deduct the reasonable cost of such machine tool(s) from the employee's final paycheck.

(d) No Employer may deduct any money from an employee's paycheck for tools not returned if the employee has filed a police report indicating such tool(s) were stolen.

Section 7.10    (a) The Employer agrees that no employee shall be required to use any poisonous material or material injurious to the employee's health, such as wood alcohol, varnish remover, oxalic acid, or to perform the sanding of lead or other dangerous materials, unless they are protected by respirators and gloves furnished to them by the Employer. Prepared liquid paint and varnish removers shall be of the non-flammable type. This shall not apply to the use of other liquids or solvents or other methods.

(b) Where lead is used, the Employer shall furnish hot water, soap, and towels to employees.

Section 7.11    (a) In accordance with the requirements of the Occupational Safety and Health Act of 1970, as amended, it shall be the Employer's responsibility to ensure the safety of its employees and compliance by employees with any safety rules, standards and regulations contained in federal or state law or established by the Employer. Nothing in this Agreement shall make the Union liable to any employee or to any other person in the event that work-related disease, sickness, death, injury or accident occurs.

(b) The Employer shall not file or assert a claim against or engage in any litigation against the Union on a subrogation theory, contribution theory, or otherwise, in connection with any work-related disease, sickness, death, injury, or accident.

18

19

Section 7.12    Employees are prohibited from carrying any material, scaffold or tools exceeding one hundred (100) pounds to or from jobs.

Section 7.13    Any building in which work is performed between November 1 and April 1 shall be heated.

Section 7.14    The Employer agrees that it shall comply with all applicable federal and state laws concerning worker's compensation, including all applicable standards, rules, and regulations issued pursuant thereto.

Section 7.15    The Employer shall at all times provide safe tools, materials, equipment, and working conditions.

Section 7.16    (a) If an employee covered by this Agreement sustains an accidental injury in the course of his employment which requires immediate medical care off the premises, during work hours, such employee shall be permitted to obtain medical care at once. The employee shall be paid his regular wages for that day, not to exceed eight hours, for the time necessarily spent in going to and from a physician's office, medical center, or hospital, as well as the time required to obtain the appropriate medical care. Except in unusual circumstances, this provision shall be effective only on the date of the injury, unless subsequent visits, during

20

working hours, are required by the Employer's physician for independent medical examination.

(b) If an injured employee needs to be taken to a medical care facility following an injury, he shall be taken to the nearest appropriate medical facility from the job site at the Employer's expense.

(c) The job steward or lead man shall be immediately notified of all injuries. If the steward or lead man determines that someone should accompany the injured employee to the hospital, medical center, physician's office or, later, to the employee's home, the Employer shall select such person, who shall be compensated at his regular rate for such services. If the Employer fails to select such person promptly, the steward or lead man shall select such person.

(d) If an employee is injured in the course of his employment, he shall not be dismissed from such employment because of his injury, nor shall he be dismissed during the period of medical care required by the injury, unless there is no work available with his Employer, or unless his dismissal is due to a condition beyond the control of the Employer. This paragraph shall not obligate Employer to pay an employee while the employee is disabled.

(e) The Union shall be notified by the Employer within seventy-two (72) hours

21

following any reportable injury falling within the scope of this Article.

Section 7.17  All Journeymen and Apprentices including tapers and painters shall be required to wear either white overalls or white pants and whenever possible present a neat and clean appearance.

Section 7.18  Notwithstanding any other provision, every Employer shall be obligated to abide by and comply with any applicable OSHA regulation or standard.

## ARTICLE 8
## WAGE RATES

Section 8.1  (a) The Union and the Association shall establish various "Wage Zones" within the Union's jurisdiction, as set forth in Appendix G, as a basis for determining the wages that will prevail in each Zone. When any Bargaining Unit Employee works in any Zone, the Employee shall receive the higher of (1) the hourly wage rate for the Zone in which the employee's Local Union is chartered (the "Employee's Home Zone") (see Appendix B through F) or (2) the hourly wage rate for the Zone where the work is being performed.

Section 8.2  (a) Effective May 1, 2004, the regular minimum wage for Journeymen Painters and Tapers working in the

Union's jurisdiction shall be $32.23 per hour in Zone A; $28.10 per hour in Zone B and $25.30 per hour in Zone C.

(b) Effective May 1, 2005, the total regular minimum wage rate and fringe benefit contributions for Journeymen Painters and Tapers working in the Union's jurisdiction shall be increased by $2.20 per hour for work in Zone A and $1.95 per hour for work in Zones B and C. This amount shall be allocated by the Union between wages and fringe benefits.

(c) Effective May 1, 2006, the total regular minimum wage rate and fringe benefit contributions for Journeymen Painters and Tapers working in the Union's jurisdiction shall be increased by $2.40 per hour for work in Zone A and $2.05 per hour for work in Zones B and C. This amount shall be allocated by the Union between wages and fringe benefits.

(d) Effective May 1, 2007, the total regular minimum wage rate and fringe benefit contributions for Journeymen Painters and Tapers working in the Union's jurisdiction shall be increased by $2.60 per hour for work in Zone A and $2.15 per hour for work in Zones B and C. This increase shall be allocated by the Union between wages and fringe benefits.

(e) During the life of this Agreement, all Apprentices and Apprentice Applicants shall

22

23

receive their proper percentage of Journeymen wages based on the applicable wage rate.

Section 8.3    (a)  The regular rate of wages for all Foremen shall be the Journeymens' rate plus one dollar ($1.00) per hour.

(b) the regular rate of wages for all General Foremen shall be the Journeymens' rate plus two dollars ($2.00) per hour.

(c) a regular Foreman shall be appointed after eight (8) or more Journeymen or Apprentice employees have been employed on one particular job site.

(d) A General Foreman shall be appointed after sixteen (16) or more Journeymen or Apprentice employees have been employed on one particular job site.

Section 8.4    All work performed outside the normal work day or the adjusted work day , in accordance with Article 6.1 (b), shall be considered as overtime and shall be paid at one and one-half (1fi) times the employee's regular rate.

Section 8.5    All work performed in industrial and commercial buildings only after 3:30 p.m. or before 7:00 a.m. Monday to Friday inclusive until 7:00 a.m. Saturday, shall be paid at the rate of nine (9) hours of pay for eight (8) hours worked. If less than eight hours of work is performed during this period, each employee shall be paid at the premium rate one (1) extra

24

hour of pay above the number of hours actually worked. The Employer shall report all such work to the Union at least twenty-four (24) hours before the work begins or be subject to the procedures of the Joint Trade Board. If such notice is not given, all work performed shall be paid at time and one-half (1fi) the employee's regular rate.

Section 8.6    If an employee works more than eight (8) hours in a day, premium pay of time and one-half (1fi) shall be paid for each hour worked after eight (8) hours. All work on Saturday, Sunday, and Holidays, if permitted pursuant to Article 6.3, shall also be at time and one-half (1fi) the employee's regular rate (subject to Article 6.4, for Saturday makeup).

Section 8.7    (a) The Employer shall establish and maintain a weekly payday which shall be Friday, not later than the ending time of the normal work day. Payment of wages is to be made on the job site or, if prior arrangements have been made and agreed to by the Union, the employees and the Employer, such payments may be made at the Employer's principal place of business, by electronic transfer or mailed to the employee. All employees shall be paid by negotiable check for all work performed up through and including the Wednesday night preceding said payday.

25

(b) Each employee shall be furnished with a detachable check stub showing the Employer's business name, the employee's name or social security number, total straight time hours, overtime hours, the ending date of the pay period, the total amount due, and all itemized deductions. The Employer shall (as shown on the pay stub) conform with federal law pertaining to the payment of Social Security. It shall be a violation of this Agreement for an Employer to issue any check other than a payroll check for compensation earned under this Agreement.

(c) Employees shall be required to fill out time sheets. The time sheet will contain the employee's name, all regular straight time hours worked, all overtime hours worked, the day and month in which the work was preformed, and the location of the job site. The time sheet must by completed by the employee and signed by the employee. If the employee is not capable of completing a time sheet it may be completed by another Bargaining Unit Member. The employee must sign or apply his/her mark to the time sheet. All time sheets must be kept by the Employer for six (6) years. The time sheet must be turned into the Superintendent, General Foreman or Foreman on the job site by the end of the working day for which the pay period ends. If there is no Superintendent, General Foreman or Foreman on the job site, the

Employer must make arrangements for the time sheets to be picked up on the job site or allow the time to be called into the shop no later than 10:00 a.m. the day following the end of the pay period. If no time sheet is turned in the Employer is not obligated to pay the employee until the following payroll period. The employee will stand no loss of time for complying with this provision.

(d) An Employer, who requests or insists on having daily time sheets mailed in, shall furnish employees with sufficient stamped envelopes or funds to cover the expense incurred. The time on all time sheets and records shall be expressed in terms of the actual number of hours worked. Hours for which time and a half are to be paid shall be shown separately from the number of hours actually worked. Each employee shall make out and sign the time sheets or, if someone else makes out the time sheets for him, the employee shall sign his time sheets.

(e) Any Employer hiring Journeymen, Apprentices, or Apprentice Applicants to work between 3:30 p.m. Friday and 7:00 a.m. Monday (if Article 6.1(b) is in effect, between either 3:30 p.m. or 4:30 p.m. Friday and 7:00 a.m. or 8:00 a.m. Monday) for work only on that particular job, shall pay such employees on

26

27

or before 3:30 p.m., or the ending hour on the normal work day, of the following Friday.

Section 8.8    If an employee, the Union, or an employee benefit fund provided for under this Agreement is paid by a check which is returned for insufficient funds or because the account is closed or if an Employee does not receive full and proper wages for all hours worked, the Union shall withhold all employees from jobs until all wages, dues, and fringe benefit contributions due are paid by cashiers check or by certified check unless suitable payment terms have been established. Every such employee withheld shall be paid for all time withheld up to eight (8) hours per day until all wages, dues, and fringe benefit contributions due are paid by cashiers check or by certified check. If a check for wages, dues, or fringe benefit contributions is returned for insufficient funds or because the account was closed or if an Employer is delinquent to the Funds, then, at the sole discretion of the Union, the Employer shall be obligated to pay weekly, by cashiers check or by certified check, all wages, dues, and fringe benefit contributions due. The Employer shall be obligated to pay all attorneys' fees and costs incurred in collecting such sums that are due.

Section 8.9    A discharged employee shall be paid his full wages through and

28

including the hour of discharge. Payment must be made to the employee within twenty-four (24) hours after discharge, except when the discharge occurs on a Friday, Saturday, or Sunday, in which case the employee shall be paid by 3:00 p.m. on the following Monday. If the employee is not paid in accordance with this Section, the Employer shall pay the employee the regular hourly wage rate for each hour following termination of employment until payment is actually made.

Section 8.10    All reasonable costs for transportation, food and lodging shall be paid by the Employer when it is not practical for the employee to return to his usual place of residence each evening.

Section 8.11    When an employee files a workers' compensation claim and he is assigned by the Employer to light duty, the employee shall remain a member of the Bargaining Unit. The Employer shall pay to the employee the appropriate hourly wage rate and make contributions to all Benefit Funds set forth in Article 9 for all hours actually worked by the employee.

29