## ARTICLE 9
## BENEFIT FUNDS

Section 9.1  Each Employer bound by this Agreement, and its affiliates, agree to make contributions to the Painters' District Council No. 30 Health and Welfare Fund ("Health and Welfare Fund"), the Painters' District Council No. 30 Pension Fund ("Pension Fund"), the Painters' and Allied Trades District Council No. 30 Joint Apprenticeship and Training Fund ("Apprenticeship and Training Fund"), the International Union of Painters and Allied Trades Joint Apprenticeship and Training Fund ("International Apprenticeship Fund"), and the International Union of Painters and Allied Trades Union and Industry Pension Fund ("International Pension Fund"), (collectively the "Funds") in accordance with the terms of this Agreement and with the Agreements and Declarations of Trust ("Trust Agreements") under which each Fund is operated.

Section 9.2  (a) Effective May 1, 2004 the fringe benefit contribution due for each hour or portion thereof worked by an individual covered by this Agreement shall be in accordance with Appendixes A through F.

(b) Effective May 1, 2005 and each May 1 thereafter, the Union may in its sole discretion allocate a portion of the negotiated

30

increase to the above Funds. The Employers shall be notified of the allocation prior to May 1 of each year.

Section 9.3  (a) At all times, contributions and the completed monthly remittance report form (provided by the Funds) as required by this Article 9 shall be paid and remitted to the Painters' District Council No. 30 Funds' Office. If the Funds' monthly remittance report is not completed in its entirety, the report shall be considered delinquent. If appropriate, contributions shall then be directed by the Funds' Office on behalf of each employee to the employee benefit fund for the Employee's Home Zone. Notwithstanding the above, all contributions, if any, due to the International Pension Fund shall be remitted directly to the International Pension Fund.

(b) All contributions to the Funds shall be submitted with the Funds' remittance report forms with full, complete and accurate representations of the hours worked and the sums due for each employee.

(c) The contributions and remittance reports to the Funds shall be due as of the 15th day of the month after the month in which the work was performed, or on such other date as this Agreement may require. As of the due date, the contributions shall be considered the assets of each Fund.

31

Section 9.4   Each Employer adopts and agrees to be bound by each Fund's Trust Agreement, and as the Trust Agreement(s) may be amended hereafter, as fully as if the Employer was an original party thereto. The Employer hereby designates the Association Trustees named in the respective Trust Agreement, together with their successors, as its representatives on the Board of Trustees of each Fund. The Employer agrees to be bound by all actions taken by each Board of Trustees pursuant to the powers granted them by federal law or the respective Trust Agreements. The Employer recognizes that each Board of Trustees has the sole power to construe the provisions of the respective Trust Agreements, the respective employee benefit plans, and each Fund's rules and regulations, if any, and that all constructions, interpretations, and determinations made by the respective Trustees for their respective Funds shall be final and binding on all parties.

Section 9.5   The Employer shall contribute for each hour worked by any individual who performs any management, supervisory, or estimation services and any Bargaining Unit work. The amount of contributions due shall be presumed to be at least 140 times the then current hourly contribution rates for each month during which any such services were performed unless the

Employer provides with his monthly remittance report specific, credible evidence to the Trustees' satisfaction that the individual worked less than 140 hours. Receipt of any benefits provided for by the Funds shall not excuse the Employer's obligation to make contributions for hours worked in any capacity.

Section 9.6   If an Employer is delinquent in its contributions to any of the Funds for a period of seventy-two (72) hours, the Union shall be entitled to remove all Bargaining Unit employees from the shop or job in addition to seeking any other legal remedy it may have.

Section 9.7   Contributions not received by the due date shall be considered delinquent and shall be assessed the liquidated damages, interest, reasonable attorneys' fees and costs established by the Funds' Trustees. The Employer acknowledges that the liquidated damages are provided for by federal law and shall be used to defer administrative costs arising from the delinquency.

Section 9.8   (a) Each Employer shall furnish the Trustees with information such as the names of all subcontractors, affiliates, employees (by classification, craft and social security number), wages earned and hours worked by employees, the Employer's federal/state employer identification number, the Employer's business address (which shall not be

32

33

a P.O. Box), the principal corporate officer's or business owner's driver's license number, proof of the Employer's corporate status, proof of insurance or surety bonds as required by this Agreement, and such other information as may be required by the Trustees. Such information available at the time this Agreement is executed shall be provided within seven (7) days of execution; all other information shall be provided within seven (7) days of the Trustees' written request.

(b) In addition, the Union and/or the Funds' Trustees shall have the authority to audit the Employer's books and records, including the books and records of affiliated employers, in accordance with the terms of the Funds' Trust Agreements. The Employer shall be responsible, in accordance with the terms of the Funds' Trust Agreements, for the costs of audit and for all attorneys' fees incurred if discrepancies are discovered.

Section 9.9    (a) If an Employer employs a person or entity in violation of Article 16, the number of hours for which such Employer owes contributions to the Funds shall be computed by dividing the total dollar amount paid to such employees by the actual hourly wage rate paid, as determined by the Trustees.

(b) If an Employer violates this Agreement by contributing on the basis of piecework rather than contributing on the basis of hours worked, the compensation actually received by the employee will be divided by twenty-five percent (25%) of the applicable hourly wage rate in order to estimate the number of hours worked for which contributions are due.

Section 9.10    In the event the Trustees of the Health and Welfare Fund, concurring with the recommendation of their consultant, determine additional contributions are needed for the Health and Welfare Fund, the Union shall give notice to contributing Employers that a certain portion of the wage rate negotiated in the Agreement shall be paid to the Health and Welfare Fund, and said portion contributed to the Fund shall lower the wage rate accordingly.

## ARTICLE 10
## APPRENTICESHIP AND TRAINING PROGRAM

Section 10.1    (a) An Employer will be allowed to have one (1) Apprentice if at least one (1) Journeyman is employed. After the Employer employs four (4) Journeymen, the Employer will be allowed one (1) additional Apprentice; with eight (8) Journeymen, the Employer will be allowed an additional Apprentice; with each

34

35

additional four (4) Journeymen, an additional Apprentice will be allowed.

(b) Notwithstanding above, the ratio of Apprentice tapers to Journeymen tapers shall not exceed a one to one ratio.

Section 10.2    (a) Any Apprentice who works in the geographical jurisdiction of the Union shall be immediately enrolled in the Painters' and Allied Trades District Council No. 30 Joint Apprenticeship and Training Program ("Training Program") which is incorporated and made part of this Agreement. The Apprentice shall be required to attend the Training Program's next scheduled apprentice training class.

(b) Any Apprentice or Apprentice Applicant shall be enrolled in the Training Program effective with the applicant's date of hire.

(c) If an Employer has a contractual obligation to another apprentice program and fails to abide by the terms of this Section, the Employer shall nevertheless be obligated to the Funds set forth in Article 9 for all of the contributions required by this Agreement for each hour or fraction thereof that an Apprentice is paid by the Employer or attends the other apprentice program.

(d) An Employer shall provide, within seven (7) days of hiring, the Training Fund with the names and social security number of every

36

Apprentice and Apprentice applicant employed by the Employer.

Section 10.3    Except in the final year of his apprenticeship, no Apprentice shall be permitted to take charge of any job or to work on any job unless there is at least one Journeyman employed on the same job.

Section 10.4    From the Employer contributions set forth in Article 9, the Trustees of the Training Fund shall hold in trust the sum of five ($.05) cents per hour for each hour or portion thereof for which an employee received pay, and remit said sum to the International Apprenticeship Fund at such regular periods of time and in the manner and form as shall be determined by the Trustees of the International Apprenticeship Fund.

Section 10.5    (a) Before any Apprentice applicant can work in the Union's geographical jurisdiction, the Employer must obtain a permit from the Union for that Apprentice. If the permit is not obtained, the Apprentice applicant shall be considered a Journeyman for the purposes of wages and fringe benefits. Upon application to the Training Program, an Apprentice applicant shall be granted a thirty (30) day probationary period from date of employment during which time contributions to the Health and Welfare Fund, Industry Fund, Apprenticeship Fund, Pension Fund, Painters

37

District Council No. 30 dues check-off and Painters' District Council No. 30 Organizing and Defense Fund will not be required.

(b) Apprentice applicants shall be paid at the rate of forty (40) percent of Journeymen's wage rate for the first thirty (30) days of employment.

Section 10.6    The regular wage rate for Apprentices shall be the following respective percentages of the then current regular rate for Journeymen:

| | |
|---|---|
| 1st six months | 40% of Journeymen's wage rate |
| 2nd six months | 45% of Journeymen's wage rate |
| 3rd six months | 50% of Journeymen's wage rate |
| 4th six months | 55% of Journeymen's wage rate |
| 5th six months | 70% of Journeymen's wage rate |
| 6th six months | 85% of Journeymen's wage rate |
| Thereafter | 100% of Journeymen's wage rate |

## ARTICLE 11
## EMPLOYERS' INDUSTRY FUND

Section 11.1    Each Employer shall contribute the sum of one and one half percent (1.5%) of the gross wages of all employees in each payroll period and shall remit such sums to the Northern Illinois Painting and Drywall Institute ("Employers' Industry Fund") by the due date set forth in Article 9.

38

Section 11.2    The Trustees of the Employers' Industry Fund, and their successors, shall be appointed by the Association.

Section 11.3    Such contributions shall be applied for the purpose of promoting the painting, decorating and drywall industry in the area covered by this Agreement and shall not be used, directly or indirectly, to the detriment of the parties to this Agreement.

Section 11.4    The Employers' Industry Fund hereby established shall be administered by its Board of Trustees and said Trustees shall establish and maintain a Trust Fund, the terms of which are hereby accepted by the Employers signatory to this Agreement.

Section 11.5    The Employer agrees that a representative of its company will attend one (1) meeting of either the FCA of Illinois or the Northern Illinois Painting and Drywall Institute within twelve (12) months of executing this Agreement.

## ARTICLE 12
## INSURANCE AND SURETY BONDS

Section 12.1    Each Employer agrees to be bound by the provisions of the Illinois Workers' Compensation Act and the Illinois Workers' Occupational Disease Act and shall submit to the Union certificates of insurance

39

under the Acts or proof of self-insurance before commencing any work covered by this Agreement.

Section 12.2    Before commencing any work covered by this Agreement, the Employer shall provide a performance or surety bond, in the amount and under the terms set forth below, to insure the prompt and full payment of all contributions, dues/assessments, and wages due in accordance with Articles 4, 8, 9, and 11:

$10,000. - 6 or fewer covered employees
$25,000. - 7 but fewer than 13 covered employees
$50,000. - 13 but fewer than 25 covered employees
$75,000. - 25 or more covered employees

Section 12.3    The bond shall be in a form acceptable to the Union and the Association and shall:

(a) be written by an insurance carrier authorized, licensed, or permitted to do business in the State of Illinois; or

(b) be secured by a cash deposit of the full amount of such bond in an account maintained jointly by the Trustees of the Funds; or

(c) be secured by other assets or personal sureties acceptable to the Trustees which equal or exceed in value the full amount of the bond; or

(d) be secured by any combination of (a), (b), and/or (c) above.

Section 12.4    The Employer must maintain the bond (or other security arrangement acceptable to the Union) for the term of this Agreement and for a period of six months following the Agreement's termination. Any bond (or other security arrangement) must provide that it shall be payable on written demand by the Union.

Section 12.5    (a) If an Employer fails for any reason to satisfy the bonding requirement of this Article, the Employer or the Employer's corporate officials who are authorized to execute agreements or sign checks, or to designate the persons authorized to do so, shall be personally liable for the wages, dues/assessments, and fringe benefit contributions due under this Agreement or the Funds' Trust Agreements. This Section shall not relieve or excuse in any way any Employer of the obligation to provide the bond required by Article 12.2 nor shall this Section limit the personal liability of any Employer or corporate official based on state or federal law. An Employer shall be required to submit for an

40

41

audit any document required by this Agreement and shall provide such records as the Union considers necessary to enforce the provisions of this Agreement.

(b) notwithstanding any other provision in this Article, if the performance or surety bond is obtained and maintained in accordance with this Article and provided the Employer has completely and accurately reported and paid on a timely basis for all covered employees and hours worked under this Agreement, the Employer or the Employer's appropriate corporate officials shall not be personally liable for a delinquency as set forth in Article 12.5 (a).

(c) Article 12.5 (b) shall also apply to the extent that an Employer can establish that a subcontractor(s) has complied with the bonding and reporting obligations pursuant to Article 12.5 (b).

12.6. An Employer covered by the Illinois Unemployment Compensation Act ("IUCA") shall provide the Union with the Employer's IUCA identification number. An Employer not covered by the IUCA agrees to elect to be bound by the IUCA and shall be personally liable for the payment of IUCA benefits.

42.

## ARTICLE 13
## JOINT TRADE BOARD

Section 13.1    The Union and the Association agree to establish and maintain a Joint Trade Board consisting of twelve (12) members with six (6) members and an alternate appointed by each party. All disputes and grievances shall be referred to the Joint Trade Board, unless as otherwise expressly provided for under this Agreement.

Section 13.2    The Joint Trade Board shall have the right to establish reasonable rules and regulations for its operation and such rules and regulations shall be binding upon all the parties.

Section 13.3    Three (3) members of the Joint Trade Board shall constitute a quorum, provided that at least one (1) member is representing each party to this Agreement. In the absence of any party's representatives or if there is a vacancy, that party shall be entitled to cast pro rata through the members present the votes of an absent member or vacant position so that at all times the votes of each party shall be equal. Any decision of the Joint Trade Board shall be final and binding upon every party and any signatory to this Agreement.

Section 13.4    (a) The officers of the Joint Trade Board shall be a Chairman and a

43

Secretary-Treasurer. One officer shall be a representative of the Union and the other officer shall be a representative of the Association.

(b) The Joint Trade Board shall meet once every quarter and at such other times during the year as the Chairman determines.

Section 13.5    If the Joint Trade Board finds that an Employer violated this Agreement, the Joint Trade Board is authorized to fashion, in its sole discretion, all appropriate remedies, including but not limited to, awarding actual damages to the aggrieved individual or entity, plus fines not to exceed one thousand dollars ($1,000.00) per violation, and assessing liquidated damages, interest, costs, reasonable attorneys' fees, administrative expenses, and auditing fees incurred by the Joint Trade Board. Such remedies and assessments shall also be imposed on the Employer if the Joint Trade Board, any party to this Agreement, or any entity enforcing its rights under this Agreement obtains judicial enforcement of the Joint Trade Board Award.

Section 13.6    If the Joint Trade Board deadlocks, all matters in dispute shall be referred to arbitration by either party. The complaining party may submit the matter to binding arbitration before the American Arbitration Association ("AAA") (Labor Dispute Rules) in Chicago. The decision of the arbitrator shall be final and binding. Each party

44

shall bear its own costs but shall share the costs of the arbitrator and of the AAA.

Section 13.7    If the Joint Trade Board finds that a member in good standing of Painters' District Council No. 30 violated this Agreement, Painters' District Council No. 30 shall have the duty to prefer charges against such member.

Section 13.8    If an Employer violates the provisions of Article 8 or Article 16, the Employer shall be required to provide a thirty thousand dollar ($30,000) bond for the life of the Agreement, in addition to any other bond which may be required. The Joint Trade Board shall meet within five (5) days of giving notice to an Employer charged with violating the above Articles.

Section 13.9    Each and every Employer and member of the Union pledges upon his honor not to break the rules and regulations embodied herein, which have been promulgated for the improvement and betterment of the entire organized painting, decorating and drywall industry in the jurisdiction of Painters' District Council No. 30, and, furthermore, each shall recognize it to be their duty to report immediately to the Trade Board, in writing, any facts, and facts only, pertaining to any violation of the Agreement.

45

## ARTICLE 14
## MISCELLANEOUS

Section 14.1    The Employer shall give notice to the Union in writing not later than ten (10) days after the occurrence of any of the following events relating to the Employer, occurring after the date hereof:

(a)    formation of partnerships;
(b)    termination of business;
(c)    change of name commonly used in business operation;
(d)    change of form of business organization;
(e)    incorporation of business;
(f)    dissolution of corporation;
(g)    name and business organization of successor;
(h)    admission to or withdrawal from any association operating as a multi-employer bargaining agent.
(I)    formation of a L.L.C.

A copy of this notification shall be sent to the Association Secretary.

Section 14.2    The Employer shall maintain an office and telephone where it can be contacted during the usual working hours.

46

Section 14.3    The Association and the Union shall share equally in the cost of printing copies of this Agreement, which shall bear the union label.

Section 14.4    Employees covered by this Agreement shall, during the life hereof, have the right to respect any legal picket line validly established by any bonafide labor organization. In addition, the Union has the right to withdraw employees covered by the Agreement whenever the Employer is involved in a legitimate primary labor dispute with any bonafide labor organization. These rights shall not be subject to the jurisdiction of the Joint Trade Board.

Section 14.5    Should any part of, or any provision of this Agreement be rendered or declared invalid by reason of any existing or subsequent enacted legislation, or by any decree of a court of competent jurisdiction, such invalidation of such part or portion of this Agreement shall not invalidate the remaining portions thereof.

Section 14.6    Every employee hired shall be required to provide the Employer and the Union with a driver's license number or state identification number. Every employee must have a valid photo identification card issued by the Union. It shall be the Employer's responsibility to ensure that all employees are in possession of the

47

Union issued photo identification card while employed by the Employer.

Section 14.7   The Employer shall employ at least one (1) Journeyman.

Section 14.8   The Union shall provide ongoing Journeyman education classes for safety and skills training and will notify the Employers of all scheduled classes.

# ARTICLE 15
## THE PAINTERS AND ALLIED TRADE LABOR-MANAGEMENT COOPERATION INITIATIVE

Section 15.1   (a) Commencing with the 1st day of May, 2004, and for the duration of this Agreement, and any renewals or extension thereof, the Employer agrees to make payments to The Painters and Allied Trades Labor-Management Cooperation Initiative ("LMCI") for each employee covered by this. Agreement, as follows:

(b) For each hour or portion thereof, for which an employee receives pay, the Employer shall make a contribution of $.05 to the LMCI.

(c) For the purpose of this Article, each hour paid for, including hours attributable to show up time, and other hours for which pay is received by the employee in accordance with

48

the Agreement, shall be counted as hours for which contributions are payable.

(d) Contributions shall be paid on behalf of any employee starting with the employee's first day of employment in a job classification covered by this Agreement. This includes, but is not limited to, apprentices and apprentice applicants.

Section 15.2   (a) The Employer and Union agree to be bound by and to the Agreement and Declaration of Trust, as amended from time to time, establishing the LMCI.

(b)  The Employer hereby irrevocably designates as its representatives on the Board of Trustees such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors.

Section 15.3   All contributions shall be made at such time and in such manner as this Agreement provides in Article 9. The LMCI Trustees may at any time conduct an audit in accordance with the Agreement and Declaration of Trust. If an Employer fails to make contributions to the LMCI within twenty (20) days after the date required by the Trustees, the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provision hereof to the contrary notwithstanding, and the Employer shall be liable for all costs of collection of the

49

payments due together with attorneys' fees and such penalties as may be assessed by the Trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no-strike" clause which may be provided or set forth elsewhere in this Agreement.

## ARTICLE 16
## SUBCONTRACTING

**Section 16.1**  If an Employer contracts or subcontracts any work covered by this Agreement to be done at the job site of the construction, alteration, painting or repair of a building or structure or other work to any person or proprietor who is not signatory to this Agreement, the Employer shall:

(a) require such subcontractor to be bound by all the provisions of this Agreement. Such signatory Employer shall maintain daily records of the subcontractor and the subcontractor's employees' job site hours and shall be liable for payment of wages, dues check-off, as well as payments to the Funds identified in Articles 9, 11, and 15 of this Agreement for each of such hours worked. The Union may require an Employer to deposit into an escrow the subcontractor's estimated contributions to the Funds.

50

(b) obtain from any subcontractor a list of all of the subcontractor's employees, with address and social security number, a list of the subcontractor's employees performing the subcontracted work, the address and legal description of the property, a brief description of the type of property and a counting of the surfaces subcontracted out, and the subcontractor's price. This information must be submitted on the Union's form before the job starts. If any Employer violates this Article, the Employer shall be subject to fine and any remedy awarded by the Joint Trade Board.

(c) the Employer which subcontracts must file with the Funds' Office a copy of the subcontractor's contribution report forms as an attachment to the Employer's own remittance reports. A subcontractor is not excused from the obligation to file its own remittance reports.

**Section 16.2**  Any Employer which sublets or subcontracts any work covered by this Agreement shall be directly responsible and obligated for the wages, dues/assessments, benefits, and employee benefit fund contributions owed to employees or to the Funds for work performed for the subcontractor. The terms of this Article shall apply to all Bargaining Unit work performed directly or indirectly by the Employer, or any affiliate or member of a controlled group, as defined in the Internal Revenue Code.

51

**Section 16.3**    To protect and preserve, for the employees covered by this Agreement, all work they have performed and all work covered by this Agreement, and to prevent any device or subterfuge to avoid the protection and preservation of such work, it is agreed that if the Employer performs on-site construction work of the type covered by this Agreement, under its own name or the name of another, as a corporation, company, partnership, or other business entity, including a joint venture, wherein the Employer, through its officers, directors, partners, owners, or stockholders, exercises directly or indirectly (through family members or otherwise), management, control, or majority ownership, the terms and conditions of this Agreement shall be applicable to all such work.

## ARTICLE 17
## SUBSTANCE ABUSE AND RECOVERY PROGRAM

**Section 17.1**    The Employer and the Union agree to the Substance Abuse and Recovery Program (Program) as described in this Article 17 and further agree that the Employer may only implement a policy regarding drug and alcohol abuse to the extent that it complies with Program.

52

**Section 17.2**    It is further agreed that there will be established a Joint Committee on Substance Abuse and Recovery which will be made up of three (3) persons selected by Union and three (3) persons selected by the Association. This Committee shall meet on the request of any two members at reasonable times and places, no less often than quarterly. The Committee shall be empowered, upon the affirmative vote of five members of the Committee, to establish or modify this drug and alcohol testing policy which shall become binding upon the parties to this Agreement provided sixty (60) days written notice has been served on the Union and the Association.

**Section 17.3**    The parties recognize the problems created by drug and alcohol abuse and the need to develop prevention and treatment programs. The Employer and the Union have a commitment to protect people and property, and to provide a safe working environment. The purpose of the Program is to establish and maintain a drug-free, alcohol-free, safe, healthy work environment for all of the employees covered by this Agreement.

**Section 17.4**    For the purpose of this Article, the term "Prohibited Substances" shall mean and include any illegal drugs, controlled substances (other than prescribed medications), look alike drugs, designer drugs and alcoholic beverages.

53

For the purpose of this Article the, term "Job Site" shall include that portion of the site on which construction or construction related activities is taking place as well as the portion of the site or project which is used for parking and shall also include automobiles, trucks and other vehicles owned or leased by the Employer.

Section 17.5    It is recognized that there are certain medications which may impair the performance of job duties and mental and/or motor functions. In such cases, with the permission of an employee and after consultation with such employee's physician or other physician, the Employer shall make every effort to accommodate an employee by reassignment to a job compatible with the administration of such medications.

Section 17.6    An employee who is involved in the sale, purchase, dispensation, distribution, possession, consumption or use of a Prohibited Substance on the Job Site shall be subject to termination in accordance with the terms of this Agreement.

Section 17.7    No pre-employment screening shall be permitted and no random testing shall be permitted except as provided in Sections 17.17(c).

54

Section 17.8    An employee involved or injured in a work place accident may, at the discretion of the Employer, be required to submit to a drug test. It is agreed that under certain circumstances, an employee whose work performance and/or behavioral conduct indicates that he or she is not in a physical condition that would permit the employee to perform a job safely and efficiently will be subject to submitting to a urine, blood or Breathalyzer test to determine the presence of alcohol or drugs in the body, provided:

(a)    The Employer has reasonable grounds to believe that the employee is under the influence of or impaired by the use of Prohibited Substances. Reasonable grounds include abnormal coordination, appearance, behavior, speech, odor or any detectable amount of a Prohibited Substance. It can also include work performance, safety and attendance problems.

(b) The supervisor's reasonable grounds must be confirmed by another management representative in conjunction with a representative of the Union, which may be steward or Business Representative if available in a reasonable period of time. Both management representatives must describe such grounds in writing prior to any testing being directed.

(c) The employee will be provided with an opportunity to explain his or her

55

conduct at a meeting with the Representatives, including the Union Representative referred to in Article 17.8(b), provided that such a Union Representative is reasonably available and provided further that all reasonable efforts have been made to attempt to have such Union Representative present.

Section 17.9    An employee who refuses to submit to a test requested pursuant to Article 17.8 shall be offered the option of enrolling in an Alcohol/Drug Assistance Program. In the event the employee refuses to do either, he shall be subject to termination.

Section 17.10    Drug testing shall take place at a recognized medical facility or certified independent laboratory at the expense of the Employer.

Section 17.11    When a test is required, the specimen will be identified by a code number, not by name to insure confidentiality of the donor. Each specimen contained will be properly labeled and made tamper proof.

Section 17.12    The handling and transportation of each specimen will be properly documented through the strict chain of custody procedures.

Section 17.13    Any sample taken for testing must be tested as follows:

56

(a) for screening; and

(b) in the event the screening test is positive, for confirmation testing by gas chromatography/mass spectrophotometer (GC/MS)

Section 17.14    Drug testing shall only be conducted by a CAP or NIDA certified independent laboratory.

Section 17.15    The Employer, all of its medical personnel and the personnel of the laboratory/testing facility shall adhere to the American Occupational Medical Association's Code of Ethical Conduct for Physicians Providing Occupational Medical Services and to AOMA Drug Screening in the Work Place Ethical Guidelines.

Section 17.16    (a) An employee undergoing testing shall be placed on an unpaid leave of absence pending results of the screening test.

(b) In the event that the results of the screening test are positive, there shall be confirmation testing by a laboratory selected by the Union. In the event the results of the confirmation testing are negative, the employee shall be reinstated with back pay. Unless an initial positive result is confirmed as positive, it shall be deemed negative and reported by the laboratory as such.

57

(c) In the event that results of the confirmation testing are positive, the employee will be given the opportunity to enroll in a recognized Alcohol/Drug Assistance Program. In the event such employee declines to participate in the ADAP, he shall be subject to termination.

Section 17.17  An employee who fails to cooperate, abandons, does not complete the treatment program prescribed by the ADAP counselor or who fails to live up to the terms and conditions of this Agreement will be subject to termination.

(b) If treatment necessitates time away from work, the Employer shall provide for the employee an unpaid leave of absence for purposes of participation in an agreed upon treatment program. An employee who successfully completes a rehabilitation program shall be reinstated to his or her former employment status, if work for which he or she is qualified exists.

(c) Employees returning to work after successfully completing the rehabilitation program will be subject to drug test without prior notice for a period of one (1) year. A positive test result will result in termination.

(d) In order to ensure confidentiality in the ADAP program, Employer shall designate a management Representative as the Employee Assistance Representative for the Employer.

58

This individual shall be the sole representative of the Employer who may be in possession of the employee's ADAP information.

(e) Whenever Owner or Awarding Agency specifications require the Employer to provide a drug-free work place, such additional requirements may be incorporated herein upon mutual agreement of the Union and the Employer.

Section 17.18  All aspects of this policy and Program shall be subject to the Joint Trade Board.

Section 17.19  Nothing in this Article shall be construed to limit the Employer's right to suspend or terminate an employee so long as such suspension or termination is otherwise permitted without regard to the provisions of this Article.

## ARTICLE 18
## TERM AND RENEWAL

Section 18.1  This Agreement shall be in effect until April 30, 2008, and shall continue in effect from year to year thereafter and, unless the parties otherwise agree, the parties hereto hereby specifically adopt the Agreement between the Union and the Association for the contract period subsequent to April 30, 2008, and each such subsequent Agreement thereafter unless written notice of such termination of

59

Agreement is given from the Employer or the Union at least one hundred twenty (120) days prior to the expiration of the then current Agreement adopted by reference.

Section 18.2    At least one hundred and twenty (120) days prior to the original termination of this Agreement or prior to the expiration date of any renewal of this Agreement, representatives of Painters' District Council No. 30 and the Association shall convene and meet for the purpose of reviewing the various terms and provisions of this Agreement.

This Agreement shall remain in full force and effect from May 1, 2004 through April 30, 2008.

FCA of Illinois

Date: 4/27/04

Painters District Council 30

Date: 4-26-04

60

## APPENDIX A

INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES UNION AND INDUSTRY PENSION FUND

The Employer and the Union agree as follows:

1. (a) Commencing with the 1st day of May, 2004, and for the duration of the Agreement, and any renewals or extension thereof, the Employer agrees to make payments to the IUPAT Union and Industry Pension Fund for each employee covered by this Agreement, as follows:

(b) For each hour or portion thereof for which an employee receives pay, the Employer shall make a contribution in accordance with Appendices C through F to the above named Pension Fund;

(c) For the purpose of this Article, each hour paid for, including hours attributable to show-up time, and other hours for which pay is received by the employee in accordance with the Agreement, shall be counted as hours for which contributions are payable;

(d) Contributions shall be paid on behalf of any employee starting with the employee's first day of employment in a job classification covered by this Agreement. This

61

includes, but is not limited to, apprentices, helpers, and probationary employees.

(e) The payments to the Pension Fund shall be made to the IUPAT Union and Industry Pension Fund, which was established under an Agreement and Declaration of Trust, dated April 1, 1967. The Employer hereby agrees to be bound by and to the said Agreement and Declaration of Trust, as amended from time to time, as though he had actually signed the same.

2. The Employer hereby irrevocably designates as its representatives on the Board of Trustees such Trustees as are now serving, or who will in the future serve, as employer Trustees, together with their successors. The Employer further agrees to be bound by all actions taken by the Trustees pursuant to the said Agreement and Declaration of Trust, as amended from time to time.

3. All contributions shall be made at such time and in such manner as the Trustees require; and the Trustees may at any time conduct an audit in accordance with said Agreement and Declaration of Trust.

4. If an Employer fails to make contributions to the Pension Fund within twenty (20) days after the date required by the Trustees, the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provisions hereof to the

62

contrary notwithstanding, and the Employer shall be liable for all costs of collection of the payments due together with attorneys' fees and such penalties as may be assessed by the Trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no-strike" clause which may be provided or set forth elsewhere in this Agreement.

5. The Pension Plan adopted by the Trustees shall at all times conform with the requirements of the Internal Revenue Code so as to enable the Employer at all times to treat contributions to the IUPAT Union and Industry Pension Fund as a deduction for income tax purposes.

63

## APPENDIX B

### WAGE and CONTRIBUTION RATES
EFFECTIVE MAY 1, 2004
THROUGH APRIL 30, 2005
FOR MEMBERS OF PAINTERS
LOCAL UNIONS 97, 154, 448 and 1285

| | |
|---|---|
| Hourly wage | $32.23 per hour |
| Health and Welfare Fund | $ 4.85 per hour |
| Painters D.C. 30 Pension Fund | $ 4.20 per hour |
| Apprenticeship Fund | $ .30 per hour |
| I.U.P.A.T. Labor Management Fund | $ .05 per hour |
| Northern Illinois Painting and Drywall Institute | 1.5% of gross wages |

Note: Painters District Council 30 Pension Fund contributions are not required on Apprentices whose membership is in the above mentioned Local Unions.

64

## APPENDIX C

### WAGE and CONTRIBUTION RATES
EFFECTIVE MAY 1, 2004 THROUGH
APRIL 30, 2005 FOR MEMBERS OF
PAINTERS LOCAL UNION 209

| | |
|---|---|
| Hourly wage | $25.30 per hour |
| Health and Welfare Fund | $ 4.85 per hour |
| Painters D.C. 30 Pension Fund | $ 2.70 per hour |
| I.U.P.A.T. Pension Fund | $ 1.50 per hour |
| Apprenticeship Fund | $ .30 per hour |
| I.U.P.A.T. Labor Management Fund | $ .05 per hour |
| Northern Illinois Painting and Drywall Institute | 1.5% of gross wages |

65

## APPENDIX D

**WAGE and CONTRIBUTION RATES
EFFECTIVE MAY 1, 2004 THROUGH
APRIL 30, 2005 FOR MEMBERS OF
PAINTERS LOCAL UNIONS 465 and 467**

| | |
|---|---|
| Hourly wage | $25.30 per hour |
| Health and Welfare Fund | $ 4.85 per hour |
| Painters D.C. 30 Pension Fund | $ 1.90 per hour |
| I.U.P.AT. Pension Fund | $ 2.30 per hour |
| Apprenticeship Fund | $ .30 per hour |
| I.U.P.A.T. Labor Management Fund | $ .05 per hour |
| Northern Illinois Painting and Drywall Institute | 1.5% of gross wages |

66

## APPENDIX E

**WAGE and CONTRIBUTION RATES
EFFECTIVE MAY 1, 2004 THROUGH
APRIL 30, 2005 FOR MEMBERS OF
PAINTERS LOCAL UNION 157**

| | |
|---|---|
| Hourly wage | $25.30 per hour |
| Health and Welfare Fund | $ 4.85 per hour |
| Painters D.C. 30 Pension Fund | $ 1.60 per hour |
| I.U.P.AT. Pension Fund | $ 2.60 per hour |
| Apprenticeship Fund | $ .30 per hour |
| I.U.P.A.T. Labor Management Fund | $ .05 per hour |
| Northern Illinois Painting and Drywall Institute | 1.5% of gross wages |

67

## APPENDIX F

### WAGE and CONTRIBUTION RATES
### EFFECTIVE MAY 1, 2004 THROUGH
### APRIL 30, 2005 FOR MEMBERS OF
### PAINTERS LOCAL UNION 607

| | |
|---|---|
| Hourly wage | $28.10 per hour |
| Health and Welfare Fund | $4.85 per hour |
| Painters D.C. 30 Pension Fund | $ .75 per hour |
| I.U.P.A.T. Pension Fund | $ 3.45 per hour |
| Apprenticeship Fund | $ .30 per hour |
| I.U.P.A.T. Labor Management Fund | $ .05 per hour |
| Northern Illinois Painting and Drywall Institute | 1.5% of gross wages |

68

## APPENDIX G

### Effective May 1, 2004
### through the term of this Agreement

Zone A will include DeKalb, DuPage, Kane, Kendall and McHenry Counties in the State of Illinois.

Zone B will include Boone, JoDaviess, Lee, Ogle, Stephenson and Winnebago Counties in the State of Illinois.

Zone C will include Bureau, Ford, Fulton, Hancock, Iroquois, Kankakee, LaSalle, Livingston, Marshall, Mason, McDonough, McLean, Peoria, Putnam, Schuyler, Stark, Tazewell and Woodford Counties in the State of Illinois.

69

## SIGNATURE PAGE

The May 1, 2004 through April 30, 2008
Agreement between Painters' District Council
No. 30 and the FCA of Illinois and various
individual Painting, Decorating and Drywall
Finishing Contractors

Company Name _____

Address _____

_____

Signature _____

Title _____

Print name _____

Drivers License # _____

Phone number _____

70

71

# Vinco Painting
### Amended 1/24/08

| TOTAL WAGE DISCREPANCY | | | $3,449.86 |
|---|---|---|---|

| FUNDS | RATE | HOURS | AMOUNTS |
|---|---|---|---|
| HEALTH & WELFARE | $6.40 | 260.5 | $1,667.20 |
| PENSION | $6.50 | 252 | $1,638.00 |
| APPRENTICESHIP | $0.55 | 260.5 | $143.28 |
| I.U.P.A.T. LABOR MANAGEMENT | $0.05 | 260.5 | $13.03 |
| N.I.P.D.I. | 1.5% of gross wages | | $51.75 |
| TOTAL | | | $3,513.25 |

| DISTRICT COUNCIL | | | |
|---|---|---|---|
| DUES CHECK - OFF | 2% of gross wages | | $69.00 |
| DEFENSE FUND | $0.20 | 260.5 | $52.10 |
| TOTAL | | | $121.10 |

| TOTAL DUE TO ALL FUNDS | $3,634.35 |
|---|---|
| TOTAL DUE TO ALL MEMBERS | $3,328.76 |

| GRAND TOTAL | $6,963.11 |
|---|---|

EXHIBIT
8
C-19-08

# Loren Deland
Amended 1/24/08

| NAME | PAY PERIOD | REG. | SHIFT PAY | O.T. | HRS. WORKED | HRS. PAID TO FUNDS | WAGES | AMT. PAID | DISCREPANCY |
|------|-----------|------|-----------|------|-------------|--------------------|-------|-----------|-------------|
| Deland, Loren | 11/5/2007 | 40 | 5. | 6 | 51 | 0 | $1,911.60 | $1,625.18 | $286.42 |
| | 11/13 | 39.5 | 5 | | 44.5 | 0 | $1,575.30 | $1,398.33 | $176.97 |
| | 11/26 | 30 | 4 | | 34 | 0 | $1,203.60 | $1,062.00 | $141.60 |
| Rate: $35.40 | 12/3 | 40 | 5 | 16 | 61 | 0 | $2,442.60 | $1,982.40 | $460.20 |
| | 12/16 | | | 32 | 32 | 0 | $1,699.20 | $0.00 | $1,699.20 |
| TOTALS | | | | | 222.5 | 0 | $8,832.30 | $6,067.91 | $2,764.39 |
| | | | | | | | | Cash Payment - $800.00 | |
| | | | | | | | | | $1,964.39 |

| FUNDS | RATE | HOURS | AMOUNTS |
|-------|------|-------|---------|
| HEALTH & WELFARE | $6.40 | 222.5 | $1,424.00 |
| PENSION | $6.50 | 222.5 | $1,446.25 |
| APPRENTICESHIP | $0.55 | 222.5 | $122.38 |
| I.U.P.A.T. LABOR MANAGEMENT | $0.05 | 222.5 | $11.13 |
| N.I.P.D.I. | 1.5% of gross wages | | $41.47 |
| TOTAL | | | $3,045.22 |

| DISTRICT COUNCIL | | | |
|------------------|------|-------|---------|
| DUES CHECK - OFF | 2% of gross wages | | $55.29 |
| DEFENSE FUND | $0.20 | 222.5 | $44.50 |
| TOTAL | | | $99.79 |

| TOTAL AMOUNT DUE | | | $5,109.39 |
|------------------|--|--|-----------|
| DUE TO ALL FUNDS | | | $3,145.00 |
| DUE TO MEMBER | | | $1,864.60 |

# Loren Deland
### Amended 1/24/08

| NAME | PAY PERIOD | REG. | SHIFT PAY | O.T. | HRS. WORKED | HRS. PAID TO FUNDS | WAGES | AMT. PAID | DISCREPANCY |
|---|---|---|---|---|---|---|---|---|---|
| Deland, Loren | 11/5/2007 | 40 | 5 | 6 | 51 | 0 | $1,911.60 | $1,625.18 | $286.42 |
| | 11/13 | 39.5 | 5 | | 44.5 | 0 | $1,575.30 | $1,398.33 | $176.97 |
| | 11/26 | 30 | 4 | | 34 | 0 | $1,203.60 | $1,062.00 | $141.60 |
| Rate: $35.40 | 12/3 | 40 | 5 | 16 | 61 | 0 | $2,442.60 | $1,982.40 | $460.20 |
| | 12/16 | | | 32 | 32 | 0 | $1,699.20 | $0.00 | $1,699.20 |
| TOTALS | | | | 32 | 222.5 | 0 | $8,832.30 | $6,067.91 | $2,764.39 |
| | | | | | | | | Cash Payment | -$800.00 |
| | | | | | | | | | $1,964.39 |

| FUNDS | RATE | HOURS | AMOUNTS |
|---|---|---|---|
| HEALTH & WELFARE | $6.40 | 222.5 | $1,424.00 |
| PENSION | $6.50 | 222.5 | $1,446.25 |
| APPRENTICESHIP | $0.55 | 222.5 | $122.38 |
| I.U.P.A.T. LABOR MANAGEMENT | $0.06 | 222.5 | $11.13 |
| N.I.P.D.I. | 1.5% of gross wages | | $41.47 |
| TOTAL | | | $3,045.22 |

| DISTRICT COUNCIL | | | |
|---|---|---|---|
| DUES CHECK - OFF | 2% of gross wages | | $55.29 |
| DEFENSE FUND | $0.20 | 222.5 | $44.50 |
| TOTAL | | | $99.79 |

| TOTAL AMOUNT DUE | $5,109.39 |
|---|---|
| DUE TO ALL FUNDS | $3,145.00 |
| DUE TO MEMBER | $1,864.60 |

## Jesus Mota

Amended 1-17-08

| NAME | PAY PERIOD | REG. | O.T. | HRS. WORKED | HRS. PAID TO FUNDS | WAGES | AMT. PAID | DISCREPANCY |
|------|------------|------|------|-------------|--------------------|----|-----------|-------------|
| Mota, Jesus | 11/15/2007 | 8 | 4 | 4 | 0 | $212.40 | $0.00 | $212.40 |
| Rate: $35.40 | 11/16 | | 1 | 9 | 0 | $336.30 | $0.00 | $336.30 |

| TOTALS | | | | 13 | 0 | $548.70 | $0.00 | $548.70 |
|--------|--|--|--|----|---|---------|-------|---------|

| FUNDS | RATE | HOURS | AMOUNTS |
|-------|------|-------|---------|
| HEALTH & WELFARE | $6.40 | 13 | $83.20 |
| PENSION | $6.50 | 13 | $84.50 |
| APPRENTICESHIP | $0.55 | 13 | $7.15 |
| I.U.P.A.T. LABOR MANAGEMENT | $0.05 | 13 | $0.65 |
| N.I.P.D.I. | 1.5% of gross wages | | $8.23 |
| TOTAL | | | $183.73 |

| DISTRICT COUNCIL | | | |
|------------------|--|--|--|
| DUES CHECK - OFF | 2% of gross wages | | $10.97 |
| DEFENSE FUND | $0.20 | 13 | $2.60 |
| TOTAL | | | $13.57 |

| TOTAL AMOUNT DUE | $759.58 |
|------------------|---------|
| DUE TO ALL FUNDS | $197.30 |
| DUE TO MEMBER | $535.13 |

Page 1 of 1

# Vinco Painting Inc.

4637 N. Forestview Ave. ● Chicago, IL 60631 ● Tel. (773) 507 – 7400 ● Fax. (773) 589 - 1413

February 29, 2008

*Via fax to 630-377-2384*

Charles E. Anderson
Secretary-Treasurer
Painters District Council 30
1905 Sequoia Drive, Suite 201
Aurora, IL 60506

Dear Mr. Anderson,

On January 25, 2008 I told you that Vinco Painting never received notice of a Joint Trade Board hearing. However, mail is still being sent to Vinco Painting's old address. Again, please correct your records to show that mail should be sent to Vinco Painting at the address listed at the top of this letter.

After I informed you on January 25th that we did not receive notice of any hearing, you told me to pay the last checks for employees and to send a check to you for $50,000 with a letter by March 13, 2008. You said that you would not cash the check, but would get the case back before the Joint Trade Board. I do not understand why you are asking for a check on one hand, and then representing that you would not cash it on the other hand. Jim Stelmasek also told me just prior to faxing me the decision the numbers were outrageous and we should ignore them.

The claims made are ridiculous and untrue. For example, attached is a check paid to Jesus Mota in the amount of $441.84, which is dated December 7, 2007, with corresponding paystub that shows Mr. Mota worked 17 hours. The documents faxed by your office to us on January 25th claim that Mr. Mota worked 13 hours and was not paid anything for his work. As the documents attached to this letter show, Mr. Mota did received gross pay in an amount exceeding his alleged claim.

The other claims made by others, including, but not limited to, Loren Deland, are also ridiculous and untrue. As you also know, Loren Deland was caught on a jobsite using and selling drugs, which prompted us to immediately terminate his employment.



DEF. EXHIBIT
9
2-19-08

I cannot understand how you continue to claim that we owe any money when we were prevented from submitting our position to the board, since we did not receive any notice of the hearing and you are now trying to extort money from us.

If you truly believe that Vinco Painting received notice of the hearing, please immediately provide me with the basis of your belief, including any documents that support your belief. Otherwise, please confirm in writing that the Award is invalid.

Please send to me all agreements signed by Vinco Painting, as well as any other agreements to which Vinco Painting may be bound.


Sincerely,

Denise Angelilli
Administrative Assistant

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PAINTERS DISTRICT COUNCIL NO. 30,

     Plaintiff/Counterdefendant,

v.

VINCO PAINTING INC.,

     Defendant/Counterplaintiff.

Case No. 08-cv-1163
Judge Conlon
Magistrate Judge Ashman

## PLAINTIFF'S ANSWERS TO
## DEFENDANT'S FIRST SET OF INTERROGATORIES

Pursuant to Fed. R. Civ. P. 33, Plaintiff submits the following response to Defendant's First Set of Interrogatories:

1.   State the name, address, occupation, and title of the person answering these questions, including all persons assisting in answering these questions.

**ANSWER:** Ryan Anderson, Director of Organizational Development, Painters District Council No. 30; Charles E. Anderson, Secretary-Treasurer, Painters District Council No. 30.

2.   Identify all short-form and collective bargaining agreements to which you claim Plaintiff is and has been bound with Defendant.

**ANSWER:** Defendant is and has been bound by the collective-bargaining agreement provided with Plaintiff's Rule 26(a)(1) Disclosures.

3.   Identify all individuals with knowledge of any facts that are or you believe to be relevant to any of the allegations of your Complaint and to any of your responses, denials and/or defenses to Defendant's Counterclaim and state what knowledge each such person has.

**ANSWER:** Plaintiff objects to this request as not reasonably calculated to lead to the discovery of admissible evidence insofar as it is not limited to facts relevant to the *disputed* allegations of the complaint. With respect to the disputed allegations of the complaint, Plaintiff



EXHIBIT
10

states as follows:

*Complaint allegation 6* — Charles E. Anderson is familiar with the existence of a collective bargaining agreement between the Union and the FCAI effective May 1, 2004 through April 20, 2008.

*Complaint allegations 11-12 and 16, and counterclaim reply ¶ 8 and 12* — Charles E. Anderson and Linda Anderson are knowledgeable regarding the mailing to Vinco at the last known address provided by Vinco to the Union of notice both of the charges against Vinco and the January 17, 2008, JTB hearing and of the outcome of the hearing.

*Complaint allegation 13* — Charles E. Anderson and all other persons in attendance as reflected in the minutes of the January 17, 2007, JTB hearing provided with Plaintiff's Rule 26(a)(1) Disclosures have knowledge concerning the JTB hearing on January 17, 2008, and the JTB's findings regarding the charges against Vinco.

4.    Identify all grievances that were presented by you against Vinco to the Joint Trade Board ("JTB") on January 17, 2008, and state whether said grievance [*sic*] were verbal or written. If said grievances were written, identify all said grievances. If any grievance was verbal, state the date said grievances were discussed with Defendant and identify the location and persons present at said grievance meeting(s).

ANSWER: The grievances against Vinco presented to the Joint Trade Board on January 17, 2008, were written and were provided with Plaintiff's Rule 26(a)(1) Disclosures.

5.    For each grievance identified in your Answer to No. 4 above, identify all attempts to resolve said grievance with Defendant, including the dates, location and persons present in which said attempts were made.

ANSWER: Plaintiff objects to this request as not reasonably calculated to lead to the discovery of admissible evidence. The collective bargaining agreement contains no requirement that the Union attempt to resolve contractual disputes before bringing them to the Joint

Trade Board, and Defendant has in any event not pled any such failure as an affirmative defense.

6.    Identify the names, addresses, telephone numbers and addresses of all persons that were present at the JTB hearing and identify the persons who (including the Chairman and Secretary-Treasurer) served on the Joint Trade Board that issued the decision which is the subject of this action.

ANSWER: To the extent that it seeks information regarding persons who were present at the JTB hearing on matters unrelated to the charges against Vinco, Plaintiff objects to this request as not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff states that the minutes of the meeting provided with Plaintiff's Rule 26(a)(1) Disclosures identify all persons present for the portion of the meeting dealing with the charges against Vinco, including the members of the JTB.

7.    For each grievance identified in your Answer to No. 4 above, identify all agreements with corresponding sections therein which you allege Vinco violated.

ANSWER: Plaintiff refers to the grievance itself, submitted with Plaintiff's Rule 26(a)(1) Disclosures, which identifies the sections of the collective-bargaining agreement that the Union alleged, and the JTB found, Vinco violated.

8.    Identify the name, address, and telephone number of the person who took notes of the JTB hearing on January 17, 2008.

ANSWER: Charles E. Anderson.

9.    Identify the name, address and telephone number of the person who typed or otherwise transcribed notes taken of the JTB hearing on January 17, 2008.

ANSWER: Charles E. Anderson.

10.    Identify the name, address and telephone number of the person who mailed notice of the grievances (charges) to Vinco.

ANSWER: Linda Anderson physically placed the notices in the Union's outgoing mail, which was picked up by the U.S. Postal Service.

3

11.   Specify the location, date and time at which notice of the grievances (charges) were mailed to Vinco.

**ANSWER:** Notice of the charges was mailed to Vinco's last reported address from the Union's offices at 1905 Sequoia Drive in Aurora, Illinois, on the morning of January 3, 2008.

12.   Identify the name, address and telephone number of the person who mailed notice of the January 17, 2008 JTB hearing to Vinco.

**ANSWER:** Linda Anderson physically placed the notices in the Union's outgoing mail, which was picked up by the U.S. Postal Service.

13.   Specify the location, date and time at which notice of the January 17, 2008 JTB hearing was mailed to Vinco.

**ANSWER:** Notice of the January 17, 2008, JTB hearing was mailed to Vinco's last reported address from the Union's offices at 1905 Sequoia Drive in Aurora, Illinois, on the morning of January 3, 2008.

14.   Identify the number contained on the receipt for the certified mailing containing notice of the January 17, 2998 [*sic*] hearing mailed to Vinco.

**ANSWER:** 7006-2150-0002-0963-9644.

15.   Specify whether or not the certified mailing, which contained notice of the January 17, 2008 JTB hearing, was returned to you.
   a. If the certified mailing was returned to you, specify the reason(s) why it was returned and identify the date it was received back by you.

**ANSWER:** The certified mailing containing notice of the January 17, 2008, JTB hearing was returned to the Union's offices by the U.S. Postal Service on January 14, 2008. The Union has no first-hand knowledge as to the reason why it was returned, but states that the United States Postal Service purports to have returned it for the reason that the recipient had moved without leaving a forwarding address. Plaintiff further states that the copy of the notice sent separately on January 3, 2008, by regular first-class mail was not returned to the Union.

4

16.    Identify the name, address and telephone number of the person who mailed notice of the JTB Decision to Vinco.

**ANSWER:** Linda Anderson physically placed the notices in the Union's outgoing mail, which was picked up by the U.S. Postal Service.

17.    Specify the location, date and time at which notice of the JTB Decision was mailed to Vinco.

**ANSWER:** Notice of the January 17, 2008, JTB hearing was mailed from the Union's offices at 1905 Sequoia Drive in Aurora, Illinois, on the morning of January 22, 2008.

18.    Identify the number contained on the receipt for the certified mailing containing notice of the JTB Decision mailed to Vinco.

**ANSWER:** 7006-2150-0002-0963-9743.

19.    Specify whether or not the certified mailing, which contained notice of the JTB Decision was returned to you.
   a.    If the certified mailing was returned to you, specify the reason(s) why it was returned and identify the date it was received back by you.

**ANSWER:** The certified mailing containing notice of the JTB Decision was returned to the Union's offices by the U.S. Postal Service on February 25, 2008. The Union has no firsthand knowledge as to the reason why it was returned, but states that the United States Postal Service purports to have returned it for the reason that the recipient failed to claim it. Plaintiff further states that the copy of the notice sent separately on January 22, 2008, by regular first-class mail was not returned to the Union.

20. Identify the date(s) upon which each member of the Joint Trade Board signed the Joint Trade Board Decision.

**ANSWER:** There is no written decision signed by the members of the Joint Trade Board; the only official record of their decision is contained in the official minutes of the January 17, 2008, hearing, which the JTB approved and adopted at its subsequent meeting on March 13, 2008.

Respectfully submitted,

One of Plaintiff's attorneys

David Huffman-Gottschling
Jacobs, Burns, Orlove, Stanton and Hernandez
122 S. Michigan Ave., Ste. 1720
Chicago, Illinois 60603
(312) 372-1646

## CERTIFICATE OF SERVICE

I, David Huffman-Gottschling, an attorney, certify that I caused a copy of the foregoing document to be served upon the following person by email and by first-class mail on May 16, 2008:

Joseph P. Berglund
Berglund & Mastny, P.C.
900 Jorie Blvd., Ste. 122
Oak Brook, IL 60523-2229

berglundmastny@aol.com

David Huffman-Gottschling

## VERIFICATION

I, Charles E. Anderson, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that I am the Secretary-Treasurer of Plaintiff Painters District Council No. 30, that I have reviewed the foregoing answers to interrogatories, and that to the best of my knowledge, information, and belief formed after a reasonable inquiry those answers are complete and correct as of the time they were made.

Executed May 16, 2008

Charles E. Anderson

7