# EXHIBIT

# 1

## DECLARATION OF DENISE ANGELILLI

I, Denise Angelilli, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.    Attached as Exhibit A is a genuine copy of a Collective Bargaining Agreement I received in April, 2008, for Vinco Painting, Inc. from the Painters District Council No. 30 ("Union"), which covers the period from May 1, 2008 – April 30, 2013.

2.    On November 6, 2007, I moved my residence from 6649 Ogallah, Chicago, Illinois to 4637 N. Forestview Avenue, Chicago, Illinois 60650. At the same time, I was attending Triton College in River Grove, Illinois full time. I also take care of my two children full time who are 7 and 9 years old and I handle administrative responsibilities for Vinco Painting, Inc.

3.    I thought I notified the Union of Vinco's new address. If the Union did not receive notice, it was inadvertent on my part since my life had been complicated and become very disruptive as a result of the dispute I had with our landlord, the move to my new address, caring for my two children, attending school full time and performing administrative duties for Vinco Painting, Inc.

By: /s/  Denise Angelilli

DATED:   July 15, 2008

1

EXHIBIT

1



FCA
FINISHING CONTRACTORS
ASSOCIATION OF ILLINOIS

COLLECTIVE
BARGAINING
AGREEMENT
for

Painters District
Council

30

May 1, 2008 –

EXHIBIT

A

# ARTICLES OF AGREEMENT

This Agreement is effective this first day of May 2008 by and between Painters' District Council No. 30, International Union of Painters and Allied Trades, AFL-CIO (the "Union") and the present and future members of the FCA of Illinois (the "Association"), its successors and assigns, each employer which has assigned to the Association the exclusive authority to represent it for collective bargaining purposes and such other employers which become signatory to this Agreement (hereinafter referred to individually as the "Employer" and collectively referred to as the "Employers").

# INDEX

| Article 1 | PURPOSE AND INTENT | 5 |
|---|---|---|
| Article 2 | THE PARTIES | 6 |
| Article 3 | RECOGNITION | 8 |
| Article 4 | UNION SECURITY | 10 |
| Article 5 | THE UNION'S GEOGRAPHICAL JURISDICTION – WORK OUTSIDE THE UNION'S GEOGRAPHICAL JURISDICTION | 12 |
| Article 6 | HOURS OF WORK – HOLIDAYS | 14 |
| Article 7 | WORKING TOOLS AND CONDITIONS | 17 |
| Article 8 | WAGE RATES | 22 |
| Article 9 | BENEFIT FUNDS | 27 |
| Article 10 | APPRENTICESHIP AND TRAINING PROGRAM | 31 |
| Article 11 | EMPLOYERS' INDUSTRY FUND | 33 |
| Article 12 | PAINTERS DISTRICT COUNCIL NO. 30 LABOR-MANAGEMENT INDUSTRY DEVELOPMENT FUND | 34 |
| Article 13 | INSURANCE AND SURETY BONDS | 35 |
| Article 14 | JOINT TRADE BOARD | 37 |
| Article 15 | MISCELLANEOUS | 39 |
| Article 16 | THE PAINTERS AND ALLIED TRADE LABOR-MANAGEMENT COOPERATION FUND | 41 |
| Article 17 | SUBCONTRACTING | 43 |
| Article 18 | SUBSTANCE ABUSE & RECOVERY PROGRAM | 45 |
| Article 19 | TERM AND RENEWAL | 50 |
| | APPENDIX A-G | 52 |
| | SIGNATURE PAGES | 60 |
| | FUNDS COLLECTION POLICY AND PROCEDURES | 63 |

## ARTICLE — Purpose and Intent

The parties' express purpose and intent is to promote and improve the relationship between Employers, the Union and the employees subject to this Agreement ("Employees"), to facilitate the peaceful and orderly adjustments of grievances and disputes, and to enter into contractual relations with respect to wages, hours of work and other conditions of employment to be faithfully observed by all parties.

The parties recognize their respective responsibility for and mutual interest in continuity of employment, gained through efficient service to the customer and sincere fulfillment of their obligations to the public in promoting the best interest of the painting, decorating and drywall industry.

5

# ARTICLE 2   The Parties

Section 2.1   The Union is acting on behalf of all of its present and future affiliated Local Unions and as the sole and exclusive bargaining agent of all Employees. The Union's geographical jurisdiction is the counties of: Boone, Bureau, DeKalb, DuPage, Ford, Fulton, Hancock, Iroquois, JoDaviess, Kane, Kankakee, Kendall, LaSalle, Lee, Livingston, Marshall, Mason, McDonough, McHenry, McLean, Ogle, Peoria, Putnam, Schuyler, Stark, Stephenson, Tazewell, Winnebago, and Woodford and any other geographical jurisdiction that the International Union of Painters and Allied Trades (I.U.P.A.T.) may grant to the Union.

Section 2.2   (a)   The Association, and its successors and assigns, represents that it has the legal authority under its governing documents to act as the sole and exclusive bargaining agent for all of its present and future members, and their successors and assigns, as well as for those employers which have assigned to the Association the authority to represent the employer for collective bargaining purposes, and their successors and assigns. The Union recognizes the Association as the sole and exclusive bargaining agent for all such Employers.

(b)   Every Employer shall remain bound to the Agreement as amended thereafter in future negotiations with the Association unless timely written notice is given to the Union and the Funds of its withdrawal from membership in the Association.

(c)   Employers which have not assigned to the Association the authority to represent the employer for collective bargaining purposes shall

remain bound to the Agreement as amended thereafter in future negotiations with the Association unless timely written notice is given to the Union and the Funds of its cancellation of the Agreement.

Section 2.3   A non-member of the Association which has not previously assigned to the Association the authority to bargain on its behalf may become bound by this Agreement and all references to the Association or Employer shall be considered as referring to and including that non-member.

Section 2.4   Notwithstanding any other term or provision set forth in this Agreement or a written assignment of bargaining authority, every Employer bound to this Agreement agrees that if a majority of the members of the FCA of Illinois, in accordance with the Association's by-laws, vote to transfer or assign the Association's authority to represent its members and those Employers which have assigned to the Association the authority to represent the Employer for collective bargaining purposes, to any other association, then all references to the FCA of Illinois herein or in any related document shall automatically be changed to read the name of the association.

# ARTICLE 3 Recognition

Section 3.1 (a) Each Employer acknowledges, agrees and recognizes the Union as the sole and exclusive bargaining agent for a unit of employees appropriate for bargaining within section 9(a) of the National Labor Relations Act (the "Act"). Each Employer further agrees and stipulates that this recognition is predicated on a clear showing of majority support indicated by bargaining unit Employees without the need for a National Labor Relations Board certified election under sections 9(a) and (c) of the Act.

(b) The Employers agree that all work generally recognized as coming within the jurisdiction of the painting, decorating and drywall finishing industry shall be assigned to Employees. The bargaining unit work to be performed by Journeymen, Apprentice Painters, Decorators, Applicators, Paperhangers, Drywall Tapers, Drywall Apprentices, and Apprentice Applicants shall include, but not be limited to, the application of all painting and decorating finishes and the operation of all equipment used in the performance of such work, as has been customary, including but not limited to sandblasting equipment; the erection, moving and dismantling of all scaffolding; the operation of any mechanical or manually operated lift structure or platform, including, but not limited to, articulating booms, scissor lifts, and stages; the operation of compressors or any other equipment related to bargaining unit work; and all preparatory work incidental to the above work (all such work referred to herein as "Bargaining Unit Work").

(c) The term "painting and decorating finishes", as used herein, includes painting, decorating, paperhanging, and the application and removal of any and all types of wall covering including all soft roll wall coverings

goods; the finishing of wood, metal or other surfaces; the application of insulating and acoustical materials; the application of wet film waterproofing coatings and all other coatings for decorative and protective purposes; the taping, surfacing and finishing of drywall surfaces; and any work that is necessary to remove: any paint by the application of any method; any sandblasting by-products by any sandblasting method; or the removal of paint or sandblasting residue.

Section 3.2 The Employer agrees to recognize and deal with the Union's elected or appointed representatives, at a reasonable time, at every location at which the Employer performs any work. The Employer agrees to permit the Union's representatives to visit its shops (upon reasonable notice) and job sites during working hours for the purpose of inspecting lists of employees, payroll records, insurance certificates, and time cards in order to determine if the Employer is complying with this Agreement and with state and federal laws.

Section 3.3 It shall be a violation of this Article for any Employer, or Employer representative, to interfere with the functions or purposes of the Union or its authorized representatives.

Section 3.4 The Union's Secretary-Treasurer ("Secretary-Treasurer") may appoint shop or job stewards. Stewards shall be selected at the sole discretion of the Secretary-Treasurer. If a steward is appointed from outside the Employer's workforce, the Employer shall place the steward on the job. The steward must be a qualified mechanic in work performed by the Employer and shall be a working steward. If there is a work slowdown, the steward shall be the last Employee employed. If an Employer's work load does not require Employees, the Secretary-Treasurer shall remove the steward until the Employer hires any employee to perform Bargaining Unit Work, at which time the steward shall be the first Employee recalled. In no event shall any steward be considered an agent of the Union. If an Employer is not satisfied with the work performance of any steward, the Employer may request a replacement by notifying the Secretary-Treasurer in writing.

# ARTICLE 4  Union Security

Section 4.1  (a) All Bargaining Unit Employees must during the term hereof, as a condition of employment, maintain their membership in the Union.

(b) Current employees shall be required as a condition of continued employment to become members of the Union on the eighth (8th) day following the effective date of this Agreement. Employees hired after the effective date of this Agreement and covered by this Agreement shall be required, as a condition of continued employment, to become members of the Union on the eighth (8th) day following the beginning of their employment.

Section 4.2  The Employer agrees to check off from each Employee's wages special administrative dues in the amount of two (2%) percent of gross wages in each payroll period, plus twenty-five cents ($.25) per hour paid, as an assessment for the Union's Organizing and Defense Fund, and will remit such sums to the Union in accordance with Article 9, provided the Employee has signed a valid authorization card authorizing such deduction.

The Employer further agrees that at the time it employs any Bargaining Unit Employee the Employer will submit to each such Employee, for his voluntary signature, a dues deduction authorization card in duplicate, one copy of which shall be returned to the Union. The Union will supply the form to the Employer.

The Employer further agrees that each month it will submit a list of all Employees who have failed to sign a dues deduction authorization card, together with the numbers of hours each such Employee was paid.

Section 4.3  The Union agrees to indemnify and hold the Employer harmless against any and all claims, demands, suits or other forms of liability, exclusive of attorneys' fees and costs, which may arise out of or by reason of any actions taken or not taken by the Employer for purpose of complying with a specific direction of, or notice from, the Union regarding any provision of this Article.

# ARTICLE 5  The Union's Geographical Jurisdiction

Work Outside the Union's Geographical Jurisdiction

<u>Section 5.1</u>  (a)  The Employer's principal place of business and employ-ment shall be considered within the jurisdiction of the Union. An Employer may undertake Bargaining Unit Work in other counties and areas, on which occasions the Employer employs additional employees who are members of affiliated I.U.P.A.T. District Councils or Local Unions outside the Union's jurisdiction. In recognition of these facts, it is agreed that:

(i)  This Agreement shall embrace, and the Union shall be the exclusive bargaining representative for and on behalf of, all the employees employed by such Employer, wherever and whenever employed during the term of this Agreement;

(ii)  The Employer, when engaged in work outside the Union's geographical jurisdiction, shall employ not less than fifty percent (50%) of the workers employed on such work from among the residents of the area where the work is performed, or from among persons who are employed the greater percentage of their time in such area; any others shall be employed only from the Employer's home area;

(iii)  The Employer shall, when engaged in work outside the Union's geographical jurisdiction, comply with all of the lawful clauses of the collective bargaining agreement in effect in said other geographical jurisdic-tion and executed by the employers in the industry and the affiliated I.U.P.A.T. District Council or Local Union in that jurisdiction, including, but not limited to, the wages, hours of work, working conditions, fringe benefits, and procedure for settlement of grievances set forth therein; provided, how-

ever, that as to Employees employed by the Employer from the Local Unions within the Union's geographical jurisdiction and who are brought into an outside jurisdiction, such Employees shall be entitled to receive the wages and conditions effective in either the Union's jurisdiction or the outside jurisdiction, whichever are more favorable to such Employees, and fringe benefit contributions on behalf of such Employees shall be made pursuant to this Agreement solely to the Funds in accordance with the Funds' gov-erning documents.

(b)  This Article is enforceable by the District Council or Local Union in whose jurisdiction the work is being performed, both through the procedure for settlement of grievances set forth in its applicable collective bargaining agreement and through the courts, and is also enforceable by the Union, both through the procedure for settlement of grievances set forth in this Agreement and through the courts.

<u>Section 5.2</u>  The Employer shall not attempt to engage in any work covered by this Agreement in any area outside the geographical juris-diction of the Union through the use or device of a joint venture of any type, through a member of the Employer's controlled group as defined in the Internal Revenue Code ("Employer's controlled group"), or through subcon-tracting with another employer or contractor in the outside area, unless such use or device is not for the purpose of taking advantage of lower wages or conditions that are in effect in the home area of the other employer, the member of the Employer's controlled group, or contractor.

<u>Section 5.3</u>  There shall be no priority given for employment opportunities to any person because of membership in the Union nor shall there be any discrimination on the basis of race, color, sex, age, disability, national origin, religious affiliation or any other protected status under fed-eral, state or local laws.

13

12

# ARTICLE 6  Hours of Work

Holidays

Section 6.1  (a) The normal work week shall be Monday through Friday.

(b) The normal work day shall be eight (8) continuous hours, excluding one-half (½) hour for lunch, between the hours of 6:00 a.m. and 3:30 p.m.

(c) For residential repainting only, a work day shall be eight (8) hours, excluding one-half (½) hour for lunch, and may have a starting time of either 7:00 a.m. or 8:00 a.m.

(d) When an Employee must travel greater than seventy-five (75) miles from his residence to the jobsite, and at the request of the Employee, or unanimous consent of a group of Employees working at a single jobsite location, four (4) consecutive ten-hour (10 hr.) work days, Monday through Thursday, or Tuesday through Friday, may constitute a normal work week ("Four-Tens Rule").

i) Notwithstanding the provisions of Section 8.5, and for the purposes of this subsection, (d), the normal workday shall be ten (10) continuous hours, including one-half (½) hour for lunch, between the hours of 6:00 a.m. and 5:00 p.m. and shall be paid at the applicable current regular hourly wage rates.

ii) The Employer shall provide each Employee working under the Four-Tens Rule with single-occupancy overnight accommodations and a fifty dollar ($50.00) per day per diem to be utilized at the discretion of the Employee.

iii) Utilization of the Four-Tens Rule must be submitted to the Secretary-Treasurer in a format approved by the Union and shall include, but not be limited to, the Employee(s) name, Employee(s) classification(s), job site name, job site address and/or lot number(s), starting date and ending date, no less than seventy-two (72) hours prior to the commencement of work.

Section 6.2  The Legal Holidays are: New Year's Day, Memorial Day (as designated by the federal government), Independence Day, Labor Day, Thanksgiving Day, and Christmas Day. When any Legal Holiday falls on a Sunday, the Monday following shall be observed. When any Legal Holiday falls on a Saturday, the Friday preceding shall be observed. No work shall be performed on any Legal Holiday except in extreme emergencies, such emergencies to be determined solely by the Union.

Section 6.3  A permit must be secured for overtime or work on Saturday, Sunday or a Holiday. The request must be submitted to the Secretary-Treasurer, in a format approved by the Union, and shall include the Employee name, Employee classification, job site name, job site address and/or lot number(s), starting time and the approximate number of total overtime hours to be worked, per Employee, twenty-four (24) hours in advance, or within four (4) hours of a request to the Employer, whichever is later.

Section 6.4  The Employer may, with the Employee's agreement, schedule that Employee for make-up time on a Saturday, at regular pay, only if that Employee missed no less than four (4) hours of work, Monday through Friday, as a result of weather or the Employee's voluntary absence from work, but not because of a Holiday. All make-up days shall be reported to the Secretary-Treasurer in a format approved by the Union, and shall include the Employee name, Employee classification, job site name, job site address and/or lot number(s), starting time and total number of hours to be worked, per Employee. The scheduling of make-up time shall not be for the Employer's scheduling convenience. This provision shall not affect the Employee's right to Holiday pay or premium pay for hours worked in excess of the approved make-up time, or for hours worked in excess of eight (8) hours in a day or forty (40) hours in a week.

Section 6.5  (a) There shall be a fifteen (15) minute non-organized break during the first four (4) hours of the work day at the assigned place of work and at a time mutually agreed upon by the Employee(s) and the Employer. An allowance of five (5) minutes for wash-up time shall be allowed immediately prior to a thirty (30) minute unpaid lunch at the half-way point of the day and prior to the end of the work day.

(b) When overtime work is required, there shall be an additional fifteen (15) minute break at a time determined by the Employee(s) for every additional three (3) hour increment of Bargaining Unit Work to be performed.

Section 6.6  (a)  Any Employee required to report to a job site or shop (including supply houses) who is subsequently directed to a different site, different supply house, or to the shop shall be paid from the time the Employee first reported to a job site, supply house or to the shop.

(b)  Employees shall not report to the shop, supply house or job more than fifteen (15) minutes before the six (6:00) a.m., seven (7:00) a.m. or eight (8:00) a.m. starting time, as authorized in this Agreement.

Section 6.7  When an Employee works a fractional part of a day, he shall be paid for no less than one-half (½) of a day's work, except in cases when an Employee quits voluntarily or when weather conditions prevent a continuation of his employment.

Section 6.8  An Employee who reports for work at the regular starting time shall be paid the regular journeymen's wages, or Apprentice wages when applicable, for two (2) hours when no work is provided for the Employee. However, this provision shall not apply if work is not available because of weather conditions.

Section 6.9  (a)  The Employer shall report in writing to the Secretary-Treasurer all job sites where Bargaining Unit Work is to be performed prior to the commencement of work at that job site.

(b)  In addition to the reporting requirement of Section 6.9 (a), the Employer agrees to report in writing to the Secretary-Treasurer on or before the 15th day of each month all job sites where Bargaining Unit Work is in progress.

(c)  All reporting will be in a format approved by the Union and will include, but not be limited to, the job site name, job site address, approximate start date, approximate end date, and an estimated number of total hours to be worked on the project.

16

ARTICLE 7    Working Tools and Conditions

Section 7.1  (a)  No Employer shall require or permit an Employee to use in oil paint, a brush which exceeds four and one-half (4½) inches in width.

(b)  Water emulsion paints such as rubber base, acrylic resins or paints of that type shall not be applied with a brush which exceeds six (6) inches in width.

Section 7.2  The use of the dip type roller applicator is permitted on all work. However, the roller surface shall not exceed nine (9) inches from one end of the roller to the other, except for applying coatings on floors in which case a nineteen (19) inch roller is permissible.

Section 7.3  (a)  Spray work shall be permitted for any number of coats required on all doors and frames.  Spraying of finish coats of any kind shall be permitted provided that the first coat on all surfaces is back rolled unless it is impractical to brush or roll that surface.

(b)  An Apprentice may operate a spray gun only during the last eighteen (18) months of the apprenticeship.

(c)  State of Illinois health and safety laws must be complied with and shall be strictly enforced.  Employees may not be discharged for refusing to operate a spray machine or equipment due to lack of skills or knowledge.  If an Employee refuses to operate a spray machine or equipment due to lack of skills or knowledge, the Employee shall submit to the next available journeyman upgrading class for skill enhancements for spray painting.  An Employee shall not be discharged for refusing to operate a spray machine or equipment due to any physical impairment.

17

(d) For all applications of materials above the permissible exposure limit, the Employer at its own expense shall furnish to all Employees working above the permissible exposure limit an appropriate respirator.

(e) When using spray equipment with flammable material, the spray equipment shall be grounded to prevent ignition from a spark from static electricity.

(f) Employees using spray equipment shall be instructed in the safety aspects of the proper use and care of the required safety equipment.

Section 7.4 (a) When solvents, including organic solvents, caustics, corrosives, acids, detergents and toxins are used, disposable protective clothing, protective gloves, eye and face protection, and protective skin creams shall also be furnished to the Employee by the Employer.

(b) Appropriate signs warning others of the fire and respiratory dangers present shall be posted in all areas where the above materials are used.

Section 7.5 The Employer shall at all times provide proper lighting for Employees.

Section 7.6 (a) The Employer shall provide proper ventilation on all painting and drywall finishing jobs and supply Employees with appropriate personal protective spray equipment such as, but not limited to, masks, hoods, shields, air filters, respirators and cartridges.

(b) The Employer will replace all personal respirators and related equipment when said equipment is found to be worn beyond repair or unsafe for continued use.

Section 7.7 (a) The Employer hereby agrees:

(i) that drop cloths and rags shall be furnished to Employees in a sanitary condition;

(ii) that Employees may use gloves at work when the Employee considers it necessary;

(iii) that Employees, while at work, shall be permitted sufficient time for inspection of ladders, of scaffolding and for sanitary conditions of employment.

(b) The lead man may order any necessary material which may be required on the job for that day's work at the Employer's expense.

Section 7.8 (a) Painter Employees shall furnish the following tools: grip, assorted scrapers up to six (6) inches in width, five gallon bucket opener, wire brush, spinner, assorted screwdrivers, duster, hammer, nail set, wrench, vice-grips, razor blade holder, pencils and pliers. Paperhangers shall furnish a ruler, smoother, seam roller, and level. An Employee shall not be required to furnish any tool not specifically listed herein.

(b) Drywall Finishing Employees shall furnish the following tools: taping and finishing knives up to fourteen (14) inches in width, mud pans, cleaning brushes, sanding poles, hand mixer, five (5) gallon bucket, assorted screwdrivers, wrenches, pliers and vice grips.

(c) The Employer shall furnish all tools not set forth in (a) and (b) above and all materials, sandpaper, dust masks, floor scrapers, and scaffolding.

Section 7.9 The Employer shall provide all Employees who perform drywall finishing with machine tools with a register number of each tool. The Employer shall list, in writing, each register number and tool description. The list shall be given to each Employee to review at the time such machine tool(s) are issued. The machine tool(s) shall be in good working order. Each Employee shall examine the tool list and, if accurate, each Employee shall acknowledge receipt of the tool(s) by signing on the tool list. No Employee shall refuse to acknowledge an accurate and complete list.

Section 7.10 (a) The Employer agrees that no Employee shall be required to use any poisonous material or material injurious to the Employee's health, such as wood alcohol, varnish remover, oxalic acid, or to perform the sanding of lead or other dangerous materials, unless they are protected by respirators and gloves furnished to them by the Employer. Prepared liquid paint and varnish removers shall be of the non-flammable type. This shall not apply to the use of other liquids or solvents or other methods.

(b) Where lead is used, the Employer shall furnish hot water, soap, and towels to Employees.

Section 7.11 (a) In accordance with the requirements of the Occupational Safety and Health Act of 1970, as amended, it shall be the Employer's responsibility to ensure the safety of its Employees and compliance by Employees with any safety rules, standards and regulations contained in federal or state law or established by the Employer. Nothing in this Agreement shall make the Union liable to any Employee or to any other person in the event that work-related disease, sickness, death, injury or accident occurs.

(b) The Employer shall not in any manner file or assert a claim against or engage in any litigation against the Union on a subrogation theory, contribution theory, or any other theory, in connection with any work-related disease, sickness, death, injury, or accident.

Section 7.12 The Employer is prohibited from requiring an Employee to transport in the Employee's personal vehicle any material, scaffold or tools exceeding one hundred (100) pounds or from jobs.

Section 7.18 All Journeymen and Apprentices including Tapers and Painters shall be required to wear either white overalls or white pants and whenever possible present a neat and clean appearance.

Section 7.19 Notwithstanding any other provision, Employers shall be obligated to abide by and comply with any applicable Occupational Safety and Health Administration (O.S.H.A.) regulation or standard.

21

Section 7.13 Any building in which work is performed between November 1 and April 1 shall be heated.

Section 7.14 The Employer agrees that it shall comply with all applicable federal and state laws concerning worker's compensation, including all applicable standards, rules, record-keeping requirements, and regulations issued pursuant thereto.

Section 7.15 The Employer agrees that it shall comply with all applicable federal and state laws concerning employee classification, including all applicable standards, rules, and regulations issued pursuant thereto, including, but not limited to, Illinois Public Act 095-0026.

Section 7.16 The Employer shall at all times provide safe tools, materials, equipment, and working conditions.

Section 7.17 (a) If an Employee sustains an injury in the course of his employment which requires medical care, such Employee shall be permitted to obtain medical care at once. The Employee shall be paid his regular wages for that day, not to exceed eight hours, for the time necessarily spent in going to and from a physician's office, medical center, or hospital. Except in unusual circumstances, this provision shall be effective only on the date of the injury, unless subsequent visits, during working hours, are required by the Employer's physician for independent medical examination.

(b) If an injured Employee needs to be taken to a medical care facility following an injury, he shall be taken to the nearest appropriate medical facility from the job site at the Employer's expense.

(c) The job steward or lead man shall be immediately notified of all injuries. If the steward or lead man determines that someone should accompany the injured Employee to the hospital, medical center, physician's office or, later, to the Employee's home, the Employer shall select such person, who shall be compensated at his regular rate for such services. If the Employer fails to select such person promptly, the steward or lead man shall select such person.

(d) If an Employee is injured in the course of his employment, he shall not be dismissed from such employment because of his injury, nor shall he be dismissed during the period of medical care required by the injury, unless there is no work available with his Employer, or unless his dismissal is due to a condition beyond the control of the Employer. This paragraph shall not obligate the Employer to pay an employee while the Employee is disabled, except as required by law.

(e) The Employer shall notify the Union, in writing and in a format approved by the Union, within twenty-four (24) hours following any injury falling within the scope of this Article.

20

# ARTICLE 8 Wage Rates

Section 8.1 The Union and the Association have established various "Wage Zones" within the Union's jurisdiction, as set forth in Appendix G, as a basis for determining the wages that will prevail in each Zone. When any Bargaining Unit Employee works in any Zone, the Employee shall receive the higher of (1) the hourly wage rate for the Zone in which the Employee's Local Union is chartered (the "Employee's Home Zone") (see Appendices B through F) or (2) the hourly wage rate for the Zone where the work is being performed.

Section 8.2 (a) Effective May 1, 2008, the total regular minimum wage rate and fringe benefit contributions for Journeymen Painters and Tapers working in the Union's jurisdiction shall be increased by $3.35 per hour for work in Zones A, B and C. The Union shall allocate this amount between wages and fringe benefits and notify the Employers in writing of such allocation no later than April 1, 2008.

(b) Effective May 1, 2009, the total regular minimum wage rate and fringe benefit contributions for Journeymen Painters and Tapers working in the Union's jurisdiction shall be increased by $3.35 per hour for work in Zones A, B and C. The Union shall allocate this amount between wages and fringe benefits and notify the Employers in writing of such allocation no later than April 1, 2009.

(c) Effective May 1, 2010, the total regular minimum wage rate and fringe benefit contributions for Journeymen Painters and Tapers working in the Union's jurisdiction shall be increased by $3.35 per hour for work in Zones A, B and C. The Union shall allocate this amount between wages and

fringe benefits and notify the Employers in writing of such allocation no later than April 1, 2010.

(d) Effective May 1, 2011, the total regular minimum wage rate and fringe benefit contributions for Journeymen Painters and Tapers working in the Union's jurisdiction shall be increased by $3.35 per hour for work in Zones A, B and C. The Union shall allocate this amount between wages and fringe benefits and notify the Employers in writing of such allocation no later than April 1, 2011.

(e) Effective May 1, 2012, the total regular minimum wage rate and fringe benefit contributions for Journeymen Painters and Tapers working in the Union's jurisdiction shall be increased by $3.50 per hour for work in Zones A, B and C. The Union shall allocate this amount between wages and fringe benefits and notify the Employers in writing of such allocation no later than April 1, 2012.

(f) During the life of this Agreement, all Apprentices and Apprentice Applicants shall receive their proper percentage of Journeymen wages established herein and based on the applicable wage rate.

Section 8.3 (a) The regular rate of wages for all Foremen shall be the Journeymen's rate plus two dollars ($2.00) per hour.

(b) The regular rate of wages for all General Foremen shall be the Journeymen's rate plus four dollars ($4.00) per hour.

(c) When eight (8) or more Journeymen or Apprentice Employees are performing Bargaining Unit Work under the direction or supervision of a Bargaining Unit Employee, a regular Foreman shall be appointed within this group of Employees.

(d) When sixteen (16) or more Journeymen or Apprentice Employees are performing Bargaining Unit Work under the direction or supervision of a Bargaining Unit Employee, a General Foreman shall be appointed within this group of Employees.

Section 8.4 All work performed outside the normal work day or the adjusted work day, in accordance with Article 6.1 (b), shall be considered as overtime and shall be paid at one and one-half (1½) times the Employee's regular rate.

Section 8.5 All work performed in industrial and commercial buildings only after 3:30 p.m. or before 6:00 a.m. Monday to Friday inclusive until 6:00 a.m. Saturday, shall be paid at the rate of nine (9) hours of pay for eight (8) hours worked. If less than eight (8) hours of work is performed during this period, each employee shall be paid at the premium rate of one (1) extra hour of regular pay above the number of hours actually worked.

The Employer shall report all such work to the Union at least twenty-four (24) hours before the work begins, or be subject to the procedures of the Joint Trade Board. If such notice is not given, all work performed shall be paid at time and one-half ($\frac{1}{2}$) the employee's regular rate.

Section 8.6   If an Employee works more than eight (8) hours in a day, premium pay of time and one-half ($\frac{1}{2}$) shall be paid for each hour, or fraction thereof, worked after eight (8) hours. All work on Saturday, Sunday, and Holidays, if permitted pursuant to Article 6.3, shall also be at time and one-half ($\frac{1}{2}$) the Employee's regular rate (subject to Article 6.4, for Saturday makeup).

Section 8.7   (a)   The Employer shall establish and maintain a weekly payday which shall be Friday, not later than the ending time of the normal work day. Wages shall be paid at the job site or, if prior arrangements have been made and agreed to by the Union, the Employees and the Employer, wages may be paid at the Employer's principal place of business, by electronic transfer or mailed to the Employee by first class mail. All Employees shall be paid by negotiable check, or electronic transfer if agreed to, for all work performed up through and including the Wednesday night preceding said payday.

(b)   The Employer shall furnish each Employee with a detachable check stub showing the Employer's business name, the Employee's name, unique identification number assigned by the Union, total straight time hours, total overtime hours, the ending date of the pay period, gross wages earned, the total net amount due to the Employee, and all itemized deductions. The Employer shall (as shown on the pay stub) conform with federal law pertaining to the payment of Social Security. It shall be a violation of this Agreement for an Employer to issue any check other than a payroll check for compensation earned under this Agreement.

(c)   Any reimbursement to an Employee for supplies, transportation, food, lodging, parking or any other Employer expense, shall be paid to the Employee and Employee check stubs shall contain a line- item description and separate reimbursement amount for each item included in the total reimbursement amount. Any reimbursement records shall be made available to the Union or the Funds upon request.

(d)   Employees shall be required to fill out time sheets. The time sheet will contain the Employee's name, all regular straight time hours worked, all overtime hours worked, the day and month in which the work was performed, and the location of the job site. The time sheet must be completed by the Employee and signed by the Employee. If the Employee is

24

not capable of completing a time sheet it may be completed only by another Bargaining Unit Member. The Employee must sign the time sheet. All time sheets and records must be kept by the Employer for six (6) years as required by the Employee Retirement Income Security Act (E.R.I.S.A.) of 1974. The time sheet must be turned in to the Superintendent, General Foreman or Foreman on the job site by the end of the working day for which the pay period ends. If there is no Superintendent, General Foreman or Foreman on the job site, the Employer shall make arrangements for the time sheets to be picked up on the job site or allow the time to be called into the shop no later than 10:00 a.m. the day following the end of the pay period. If no time sheet is turned in on time, the Employer is not obligated to pay the Employee until the following payroll period. The Employee will stand no loss of time for complying with this provision.

(e)   An Employer, who requests or insists on having daily time sheets mailed in, shall furnish Employees with sufficient stamped envelopes or funds to cover the expense incurred.

(f)   An Employer hiring Journeymen, Apprentices, or Apprentice Applicants to work between 3:30 p.m. Friday and 6:00 a.m. Monday for work only on that particular job shall pay such Employees on or before 3:30 p.m., or the ending hour on the normal work day, of the following Friday.

(g)   Electronic tracking of employee work hours ("electronic time-keeping") shall be permitted in a format approved by the Union. Written application for approval of electronic timekeeping shall be made to the Secretary-Treasurer and upon review, authorization or denial for the implementation of electronic timekeeping shall be forwarded in writing to the Employer. All records gathered or generated through the implementation of electronic timekeeping shall be made available to the Union or the Funds upon request.

(h)   It shall be a violation of this Article for any Employer to use any formula or method of calculation other than by determining all wages or Funds contributions due on the basis of actual hours worked. Violations of this Section will be subject to Article 9 of the Agreement.

Section 8.8   If an Employee, the Union, or any Fund is paid by a check which is returned for insufficient funds or because the account is closed or if an Employee does not receive full and proper wages for all hours worked, or if an Employer is delinquent to any Fund, the Union shall withhold all Employees from the Employer's jobs until all wages, dues, and Funds contributions due are paid in full by cashier's check or by certified check unless suitable payment terms have been established. Every such Employee

25

withheld shall be paid for all time withheld up to eight (8) hours per day, seven (7) days per week, until all wages, dues, and Funds contributions due are paid by cashier's check or by certified check. If a check for wages, dues, or Funds contributions is returned for insufficient funds or because the account was closed or if an Employer is delinquent to the Funds, then, at the sole discretion of the Union, the Employer shall be obligated to pay weekly, by cashier's check or by certified check, all wages, dues, and Funds contributions due. The Employer shall be obligated to pay all attorneys' fees and costs incurred in collecting such sums that are due.

Section 8.9   A discharged Employee shall be paid his full wages through and including the hour of discharge. Payment must be made to the Employee within twenty-four (24) hours after discharge, except when the discharge occurs on a Friday, Saturday, or Sunday, in which case the Employee shall be paid by 3:00 p.m. on the following Monday. If the Employee is not paid in accordance with this Section, the Employer shall pay the Employee the regular hourly wage rate for each hour following termination of employment until payment is actually made.

Section 8.10   The Employer shall pay all reasonable costs for transportation, food and lodging when it is not practical for the Employee to return to his usual place of residence each evening.

Section 8.11   When an Employee files a workers' compensation claim and he is assigned by the Employer to light duty, the Employee shall remain a member of the Bargaining Unit. The Employer shall pay to the Employee the appropriate hourly wage rate and make contributions to all Employee Benefit Funds set forth in this Agreement for all hours actually worked by the Employee.

26



## ARTICLE 9   Benefit Funds

Section 9.1   Each Employer and the Employer's controlled group agree to make contributions to the Painters' District Council No. 30 Health and Welfare Fund ("Health and Welfare Fund"), the Painters' District Council No. 30 Pension Fund ("Pension Fund"), the Painters' and Allied Trades District Council No. 30 Joint Apprenticeship and Training Fund ("Apprenticeship and Training Fund"), the International Union of Painters and Allied Trades Joint Apprenticeship and Training Fund ("International Apprenticeship Fund"), the Painters' District Council No. 30 Labor-Management Industry Development Fund ("L.M.I.D.F."), the Painters and Allied Trades Labor-Management Cooperation Initiative ("LMCI"), and the International Union of Painters and Allied Trades Union and Industry Pension Fund ("International Pension Fund"), (collectively the "Funds") in accordance with the terms of this Agreement and with the Agreements and Declarations of Trust ("Trust Agreements") under which each Fund is operated.

Section 9.2   (a) Effective May 1, 2008 the Funds contributions due for each hour or portion thereof worked by an individual covered by this Agreement shall be in accordance with Appendices A through F.

(b) Effective May 1, 2009 and each May 1 thereafter, the Union may in its sole discretion allocate a portion of the negotiated increase, pursuant to Article 8, to the above Funds. The Union shall notify the Employer of the allocation not later than April 1 of each year.

Section 9.3   (a) At all times, contributions and the completed monthly remittance report form (provided by the Benefits Office) as

27

required by this Article 9 shall be paid and remitted to the Painters' District Council No. 30 Benefits Office ("Benefits Office"). If the monthly remittance report is not completed accurately and in its entirety, the report shall be considered delinquent. If appropriate, contributions shall then be directed by the Benefits Office on behalf of each Employee to the employee benefit fund of the Employee's "home-fund"("money-follows-the-the-man" rule). Notwithstanding the above, all contributions, if any, due to the International Pension Fund shall be remitted directly to the International Pension Fund.

(b) Employer remittance report forms shall be submitted to the Benefits Office on a monthly basis or as otherwise required by this Agreement.

(c) All contributions to the Funds shall be submitted with the Benefits Office remittance report forms with full, complete and accurate representations of the hours worked and the sums due for each Employee.

(d) The contributions and remittance reports to the Funds shall be due as of the 15th day of the month after the month in which the work was performed, or on such other date as this Agreement may require. As of the due date, the contributions shall be considered the assets of each Fund.

Section 9.4  Each Employer adopts and agrees to be bound by each Fund's Trust Agreement, and as the Trust Agreement(s) may be amended hereafter, as fully as if the Employer was an original party thereto. The Employer hereby designates the Association Trustees named in the respective Trust Agreement, together with their successors, as its representatives on the Board of Trustees of each Fund. The Employer agrees to be bound by all actions taken by each Board of Trustees pursuant to the powers granted them by federal law or the respective Trust Agreements. The Employer recognizes that each Board of Trustees has the sole power to construe the provisions of the respective Trust Agreements, the respective employee benefit plans, and each Fund's rules and regulations, if any, and that all constructions, interpretations, and determinations made by the respective Trustees for their respective Funds shall be final and binding on all parties.

Section 9.5  Each Employer shall contribute for each hour worked by any individual who performs any management, supervisory, or estimation services and who performs any Bargaining Unit Work, including any Employee whose spouse has any ownership interest in the Employer. The amount of contributions due to the Funds shall be presumed to be at least 160 times the then current hourly contribution rates for each month during which any such services were performed. The individual's receipt of any benefits from the Funds shall not excuse the Employer's obligation to make

contributions at the rate of 160 times the then current hourly contribution rates, or for the actual number of hours worked in any capacity, whichever is greater.

Section 9.6  If an Employer is delinquent in its contributions to any of the Funds for a period of seventy-two (72) hours, the Union shall be entitled to remove all Bargaining Unit Employees from the shop or job in addition to seeking any other legal remedy it may have.

Section 9.7  Contributions not received by the due date shall be considered delinquent and shall be assessed the liquidated damages, interest, reasonable attorneys' fees and costs established by the Funds' Trustees. The Employer acknowledges that the liquidated damages are provided for by federal law and shall be used to defer administrative costs arising from the delinquency.

Section 9.8  (a)  Each Employer shall furnish the Trustees with information such as the names of all subcontractors, affiliates, Employees (by classification, craft, unique identification number assigned by the Union, and social security number), wages earned and hours worked by Employees, the Employer's federal/state employer identification number, the Employer's business address (which shall not be a P.O. Box), the principal corporate officer's or business owner's driver's license number, proof of the Employer's corporate status, proof of insurance or surety bonds as required by this Agreement, and such other information as may be required by the Trustees. Such information available at the time this Agreement is executed shall be provided within seven (7) days of execution; all other information shall be provided within seven (7) days of the Trustees' written request.

(b)  In addition, the Union and/or the Funds' Trustees shall have the authority to audit the Employer's books and records, including the books and records of affiliated employers and members of the Employer's controlled group, in accordance with the terms of the Funds' Trust Agreements. The Employer shall be responsible, in accordance with the terms of the Funds' Trust Agreements, for the costs of audit and for all attorneys' fees incurred. At the sole discretion of the Funds' Trustees the audit fees may be waived.

(c)  At the request of the Union and/or the Funds' Trustees, all Employer records shall be made available in an acceptable electronic file format within thirty (30) days of the request.

Section 9.9  (a)  If an Employer employs a person or entity in violation of Article 17, the number of hours for which such Employer owes

contributions to the Funds shall be computed by dividing the total dollar amount paid to such employees by the actual hourly wage rate paid, as determined by the Trustees.

(b) If an Employer violates this Agreement by using square footage rates, or any other formula or method of calculation, rather than by determining all Funds contributions due on the basis of actual hours worked, the compensation actually received by the employee will be divided by twenty-five percent (25%) of the applicable hourly wage rate in order to determine the number of hours for which all Funds contributions, and wages in accordance with Article 8, are due.

(c) Notwithstanding the provisions of Section 9.9 (b), if an Employer violates this Agreement by using square footage rates, or any other formula or method of calculation, rather than by determining all Funds contributions due on the basis of actual hours worked in the drywall finishing industry, the total number of boards finished shall be divided by 2.86 to determine the number of hours for which all Fund contributions, and wages in accordance with Article 8, are due. For the purposes of this Section a "board" shall be a four foot by eight foot (4' x 8') sheet of drywall.

Section 9.10 In the event the Trustees of the Health and Welfare Fund, concurring with the recommendation of their consultant, determine additional contributions are needed for the Health and Welfare Fund, the Union shall give notice to contributing Employers that a certain portion of the wage rate negotiated in the Agreement shall be paid to the Health and Welfare Fund, and said portion contributed to the Fund shall lower the wage rate accordingly.

## ARTICLE 10 Apprenticeship and Training Program

Section 10.1 (a) An Employer will be allowed to have one (1) Apprentice if at least one (1) Journeyman is employed. After the Employer employs three (3) Journeymen, the Employer will be allowed one (1) additional Apprentice; with six (6) Journeymen, the Employer will be allowed an additional Apprentice; with each additional three (3) Journeymen, an additional Apprentice will be allowed.

(b) Notwithstanding above, the ratio of Apprentice tapers to Journeymen tapers shall not exceed a one to one ratio.

Section 10.2 (a) Any Apprentice who works in the geographical jurisdiction of the Union shall be immediately enrolled in the Painters' and Allied Trades District Council No. 30 Joint Apprenticeship and Training Program ("Training Program") which is incorporated and made part of this Agreement. The Apprentice shall be required to attend training classes as prescribed in the Training Program.

(b) Any Apprentice or Apprentice Applicant shall be enrolled in the Training Program effective with the date of hire.

(c) If an Employer has a contractual obligation to another apprentice program and fails to abide by the terms of this Section, the Employer shall nevertheless be obligated to the Funds set forth in Article 9 for all of the contributions required by this Agreement for each hour or fraction thereof that an Apprentice is paid by the Employer or attends the other apprentice program.

(d) An Employer shall provide the Training Fund with the names and social security number of every Apprentice and Apprentice Applicant employed by the Employer within seven (7) days of hiring.

Section 10.3 Except in the final year of his apprenticeship, no Apprentice shall be permitted to take charge of any job or to work on any job unless there is at least one Journeyman employed on the same job.

Section 10.4 From the Employer contribution to the Training Fund set forth in Article 9, the Trustees of the Training Fund shall hold in trust the sum of five ($.05) cents per hour for each hour or portion thereof for which an Employee received pay, and remit said sum to the International Apprenticeship Fund at such regular periods of time and in the manner and form as shall be determined by the Trustees of the International Apprenticeship Fund.

Section 10.5 (a) Before any Apprentice Applicant can work in the Union's geographical jurisdiction, the Employer must obtain a permit from the Union for that Apprentice. If the permit is not obtained, the Apprentice Applicant shall be considered a Journeyman for all purposes under this Agreement, including for wages and fringe benefits. Upon application to the Training Program, an Apprentice Applicant shall be granted a thirty (30) day probationary period from date of employment during which time contributions to the Health and Welfare Fund, Industry Fund, Apprenticeship and Training Fund, Pension Fund, L.M.I.D.F., Painters District Council No. 30 dues check off and Painters' District Council No. 30 Organizing and Defense Fund will not be required.

(b) Apprentice Applicants shall be paid at the rate of fifty (50) percent of Journeymen's wage rate for the first thirty (30) days of employment.

Section 10.6 The regular wage rate for Apprentices shall be the following respective percentages of the then current regular rate for Journeymen:

- 1st Year    50% of Journeymen's wage rate
- 2nd Year    60% of Journeymen's wage rate
- 3rd Year    85% of Journeymen's wage rate
- 4th Year    100% of Journeymen's wage rate

## ARTICLE 11    Employers' Industry Fund

Section 11.1 Each Employer shall contribute an amount to be determined by the Association in each payroll period and shall remit such sums to the Northern Illinois Painting and Drywall Institute ("Employers' Industry Fund") by the due date set forth in Article 9.

Section 11.2 The Trustees of the Employers' Industry Fund, and their successors, shall be appointed by the Association.

Section 11.3 Such contributions shall be applied for the purpose of promoting the painting, decorating and drywall industry in the area covered by this Agreement and shall not be used, directly or indirectly, to the detriment of the parties to this Agreement.

Section 11.4 The Employers' Industry Fund hereby established shall be administered by its Board of Trustees and said Trustees shall establish and maintain a Trust Fund, the terms of which are hereby accepted by the Employers signatory to this Agreement.

ARTICLE 12 **Painters' District Council No. 30**
Labor-Management Idustry Development Fund

**Section 12.1** The Parties agree that a new, jointly-administered Painters and Allied Trades District Council No. 30 Labor-Management Industry Development Fund (L.M.I.D.F.) shall be created for the purposes of developing, implementing and administering industry-improvement related programs.

**Section 12.2** The L.M.I.D.F. hereby established shall be administered by its eight (8) member Board of Trustees, of which four (4) shall be appointed by the Union and four (4) shall be appointed by the Association, and said Trustees shall establish and maintain a Trust Fund, the terms of which are hereby accepted by the Union, Association and Employers signatory to this Agreement.

**Section 12.3** (a) For the duration of this Agreement, and any renewals or extensions thereof, the Employers' Industry Fund shall contribute to the L.M.I.D.F. the sum of ten cents ($0.10) per hour, or fraction of an hour, that any Employee performs Bargaining Unit Work.

(b) Contributions due under this Article shall be remitted in accordance with the provisions and requirements of Article 9 of this Agreement or as otherwise allowed by the Trust Document of the Fund.

ARTICLE 13 **Insurance and Surety Bonds**

**Section 13.1** Each Employer agrees to be bound by the provisions of the Illinois Workers' Compensation Act and the Illinois Workers' Occupational Disease Act and shall submit to the Union certificates of insurance under the Acts or proof of self-insurance before commencing any work covered by this Agreement.

**Section 13.2** Before commencing any work covered by this Agreement, the Employer shall provide a performance or surety bond, in the amount and under the terms set forth below, to insure the prompt and full payment of all contributions, dues/assessments, and wages due in accordance with Articles 4, 8, 9, and 11:

| | |
|---|---|
| $20,000.- | 6 or fewer Bargaining Unit Employees |
| $30,000.- | 7 but fewer than 13 Bargaining Unit Employees |
| $50,000.- | 13 but fewer than 25 Bargaining Unit Employees |
| $75,000.- | 25 or more Bargaining Unit Employees |

**Section 13.3** All bonds shall be in a form acceptable to the Union and the Association and shall:

(i) be written by an insurance carrier authorized, licensed, or permitted to do business in the State of Illinois; or

(ii) be secured by a cash deposit of the full amount of such bond in an account maintained jointly by the Trustees of the Funds; or

(iii) be secured by other assets or personal sureties acceptable to the Trustees which equal or exceed in value the full amount of the bond; or

(iv) be secured by any combination of (i), (ii), and/or (iii) above.

34

35