Section 13.4 The Employer must maintain the bond (or other security arrangement acceptable to the Union) for the term of this Agreement and for a period of six months following the Agreement's termination. Any bond (or other security arrangement) must provide that it shall be payable on written demand by the Union.

Section 13.5 (a) If an Employer fails for any reason to satisfy the bonding requirement of this Article, the Employer or the Employer's corporate officials who are authorized to execute agreements or sign checks, or to designate the persons authorized to do so, shall be personally liable for the wages, dues/assessments, and fringe benefit contributions due under this Agreement or the Funds' Trust Agreements. This Section shall not relieve or excuse in any way any Employer of the obligation to provide the bond required by Article 13.2 nor shall this Section limit the personal liability of any Employer or corporate official based on state or federal laws. An Employer shall be required to submit for an audit any document required by this Agreement and shall provide such records as the Union, or the Funds, considers necessary to enforce the provisions of this Agreement.

(b) Notwithstanding any other provision in this Article, if the performance or surety bond is obtained and maintained in accordance with this Article and provided the Employer has completely and accurately reported and paid on a timely basis for all Bargaining Unit Employees and hours worked under this Agreement, the Employer or the Employer's appropriate corporate officials shall not be personally liable for a delinquency as set forth in Article 13.5 (a).

(c) Article 13.5 (b) shall also apply to the extent that an Employer can establish that a subcontractor(s) has complied with the bonding and reporting obligations pursuant to Article 13.

Section 13.6 An Employer covered by the Illinois Unemployment Compensation Act ("IUCA") shall provide the Union with the Employer's IUCA identification number. An Employer not covered by the IUCA agrees to elect to be bound by the IUCA and shall be personally liable for the payment of IUCA benefits.

## ARTICLE 14  Joint Trade Board

Section 14.1 The Parties to this Agreement agree that in order to maintain equality and fairness within the unionized finishing trades industries, violations of this Agreement must be adjudicated in a manner consistent with maintaining the integrity of the unionized finishing trades. As such, the Parties hereby agree and grant the Painters and Allied Trades District Council No. 30 Joint Trade Board ("Joint Trade Board") exclusive and absolute authority to adjudicate and/or adjust any dispute or grievance under this Agreement in accordance with this Article.

Section 14.2 The Joint Trade Board shall consist of eight (8) members with four (4) members and an alternate appointed by the Union and by the Association. All disputes and grievances under this Agreement shall be referred to the Joint Trade Board, unless as otherwise expressly provided for under this Agreement.

Section 14.3 The Joint Trade Board shall have the right to establish reasonable rules and regulations for its operation and such rules and regulations shall be binding.

Section 14.4 Three (3) members of the Joint Trade Board shall constitute a quorum, provided that at least one (1) member is representing the Union and one (1) member is representing the Association. In the absence of any party's representatives or if there is a vacancy, that party shall be entitled to cast pro rata through the members present the votes of an absent member or vacant position so that at all times the votes of each party shall be equal. Any decision or award of the Joint Trade Board shall be final and binding and shall be enforceable as an arbitration award.

Section 14.5 (a)  The officers of the Joint Trade Board shall be a Chairman and a Secretary-Treasurer. One officer shall be a representative of the Union and the other officer shall be a representative of the Association.

(b)  The Joint Trade Board shall meet once every quarter and at such other times during the year as the Chairman or Secretary-Treasurer determines.

Section 14.6  If the Joint Trade Board finds that an Employer violated this Agreement, the Joint Trade Board is authorized to fashion, in its sole discretion, all appropriate remedies, including but not limited to, awarding actual damages to the aggrieved individual or entity, plus fines not to exceed two thousand five hundred dollars ($2,500) per violation, and assessing liquidated damages, interest, costs, reasonable attorneys' fees, administrative expenses, and auditing fees incurred by the Joint Trade Board. Such remedies and assessments shall also be imposed on the Employer if the Joint Trade Board, any party to this Agreement, or any entity enforcing its rights under this Agreement, obtains judicial enforcement of the Joint Trade Board decision or award.

Section 14.7  If the Joint Trade Board deadlocks, all matters in dispute may be referred to arbitration by either party. The complaining party may submit the matter to binding arbitration before the American Arbitration Association ("AAA") (Labor Dispute Rules) in Chicago. The decision of the arbitrator shall be final and binding. Each party shall bear its own costs but shall share the costs of the arbitrator and of the AAA.

Section 14.8  If the Joint Trade Board finds that a member in good standing of Painters' District Council No. 30 violated this Agreement, Painters' District Council No. 30 shall have the duty to prefer charges against such member.

Section 14.9  If an Employer violates the provisions of Article 8 or Article 17, the Employer shall be required to provide a thirty thousand dollar ($30,000) bond for the life of the Agreement, in addition to any other bond which may be required.

Section 14.10  Each and every Employer and member of the Union pledges upon his honor not to break the rules and regulations embodied herein, which have been promulgated for the improvement and betterment of the entire organized finishing trades in the jurisdiction of Painters' District Council No. 30, and, furthermore, each shall recognize it to be their duty to report immediately to the Trade Board, in writing, any facts, and facts only, pertaining to any violation of the Agreement.

# ARTICLE 15  Miscellaneous

Section 15.1  The Employer shall give notice to the Union in writing not later than ten (10) days after the occurrence of any of the following events relating to the Employer, occurring after the date hereof:

(a)  formation of partnerships;

(b)  termination of business;

(c)  change of name commonly used in business operation;

(d)  change of form of business organization;

(e)  incorporation of business;

(f)  dissolution of corporation;

(g)  name and business organization of successor;

(h)  admission to or withdrawal from any association operating as a multi-employer bargaining agent;

(i)  formation of a L.L.C.

A copy of this notification shall be sent to the Association Secretary.

Section 15.2  The Employer shall maintain an office and telephone where it can be contacted during the usual working hours.

Section 15.3  The Association and the Union shall share equally in the cost of printing copies of this Agreement, which shall bear the union label.

Section 15.4  Employees covered by this Agreement shall, during the life hereof, have the right to respect any legal picket line validly established by any bona fide labor organization. In addition, the Union has the right to withdraw Employees whenever the Employer is involved in a primary labor dispute with any bona fide labor organization. These rights shall not be subject to the jurisdiction of the Joint Trade Board.

Section 15.5 Should any part of, or any provision of this Agreement be rendered or declared invalid by reason of any existing or subsequent enacted legislation, or by any decree of a court of competent jurisdiction, such invalidation of such part or portion of this Agreement shall not invalidate the remaining portions thereof.

Section 15.6 Every Employee hired shall be required to provide the Employer and the Union with a driver's license number or state identification number. Every Employee must have a valid photo identification card issued by the Union. It shall be the Employer's responsibility to ensure that all Employees are in possession of the Union issued photo identification card while employed by the Employer.

Section 15.7 Each Employer shall employ at least one (1) Journeyman.

---

ARTICLE

**The Painters and Allied Trades Labor-Management Cooperation Initiative**

Section 16.1 (a)  Commencing with the 1st day of May, 2008, and for the duration of this Agreement, and any renewals or extension thereof, the Employer agrees to make payments to The Painters and Allied Trades Labor-Management Cooperation Initiative ("LMCI") for each Employee as follows:

(b)  For each hour or portion thereof, for which an Employee receives pay, the Employer shall make a contribution of $.05 to the LMCI.

(c)  For the purpose of this Article, each hour paid for; including hours attributable to show up time, and other hours for which pay is received by the Employee in accordance with the Agreement, shall be counted as hours for which contributions are payable.

(d)  Contributions shall be paid on behalf of any Employee starting with the Employee's first day of Bargaining Unit Work. This includes, but is not limited to, Apprentices and Apprentice Applicants.

Section 16.2 (a)  The Employer and Union agree to be bound by and to the Agreement and Declaration of Trust, as amended from time to time, establishing the LMCI.

(b)  The Employer hereby irrevocably designates as its representatives on the Board of Trustees such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors.

Section 16.3 All contributions shall be made at such time and in such manner as Article 9 of this Agreement provides. The LMCI Trustees may at any time conduct an audit in accordance with the LMCI Agreement and Declaration of Trust. If an Employer fails to make contributions to the

LMCI within twenty (20) days after the date required by the LMCI Trustees, the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provision hereof to the contrary notwithstanding. The Employer shall be liable for all costs of collection of the payments due together with attorneys' fees and such penalties as may be assessed by the LMCI Trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no-strike" clause which may be provided or set forth elsewhere in this Agreement.

**ARTICLE 17 Subcontracting**

Section 17.1 (a)  If an Employer contracts or subcontracts any Bargaining Unit Work to any person, business or proprietor who is not signatory to this Agreement, the Employer shall:

(i)  require such subcontractor to be bound by all the provisions of this Agreement. The signatory Employer shall maintain daily records of the subcontractor and the subcontractor's employees' job site hours and shall be liable for payment of wages, dues check-off, as well as payments to the Funds identified in Articles 9 and 11 of this Agreement for each of such hours worked. The Union may require an Employer to deposit into an escrow the subcontractor's estimated contributions to the Funds.

(ii)  obtain from any subcontractor a list of all of the subcontractor's employees, with address and social security number, a list of the subcontractor's employees performing the subcontracted work, the address and legal description of the property, a brief description of the type of property and a counting of the surfaces subcontracted out, and the subcontractor's price. This information must be submitted in a format approved by the Union before the job starts.

(b)  The Employer which subcontracts must file with the Benefits Office a copy of the subcontractor's contribution report forms as an attachment to the Employer's own remittance reports. A subcontractor is not excused from the obligation to file its own remittance reports.

Section 17.2 Any Employer which sublets or subcontracts any work covered by this Agreement shall be directly responsible and obligated

for the wages, dues/assessments, benefits, and Employee Benefit Fund contributions owed to Employees or to the Funds for work performed for the subcontractor. The terms of this Article shall apply to all Bargaining Unit Work performed directly or indirectly by the Employer or any affiliate or member of the Employer's controlled group.

Section 17.3 To protect and preserve for Employees all work they have performed and all work covered by this Agreement, and to prevent any device or subterfuge to avoid the protection and preservation of such work, it is agreed that if the Employer performs on-site construction work of the type covered by this Agreement, under its own name or the name of another, as a corporation, company, partnership, or other business entity, including a joint venture, wherein the Employer, through its officers, directors, partners, owners, or stockholders, exercises directly or indirectly (through family members or otherwise), management, control, or majority ownership, the terms and conditions of this Agreement shall be applicable to all such work.

44

## ARTICLE 18   Substance Abuse and Recovery Program

Section 18.1 The Employer and the Union agree to the Painters' and Allied Trades District Council No. 30 Substance Abuse and Recovery Program ("Program") as described in this Article 18 and further agree that the Employer may only implement a policy regarding drug and alcohol abuse to the extent that it complies with this Article.

Section 18.2 It is further agreed that the L.M.I.D.F. will establish a Joint Committee on Substance Abuse and Recovery which will be made up of the Trustees of the Fund. This Committee shall meet on the request of any two Trustees at reasonable times and places, but not less than quarterly. The Committee shall be empowered to modify the Program, which shall become binding upon the Employers provided thirty (30) calendar days written notice has been served on the Union and the Association.

Section 18.3 The parties recognize the problems created by drug and alcohol abuse and the need to develop prevention and treatment programs. The Employers and the Union have a mutual commitment to protect people and property, and to provide a safe working environment. The purpose of the Program is to establish and maintain a drug-free, alcohol-free, safe, healthy work environment for all of the Employees covered by this Agreement.

Section 18.4 For the purpose of this Article, the term "Prohibited Substance" shall mean and include any illegal drugs, controlled substances (other than prescribed medications), look alike drugs, designer drugs and alcoholic beverages. For the purpose of this Article the term "Job Site" shall

45

include that portion of the site on which construction or construction related activities are taking place as well as the portion of the site or project which is used for parking and shall also include automobiles, trucks and other vehicles owned or leased by the Employer.

Section 18.5 It is recognized that there are certain medications which may impair the performance of job duties and mental and/or motor functions. In such cases, with the permission of the Employee and after consultation with such Employee's physician, the Employer shall make every effort to accommodate an Employee by reassignment to a job compatible with the administration of such medications, and such Employee shall remain covered under this Agreement.

Section 18.6 (a) Commencing on May 1st, 2008, the Union shall initiate a voluntary drug and alcohol testing program, administered by the L.M.I.D.F, with the testing specimen to be collected by an approved facility. The Program shall be open to all members of Painters District Council No. 30. Persons may voluntarily submit themselves for testing and, if they test negative for alcohol or drugs, will be issued a drug-free card which shall be valid for a period of one (1) year from the date of issuance.

(b) Persons who do not pass the drug and alcohol test will not be eligible to test again for a thirty (30) day period.

(c) Persons who test positive for drugs or alcohol shall receive notification of services that are available through the Program. Such test results will be kept confidential.

(d) Persons who have test results returned as "adulterated" shall be treated as having a positive result and shall not be issued a drug-free card.

(e) Drug test results that are returned "diluted specimen" shall be treated as having a positive result.

(f) Any person may appeal his test results, at which time they will be offered a hair sample test, the results of which shall stand as the final result.

(g) The L.M.I.D.F. shall bear the costs of one voluntary drug test every one (1) year for any member of Painters District Council No. 30. The Employer shall pay for testing "for-cause", and in the event of a negative result, reimburse the Employee for all lost work, travel, and testing time, not to exceed sixteen hours at the then current straight time rate. Such Employee shall be immediately reinstated to his former position.

(h) The burden of compliance is upon the Employer to assure a drug-free workplace, and the Union assumes no liability for the safety of the Employer's facility or workforce. An Employer shall not in any manner file

or assert a claim against or engage in any litigation against the Union, the L.M.I.D.F, or the Funds, on a subrogation theory, contribution theory, or any other theory, in connection with any portion of this Article.

(i) Any Employee, drug-free card holder, or otherwise, may only be tested "for-cause" as allowed for in this Article. If a "drug-free" Employee tests positive for a Prohibited Substance, his drug-free card will be forfeited.

Section 18.7 An Employee who is involved in the sale, purchase, dispensation, distribution, possession, consumption or use of a Prohibited Substance on the Job Site shall be subject to termination in accordance with the terms of this Agreement.

Section 18.8 No pre-employment screening shall be permitted and no random testing shall be permitted except as provided in Sections 18.18 (c).

Section 18.9 An Employee involved or injured in a work place accident may, at the discretion of the Employer, be required to submit to a drug test. It is agreed that under certain circumstances, an Employee whose work performance and/or behavioral conduct indicates that he or she is not in a physical condition that would permit the Employee to perform a job safely and efficiently will be subject to a urine, blood or Breathalyzer test to determine the presence of alcohol or drugs in the body ("for-cause" testing), provided:

(a) The Employer has reasonable grounds to believe that the Employee is under the influence of or impaired by the use of Prohibited Substances. Reasonable grounds include abnormal coordination, appearance, behavior, speech, odor or any detectable amount of a Prohibited Substance. It can also include work performance, safety and attendance problems.

(b) The Employer's reasonable grounds must be confirmed by another management representative in conjunction with a representative of the Union as designated by the Secretary-Treasurer. Both management representatives must describe such grounds in writing prior to any testing being directed.

(c) The Employee will be provided with an opportunity to explain his or her conduct at a meeting with the Representatives, including the Union Representative referred to in Article 18.9 (b).

Section 18.10 An Employee who refuses to submit to a test requested pursuant to Article 18.9 shall be offered the option of securing assistance available through the Program. In the event the Employee refuses to do either, the Employee shall be subject to termination.

participation in an agreed upon treatment program. An Employee who successfully completes a rehabilitation program shall be reinstated to his former employment status, if work for which he is qualified exists.

(c) Employees returning to work after successfully completing the rehabilitation program will be subject to drug or alcohol testing without prior notice for a period of one (1) year. A positive test result will result in termination.

(d) In order to ensure confidentiality in the Program, each Employer shall designate a management Representative as the Employee Assistance Representative for the Employer. This individual shall be the sole representative of the Employer who may be in possession of the Employee's information as it relates to the Program.

(e) This Article shall be the only drug and/or alcohol testing program applicable to Employees.

Section 18.19    Nothing in this Article shall be construed to limit the Employer's right to suspend or terminate an Employee so long as such suspension or termination is otherwise permitted without regard to the provisions of this Article.

49

Section 18.11    All for-cause drug testing shall take place at a recognized medical facility or certified independent laboratory at the expense of the Employer.

Section 18.12    When a test is required, the specimen will be split into two (2) equal testing specimens and identified by a code number, and not by name, to insure the confidentiality of the donor. Each specimen contained will be properly labeled and made tamper proof.

Section 18.13    The handling and transportation of each specimen will be properly documented through strict chain of custody procedures.

Section 18.14    Any sample taken for testing must be tested as follows:

(a) for screening; and

(b) in the event the screening test is positive, for confirmation testing by gas chromatography/mass spectrophotometer (GC/MS).

Section 18.15    Drug testing shall only be conducted by a College of American Pathologists (C.A.P.) or National Institute of Drug Abuse (N.I.D.A.) certified independent laboratory.

Section 18.16    The Employer, all of its medical personnel and the personnel of the laboratory/testing facility shall adhere to the American Occupational Medical Association's ("A.O.M.A.") Code of Ethical Conduct for Physicians Providing Occupational Medical Services and to A.O.M.A. Drug Screening in the Work Place Ethical Guidelines.

Section 18.17    (a) An Employee undergoing for-cause testing shall be placed on an unpaid leave of absence pending results of the screening test.

(b) In the event that the results of the screening test are positive, there shall be confirmation testing by a laboratory selected by the Union. In the event the results of the confirmation testing are negative, the Employee shall be reinstated with back pay. Unless an initial positive result is confirmed as positive, it shall be deemed negative and reported by the laboratory as such.

(c) In the event that results of the confirmation testing are positive, the Employee will be given the opportunity to secure assistance available through the Program. In the event such Employee declines to secure assistance available through the Program, he shall be subject to termination.

Section 18.18    (a) An Employee who fails to cooperate or who fails to live up to the terms and conditions of this Agreement will be subject to termination.

(b) If treatment necessitates time away from work, the Employer shall provide to the Employee an unpaid leave of absence for purposes of

48

# ARTICLE 19    Term and Renewal

Section 19.1 This Agreement shall be in effect until April 30, 2013, and shall continue in effect from year to year thereafter and, unless the Union and the Employer otherwise agree, the Union and the Employer hereby specifically adopt the Agreement between the Union and the Association for the contract period subsequent to April 30, 2013, and each such subsequent Agreement thereafter unless written notice of such termination of the Agreement is given from the Employer or the Union at least one hundred twenty (120) days prior to the expiration of the then current Agreement adopted by reference.

Section 19.2 At least one hundred and twenty (120) days prior to the original termination of this Agreement or prior to the expiration date of any renewal of this Agreement, representatives of the Union and the Association shall convene and meet for the purpose of reviewing the various terms and provisions of this Agreement.

This Agreement shall remain in full force and effect from May 1, 2008 through April 30, 2013.

FCA of Illinois

Date: 1/23/08

Painters District Council No. 30

Date: 1-21-08

50

# APPENDIX A

## International Union of Painters and Allied Trades Union and Industry Pension Fund

The Employer and the Union agree as follows:

1. (a) Commencing with the 1st day of May, 2008, and for the duration of the Agreement, and any renewals or extension thereof, the Employer agrees to make payments to the IUPAT Union and Industry Pension Fund for each Employee covered by this Agreement, as follows:

(b) For each hour or portion thereof for which an Employee receives pay, the Employer shall make a contribution in accordance with Appendices C through F to the above named Pension Fund;

(c) For the purpose of this Article, each hour paid for, including hours attributable to show-up time, and other hours for which pay is received by the Employee in accordance with the Agreement, shall be counted as hours for which contributions are payable;

(d) Contributions shall be paid on behalf of any Employee starting with the employee's first day of employment in Bargaining Unit Work.

(e) The payments to the Pension Fund shall be made to the IUPAT Union and Industry Pension Fund, which was established under an Agreement and Declaration of Trust, dated April 1, 1967. The Employer hereby agrees to be bound by and to the said Agreement and Declaration of Trust, as amended from time to time, as though it had actually signed the same.

2. The Employer hereby irrevocably designates as its representatives on the Board of Trustees such Trustees as are now serving, or who will in the future serve, as employer Trustees, together with their successors. The Employer further agrees to be bound by all actions taken by the Trustees pursuant to the said Agreement and Declaration of Trust, as amended from time to time.

3. All contributions shall be made at such time and in such manner as the Trustees require; and the Trustees may at any time conduct an audit in accordance with said Agreement and Declaration of Trust.

4. If an Employer fails to make contributions to the Pension Fund

within twenty (20) days after the date required by the Trustees, the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provisions hereof to the contrary notwithstanding, and the Employer shall be liable for all costs of collection of the payments due together with attorneys' fees and such penalties as may be assessed by the Trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no-strike" clause which may be provided or set forth elsewhere in this Agreement.

5. The Pension Plan adopted by the Trustees shall at all times conform with the requirements of the Internal Revenue Code so as to enable the Employer at all times to treat contributions to the IUPAT Union and Industry Pension Fund as a deduction for income tax purposes.

## APPENDIX C

### Wage and Contribution Rates Effective May 1, 2008 Through April 30, 2009 for Members of Painters Local Union 209

| | |
|---|---|
| Hourly wage | $29.85 per hour |
| Health and Welfare Fund | $6.75 per hour |
| Painters D.C. 30 Pension Fund | $5.25 per hour |
| IUPAT Pension Fund | $1.50 per hour |
| Apprenticeship Fund | $0.55 per hour |
| Painters D.C. 30 L.M.I.D.F. | $0.25 per hour |
| I.U.PA.T. Labor Management Fund | $0.05 per hour |
| Northern Illinois Painting & Drywall Institute | 1.5% of employee gross wages |

Note: Painters District Council 30 Pension Fund contributions are required on all Apprentices whose membership is in the above referenced Local Union following eighteen (18) months of enrollment in the Painters and Allied Trades District Council No. 30 Joint Apprenticeship and Training Program. This does not excuse the obligation of the Employer, commencing on the first day of employment, to remit pension contributions on behalf of Apprentices that participate in the IUPAT Pension Fund.

55

## APPENDIX B

### Wage and Contribution Rates Effective May 1, 2008 Through April 30, 2009 for Members of Painters Local Unions 97, 154, 488, & 1285

| | |
|---|---|
| Hourly wage | $37.83 per hour |
| Health and Welfare Fund | $6.75 per hour |
| Painters D.C. 30 Pension Fund | $6.75 per hour |
| Apprenticeship Fund | $0.55 per hour |
| Painters D.C. 30 L.M.I.D.F. | $0.25 per hour |
| IUPA.T. Labor Management Fund | $0.05 per hour |
| Northern Illinois Painting & Drywall Institute | 1.5% of employee gross wages |

Note: Painters District Council 30 Pension Fund contributions are required on all Apprentices whose membership is in the above referenced Local Unions following eighteen (18) months of enrollment in the Painters and Allied Trades District Council No. 30 Joint Apprenticeship and Training Program.

54

## APPENDIX E

### Wage and Contribution Rates Effective May 1, 2008 Through April 30, 2009 for Members of Painters Local Union 57

| | |
|---|---|
| Hourly wage | $29.85 per hour |
| Health and Welfare Fund | $6.75 per hour |
| Painters D.C. 30 Pension Fund | $4.15 per hour |
| IUPAT Pension Fund | $2.60 per hour |
| Apprenticeship Fund | $0.55 per hour |
| Painters D.C. 30 LMIDF | $0.25 per hour |
| I.U.P.A.T. Labor Management Fund | $0.05 per hour |
| Northern Illinois Painting & Drywall Institute | 1.5% of employee gross wages |

Note: Painters District Council 30 Pension Fund contributions are required on all Apprentices whose membership is in the above referenced Local Union following eighteen (18) months of enrollment in the Painters and Allied Trades District Council No. 30 Joint Apprenticeship and Training Program. This does not excuse the obligation of the Employer, commencing on the first day of employment, to remit pension contributions on behalf of Apprentices that participate in the IUPAT Pension Fund.

57

## APPENDIX D

### Wage and Contribution Rates Effective May 1, 2008 Through April 30, 2009 for Members of Painters Local Unions 465 and 467

| | |
|---|---|
| Hourly wage | $29.85 per hour |
| Health and Welfare Fund | $6.75 per hour |
| Painters D.C. 30 Pension Fund | $4.45 per hour |
| IUPAT Pension Fund | $2.30 per hour |
| Apprenticeship Fund | $0.55 per hour |
| Painters D.C. 30 LMIDF | $0.25 per hour |
| I.U.P.A.T. Labor Management Fund | $0.05 per hour |
| Northern Illinois Painting & Drywall Institute | 1.5% of employee gross wages |

Note: Painters District Council 30 Pension Fund contributions are required on all Apprentices whose membership is in the above referenced Local Unions following eighteen (18) months of enrollment in the Painters and Allied Trades District Council No. 30 Joint Apprenticeship and Training Program. This does not excuse the obligation of the Employer, commencing on the first day of employment, to remit pension contributions on behalf of Apprentices that participate in the IUPAT Pension Fund.

56

## APPENDIX G

**Effective May 1, 2008 Through the Term of this Agreement**

Zone A will include DeKalb, DuPage, Kane, Kendall and McHenry Counties in the State of Illinois.

Zone B will include Boone, JoDaviess, Lee, Ogle, Stephenson and Winnebago Counties in the State of Illinois.

Zone C will include Bureau, Ford, Fulton, Hancock, Iroquois, Kankakee, LaSalle, Livingston, Marshall, Mason, McDonough, McLean, Peoria, Putnam, Schuyler, Stark, Tazewell and Woodford Counties in the State of Illinois.

## APPENDIX F

**Wage and Contribution Rates Effective May 1, 2008 Through April 30, 2009 for Members of Painters Local Union 607**

| | |
|---|---|
| Hourly wage | $32.65 per hour |
| Health and Welfare Fund | $6.75 per hour |
| Painters D.C. 30 Pension Fund | $3.30 per hour |
| IUPAT Pension Fund | $3.45 per hour |
| Apprenticeship Fund | $0.55 per hour |
| Painters D.C. 30 LMIDF | $0.25 per hour |
| I.U.PA.T. Labor Management Fund | $0.05 per hour |
| Northern Illinois Painting & Drywall Institute | 1.5% of employee gross wages |

Note: Painters District Council 30 Pension Fund contributions are required on all Apprentices whose membership is in the above mentioned Local Union following eighteen (18) months of enrollment in the Painters and Allied Trades District Council No. 30 Joint Apprenticeship and Training Program. This does not excuse the obligation of the Employer, commencing on the first day of employment, to remit pension contributions on behalf of Apprentices that participate in the IUPAT Pension Fund.

## SIGNATURE PAGE

I hereby consent to the terms and conditions of the May 1, 2008 through April 30, 2013 Agreement between Painters' District Council No. 30 and the PCA of Illinois and various Individual Painting, Decorating and Drywall Finishing Contractors including but not limited to the provisions of Article 19.

Company Name _____

Address _____

Signature _____

Title _____

Print name _____

Drivers License # _____

Phone number _____

Date signed _____

Federal Identification # _____

State Unemployment # _____

State Tax # _____

61

---

## SIGNATURE PAGE

I hereby consent to the terms and conditions of the May 1, 2008 through April 30, 2013 Agreement between Painters' District Council No. 30 and the PCA of Illinois and various Individual Painting, Decorating and Drywall Finishing Contractors including but not limited to the provisions of Article 19.

Company Name _____

Address _____

Signature _____

Title _____

Print name _____

Drivers License # _____

Phone number _____

Date signed _____

Federal Identification # _____

State Unemployment # _____

State Tax # _____

60

# PAINTERS DISTRICT COUNCIL NO. 30
## FUNDS COLLECTION POLICY AND PROCEDURES

### EFFECTIVE JANUARY 23, 2008

WHEREAS, the Boards of Trustees ("Trustees") of the Painters District Council No. 30 Pension Fund and Health & Welfare Fund intend to continue to comply with their fiduciary responsibilities to ensure the timely and complete payment of fringe benefit funds contributions to, inter alia, the employee benefit funds listed below,

NOW THEREFORE, the Trustees hereby adopt the following Collection Policy and Procedures ("Procedures"). The employee benefit funds ("Funds") covered by these Procedures are:

Painters District Council No. 30 Health and Welfare Fund

Painters District Council No. 30 Pension Fund

Painters District Council No. 30 Joint Apprenticeship and
    Training Fund

International Union of Painters and Allied Trades Joint
    Apprenticeship and Training Fund

Painters District Council No. 30 Defense Fund

Painters and Allied Trades Labor Management
    Cooperative Initiative

These Procedures shall also apply to Painters District Council No. 30 ("Union") with regard to the collection of Union dues ("Dues") and to the Northern Illinois Painting and Drywall Institute ("NIPDI") with regard to the collection of NIPDI Contributions ("NIPDI Contributions"). Unless otherwise noted, all of the Funds listed above, the Union and NIPDI, as well as any employee benefit fund that may be created in the future to which Contributions may become due under a Collective Bargaining Agreement shall be referred to herein as the "Entities".

63

Section 1. Contributing Employer Delinquency

A Contributing Employer shall be deemed "delinquent" if the Contributing Employer's Payment is post-marked after the 15th day of the month following the month in which the work was performed (the "Due Date"). Contributions to the Funds shall be considered "plan assets" of each Fund as of the Due Date. The Delinquency Committee may extend the time for a Contributing Employer's Payment for good cause, but any extension shall apply only to the specific context and may not be relied upon by other Contributing Employers as a reason for not submitting Payments as required by the Collective Bargaining Agreement. It is within the Delinquency Committee's sole discretion to decide whether to extend the time for a Contributing Employer's Payment, and the granting of any such extension does not constitute a waiver of the Entities' rights under these Procedures.

Section 2. Liquidated Damages

A.  In the case of delinquent Contributions where no audit has been conducted, liquidated damages are due within ten (10) days of the date of the Delinquency Committee's notice of assessment. A delinquent Contributing Employer shall pay liquidated damages equal to 5% of the total Contributions owed for the 1st month of the delinquency, 10% of the total Contributions owed for the 2nd month of the delinquency, 15% of the total Contributions owed for the 3rd month of the delinquency and 20% of the total Contributions owed if the delinquency extends into a 4th month or thereafter. In the event that liquidated damages are not paid within ten (10) days from the date of the Delinquency Committee's notice of assessment, interest shall be assessed on the liquidated damages in accordance with Section 4 of these Procedures.

B.  In the event that Audit Findings reveal Delinquencies, the auditor shall compute liquidated damages at the rate of 20% for all delinquent Contributions. In the event that the Audit Findings are not paid within **fourteen (14) days** from the date of the audit, then interest shall be assessed on the liquidated damages in accordance with Section 4 of these Procedures.

65

---

The Entities hereby delegate, as evidenced by their signatures below, authority to the Painters District Council No. 30 Fringe Benefit Funds Delinquency Committee ("Delinquency Committee") to collect Payments as required by the Collective Bargaining Agreement due to each Entity. The Office of Organizational Development manages the collections on behalf of the Delinquency Committee.

Definitions

A.  "Audit Findings" are the results of an audit conducted by the Entities' designated agent of a Contributing Employer, its affiliates and/or controlled group's books and records to ensure the Contributing Employer's compliance with the Collective Bargaining Agreement(s) and the Funds' Trust Agreements. Audit Findings may include Payments, interest, liquidated damages, costs and fees.

B.  "Collective Bargaining Agreement(s)" can be one or more labor agreements between the FCA of Illinois (the "Association") and the Union, a Non-bargaining Participation Agreement, a project labor agreement, or the International Union of Painters and Allied Trades National Agreement.

C.  "Contributions" are fringe benefit funds contributions which a Contributing Employer is obligated to pay pursuant to the terms of the Collective Bargaining Agreement(s).

D.  "Contributing Employer" is an employer which has indicated its assent to and is bound by at least one Collective Bargaining Agreement.

E.  "Delinquency" or "Delinquencies" are fringe benefit funds Contributions and/or NIPDI Contribution and/or Dues which a Contributing Employer is obligated to pay under the Collective Bargaining Agreement(s) but has failed to pay on a timely basis.

D.  "Payments" are all fringe benefit funds contributions, NIPDI contributions and Union dues which a Contributing Employer is obligated to pay under the Collective Bargaining Agreement(s).

64

C. The Trustees find that the liquidated damages are a reasonable approximation of the actual damages suffered by the Funds when Contributions are delinquent and because computation of the actual damages to the Funds in each case of a Delinquency would be extremely difficult.

Section 3.  Waiver of Liquidated Damages

A. The Contributing Employer may seek a waiver of the liquidated damages for delinquent Contributions if it (a) has paid the delinquent Contributions and (b) sends a written request to the Delinquency Committee stating the reasons for the late payment of the Contributions. The Contributing Employer must submit the written request within three (3) months of the date of the Delinquency Committee's notice of assessment.

B. The Contributing Employer may seek a waiver of the liquidated damages resulting from Audit Findings if it (a) has paid the Audit Findings and (b) sends a written request to the Delinquency Committee stating the reasons why the liquidated damages should be waived. The Contributing Employer must submit the written request within three (3) months from the date of the audit report.

C. The Delinquency Committee shall review all requests for waiver of liquidated damages. A Contributing Employer may request only one such waiver in an eighteen month period. A Contributing Employer's request for a waiver of liquidated damages does not relieve it of its obligation to pay liquidated damages within ten (10) days from the date of the Delinquency Committee's notice of assessment or within fourteen (14) days from the date of the audit as required under Section 2. The Delinquency Committee shall have the sole and exclusive discretion to determine whether a whole waiver, partial waiver or no waiver is appropriate. If the Contributing Employer is awarded such a waiver it will be required to sign a written agreement requiring it to remain current with all Contributions for a period of twelve (12) months. Failure to do so will result in a reinstatement of previously waived liquidated damages. The granting of any waiver of liquidated damages by

the Delinquency Committee does not constitute a waiver of the Entities' rights under these Procedures.

Section 4.  Interest and Attorneys Fees

All Contributions, including interest and liquidated damages assessed on delinquent Contributions, are assets of the Funds. Interest shall be assessed on any delinquent Contributions and on late liquidated damages. In the event that Contributions and/or liquidated damages are not paid on a timely basis, interest shall be assessed as follows:

A. Interest on the delinquent Contributions, and/or late liquidated damages, shall be computed at the rate of 1.5% per month compounded monthly. Interest on delinquent Contributions shall begin to accrue as of the Due Date and interest on late liquidated damages shall begin to accrue as of the date of the assessment of liquidated damages.

B. The reasonable costs and attorneys' fees incurred by the Funds in compelling an audit or in attempting to collect any Delinquency, interest and/or liquidated damages owed to the Funds shall be assessed against the delinquent Contributing Employer.

Section 5.  Returned Payments

If any Payment from a Contributing Employer is returned to the Entities for any reason, including for insufficient funds in the Contributing Employer's bank account, the Trustees may require the Contributing Employer to submit all future Payments to the Funds in the form of either a cashier's or a certified check for a period of time not less than six (6) months. Additionally, a returned Payment constitutes a Delinquency and is therefore subject to the assessment of liquidated damages (Section 2) and interest (Section 4) and a $25.00 assessment fee, per check.

Section 6.  Application of Payments Received from a Delinquent Contributing Employer

All Payments received by the Entities from a delinquent Contributing Employer shall be applied to satisfy or reduce the delinquent Contributing Employer's obligations to the Entities in the following order: any Payment shall be first applied pro-rata to the outstanding amounts due for the earliest delinquent month; if a delinquent Contributing Employer's

obligation for a month is not satisfied in full as a result of the Payment, then Payment shall be applied first to any interest due, next to the liquidated damages due and finally to the Delinquency due for that earliest delinquent month;

B.  once all Delinquencies, interest and liquidated damages have been satisfied, then Payment shall be applied to any costs and attorneys' fees incurred by the Funds;

C.  once all Delinquencies, interest, liquidated damages and costs and attorneys' fees have been satisfied, then Payment shall be applied to any current, non-delinquent obligations of the Contributing Employer.

In certain cases and in the exercise of its sole discretion, the Delinquency Committee may apply Payments received from a delinquent Contributing Employer in an order different from the order stated above. Any deviation from the above stated order does not constitute a waiver of the rules set forth in these Procedures.

Section 7. Audits

Upon written request from the Entities' representatives or their agents ("Agents"), a Contributing Employer shall furnish to the Agents all information requested to determine whether the Contributing Employer has performed fully its obligations under the Collective Bargaining Agreement(s) and/or the Funds' Trust Agreement(s). Such information may include, but is not limited to payroll and employer tax information, IRS forms 1099 and 1096, cash disbursement journals, check registers, general ledgers, employee listings and job classifications, invoices from vendors, other union benefit fund reporting reports, and affiliated company and controlled group records. The Entities' respective officers and Trustees, or their Agents, shall have the right to enter upon the premises of any Contributing Employer upon reasonable notice to examine and copy the necessary books and records of the Contributing Employer, regardless of whether the books and records are contained in written or electronic form.

The Delinquency Committee has sole discretion to address all matters involving disputes regarding the Audit Findings or offers of compromise with regard to audits and assessments, including, but not limited to, the assessment of liquidated damages, interest, and attorneys' fees and costs. If the Contributing Employer disputes the Audit Findings it is nevertheless required to pay one-half of the Audit Findings while the disput-

ed issues are investigated and a determination is made by the Delinquency Committee. If the Delinquency Committee determines that adjustments to the Audit Findings are necessary and appropriate, and that the Contributing Employer's earlier payment of one-half of the Audit Findings is greater than the amount which the Contributing Employer owes under the revised Audit Findings, the Funds shall reimburse the Contributing Employer for the difference.___

The Entities shall have the right to conduct an audit of all new Contributing Employers within six (6) months after the Contributing Employer becomes a signatory to the Collective Bargaining Agreement(s).

Section 8. Promissory Notes

If extenuating circumstances are present, the Delinquency Committee may, in its sole discretion, permit a Contributing Employer to enter into a promissory note with the Entities. The promissory note shall not exceed twelve (12) months in duration, and interest on the total amount owed will be calculated at the current prime rate, as reported by the Wall Street Journal on the first business day of the month, plus two (2) percentages points. As a condition precedent for entering into a promissory note with the Entities, the Contributing Employer (a) must provide the Entities with appropriate collateral while the promissory note is in effect, and (b) shall remain current with all Payments to the Entities so long as the promissory note is in effect.

Section 9. Violation of Collective Bargaining Agreement(s) and Declaration of Trust

A Contributing Employer's failure to make timely Payments as required by the Collective Bargaining Agreement(s) or any other sum required by these Procedures shall be a violation of the Contributing Employer's obligations under the respective Collective Bargaining Agreement(s) and the Funds' Trust Agreement(s).

Section 10. Rules for Habitually Delinquent Contributing Employers

The Delinquency Committee shall have the authority to adopt special rules for habitually delinquent Contributing Employers. These rules may include, but are not limited to, requiring the habitually delinquent Contributing Employer to provide a cash or surety bond in favor of the Entities to ensure timely Payment, or to remit Payments on a

weekly basis or twice monthly, as determined by the Delinquency Committee. The determination of whether a particular Contributing Employer is habitually delinquent is within the sole discretion of the Delinquency Committee.

Section 11.  Estimation of Delinquency

When a Contributing Employer (a) is two (2) or more months delinquent and has failed to submit the required Payments and/or fringe benefit Contribution Report Forms, or (b) fails to submit the requested documentary records for any part of an audit period, the Delinquency Committee may estimate the Payments due as being the greater of the average of the monthly reported Contributions due or Payments submitted by the Contributing Employer for the last three (3) months for which Contribution Report Forms or Payments were submitted, or the average of the monthly reported Contributions due or Payments submitted by the Contributing Employer for the last twelve (12) months for which Contribution Report Forms or Payments were submitted, **or such other methods as the Delinquency Committee deems appropriate.**

This estimated Delinquency may be used by the Delinquency Committee in the event a civil action is instituted by the Entities to recover Payments due resulting from an audit or from a delinquent Contributing Employer's failure to make Payments on a timely basis as required under the Collective Bargaining Agreement(s) and/or Trust Agreements.  The Delinquency Committee shall have the authority to assess interest, liquidated damages, attorneys' fees and costs on the estimated Delinquency.

Section 12.  Overpayments

If a Contributing Employer makes an overpayment of Contributions by mistake of fact or law to the Funds, the Contributing Employer must notify the Delinquency Committee in writing no later than six (6) months after the first overpayment and must inform the Delinquency Committee of the identity of the person(s) on whose behalf it made the overpayment, the dates and amounts of the overpayments, the reason(s) why the overpayment was made and make a request for an adjustment.  The Delinquency Committee shall investigate the matter and, in its sole discretion, shall decide whether to return any portion of the overpayment.  In making its decision, the Delinquency Committee may take into consideration certain factors, including whether the Funds relied upon the Contributing Employer's Contribution Report Forms to extend coverage to the Contributing Employer's employees.  If the

Delinquency Committee decides to return an overpayment, or portion thereof, it shall do so within six (6) months of determining that the overpayment was made by mistake. In no case shall the Delinquency Committee return an overpayment that is more than six (6) months old.

# EXHIBIT

# 2

LAW OFFICES

## JACOBS, BURNS, ORLOVE, STANTON & HERNANDEZ

122 SOUTH MICHIGAN AVENUE, SUITE 1720

CHICAGO, ILLINOIS 60603-6145

(312) 372-1646

FACSIMILE: (312) 580-7175

WWW.JBOSH.COM

BRANDON M. ANDERSON
THOMAS J. ANGELL
LAURIE M. BURGESS
JOSEPH M. BURNS
EDWARD R. GALE
MARISEL A. HERNANDEZ*
M. GARRETT HOHIMER
DAVID HUFFMAN-GOTTSCHLING
WILLIAM W. LEATHEM
ANITA TANAY
SHERRIE E. VOYLES**

*ALSO LICENSED IN NEW YORK & NEW JERSEY
**ALSO LICENSED IN MICHIGAN & OHIO

OF COUNSEL:
GERALD BARRETT
IAN J. ELFENBAUM
CHARLES ORLOVE
RICHARD M. STANTON

JOSEPH M. JACOBS 1931-1995
ALBERT GORE 1956-1974
MARTIN J. BURNS 1960-1999
ROBERT S. BATES, JR. 1983-1996

May 13, 2008

Joseph P. Berglund
Berglund & Mastny, P.C.
900 Jorie Blvd., Ste. 122
Oak Brook, IL 60523-3823

Re:  Painters District Council No. 30 v. Vinco Painting Inc.
     Case No. 08-cv-1163

Dear Joe:

This is to confirm our telephone conversation this afternoon regarding the scope of the upcoming depositions of Charles Anderson and James Stelmasek. We agreed that the depositions would proceed on Monday morning, May 19, 2008, beginning at 9:30 AM at your offices.

During our conversation, I expressed my concern that the scope of the depositions be limited to the sharply limited number of disputed issues in the case, which I articulated as (a) whether your client had notice of the proceedings, (b) whether the JTB's findings contravened the provision in the contract limiting fines to $1,000 per violation, and (c) whether the JTB heard evidence at the January 2008 hearing and determined that Vinco violated the contract. Of course, issue (b) is an issue of law, not of fact, and issue (c) is largely settled by the minutes of the meeting that I produced to you.

You gave me your assurances that you would not inquire during the deposition into the thought processes or deliberations of the JTB or into the merits of the underlying grievances. You mentioned that you would likely inquire into alleged conversations between the deponents and your client following the January JTB meeting that you claimed would shed light on the issue of the contractual caps on fines. While I am not convinced that such inquiry can have any relevance at all and will likely object to it, given your other assurances I will not on the basis of that potential inquiry alone seek a protective order.

While I have no reason to expect this to occur, if questioning during the deposition contravenes these assurances so as to annoy, embarrass, or harass my client, we will stop the deposition and seek the Court's guidance. If you believe I have misstated or omitted anything pertinent from our discussion, please so advise.

Very truly yours,

David Huffman-Gottschling

c:  Charles E. Anderson



EXHIBIT

2

# EXHIBIT

# 3

**PAINTERS DISTRICT COUNCIL 30 JOINT TRADE BOARD**
**March 13, 2008**

The meeting of Painters District Council 30's Joint Trade Board was called to order at 9:00 a.m. by Chairman Justin Avey.  In attendance representing Painters District Council No. 30 were Charles E. Anderson, Aaron Anderson, Brian Muscat, Mark Guethle and Todd Dotson, representing the FCA of Illinois  were Joe Maring, Michael LeGood, Justin Avey and Rick Vandegraft.

Minutes of the previous meeting had been distributed by e-mail.  A motion was made, seconded and passed to accept the minutes as presented.

Secretary-Treasurer Anderson provided a status report on Vinco to the Board.  He stated suit had been filed against Vinco for non-compliance with the Collective Bargaining Agreement, disregard for the Trade Board ruling and delinquent contributions to the Funds.

Secretary-Treasurer Anderson informed the Board that Tricor Carpentry was appealing the decision of the Trade Board.  Anderson stated Tricor Carpentry was present and wished to address the Board.  The Board agreed to re-open the hearing and allow Tricor Carpentry to appear before the Board.  James Stelmasek, Director of Membership Servicing and District Council 30 Organizer, Lionel Espinoza (acting as an interpreter) and Member Jorge Vargas were in attendance as well as James Weber and Robert Sebastian of Tricor Carpentry.  After hearing the testimony from both parties as they related to the hearing the Board's decision was as follows:  TRICOR's fine for not reporting all jobs to Painters District Council 30 was reduced to a $10,000.00 fine which will held in abeyance for a period of twelve months, provided all job reports are received at the District Council office no later than the end of business on March 14, 2008.  In addition, Tricor Carpentry was instructed to send a settlement payment made payable to Jorge Vargas in the amount of $3,000.00 and a payment of delinquent contributions due on behalf of Mr. Vargas in the amount of $588.57 made payable to Painters District 30's Funds, to Painters District Council 30's office within ten days of the hearing.

**The next meeting of the Joint Trade Board was scheduled for May 14, 2008 at 9:00 a.m.**

No further business was brought before the Board the meeting was adjourned.

Respectfully submitted
Charles E. Anderson
Secretary-Treasurer

**EXHIBIT**
tabbies
_3_